# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**DERRICK JACOBS**                         **CIVIL COMPLAINT NUMBER:  19-CV-4616**

  **V.**

**CITY OF PHILADELPHIA, et al.**

### PLAINTIFF'S DERRICK JACOBS BRIEF IN SUPPORT OF ITS RULE 56 MOTION FOR SUMMARY JUDGMENT

SUBMITTED BY:

DERRICK JACOBS
PLAINTIFF
PRO SE
PO BOX 1454
BERLIN, MD 21811
derrickjacobs9116@gmail.com

Derrick Jacobs
Plaintiff
Pro Se
Date: December 29, 2023

## PRELIMINARY STATEMENT

This matter stems from the plaintiff's attempts to report criminality and corruption of the part of City of Philadelphia public officials. On September 27, 2018, public officials learned of the plaintiff's attempts to report their corruption and retaliated immediately. Believing the plaintiff was "only" attempting to report the illegal criminal prosecution of former Philadelphia Police Officer Ryan Pownall the defendants conspired by fabricating a grand jury leak in the Pownall matter to maliciously prosecute the plaintiff to ensure his silence.

In order to advance his criminal agenda Krasner has routinely and illegally arrested law enforcement officers. In recent Pennsylvania history, three top prosecutors have gone to prison (Ernie Preate, Kathleen Kane, and R. Seth Williams). In the plaintiff's professional law enforcement opinion, the three named prosecutors combined cannot match Krasner's level of criminal malfeasance. Krasner has conspired with members of the Philadelphia Police Department's Internal Affairs Division ("IAD") to accomplish his retaliatory goals against sworn law enforcement officers.

The plaintiff was one of the first "targets" of Krasner's Conviction Integrity Unit ("CIU"). The unit was formed by District Attorney Lawrence Krasner to fleece the City of Philadelphia of millions of dollars while making the City more dangerous under the guise of criminal justice reform. The defendants attempted to release the murderer of a four (4) year old little girl to retaliate against the plaintiff.

**As a result of the filing of this complaint, the plaintiff has experienced numerous additional acts of retaliation, including bias actions by this Court.**

Lawrence Krasner ("Krasner") was sworn in as Philadelphia District Attorney ("DA") on January 2, 2018. Mr. Krasner immediately began to target the plaintiff and his law enforcement

partner, who were assigned to the Philadelphia Police Department's Officer Involved Shooting Investigation Unit ("OISI"). Mr. Krasner reported to plaintiff's superiors that the plaintiff's partner was taking "pro police" interviews and was "affiliated" with the Fraternal Order of Police ("FOP"). When the Commanding Officer responded, asking for specifics, Krasner did not respond.

On January 13, 2018, the plaintiff was the assigned detective of the first Officer Involved Shooting ("OIS") with Krasner as DA. The OIS involved Stefon Crawley ('Crawley"), who attempted to kill multiple police officers in the area of 2865 Kensington Avenue. Crawley was yelling at the officers, "ya'll going have to kill me" while attempting this feat. During the incident Crawley was shot, arrested on location, and transported to the hospital for treatment of his injuries. The Philadelphia District Attorney's Office ("DAO") did not contact the plaintiff and did not clear the officers to testify against Crawley. Crawley was represented by Krasner's former law partner, James Funt. After not clearing the Officers to testify, the DAO withdrew all charges against Crawley.

On February 20, 2018 Krasner attempted have a murderer released by claiming the plaintiff as his partner coerced the defendant's confession, who shot his four year old daughter in the back of head and killed her. Krasner's Chief of Homicide, Anthony Voci, informed Krasner he would not be able indict the detectives (*see also Detective James Pitts)* in an effort to "exonerate" the killer because the detectives' investigation was beyond reproach. Krasner and Voci subsequently accepted the killer's "sweetheart" plea deal for killing his four year old daughter.

In February 2018, Krasner began a malicious prosecution of former Philadelphia Police Officer, Ryan Pownall.

In September 2018, the plaintiff viewed the grand jury Presentment authored by Krasner and Assistant District Attorney Tracy Tripp ("Tripp") against former Philadelphia Police Officer, Ryan Pownall, as it related to an OIS that occurred on June 8, 2017 (prior to Krasner becoming DA). Since the plaintiff played a pivotal role in the Pownall OIS involving David Jones, he knew the information in the Presentment was intentionally and criminally falsified in order to obtain the indictment against Pownall.

On September 27, 2018, with knowledge of the above listed actions by the DAO, the plaintiff sought consultation from an attorney he observed inside of the Criminal Justice Center ("CJC"). After learning of the plaintiff's consultation with the attorney, the defendants initiated a criminal proceeding against the plaintiff and his partner. Believing the plaintiff's consultation with the attorney was regarding their criminal actions against Pownall, the defendants fabricated a concocted tale of a grand jury leak that never occurred regarding the Pownall grand jury the plaintiff and his partner never participated in. *Note: The plaintiff has never waived his privilege with the attorney. As a result, the defendants, to present day, still don't know what issues the plaintiff discussed with the attorney.* Tripp informed defendant Hendershot and others the criminal proceeding was initiated against the plaintiff to ensure his silence until after the Pownall criminal trial. The defendants held the threat of criminal prosecution over the plaintiff's head for almost a year (August 1, 2019) when defendant Tripp informed the plaintiff she was withdrawing criminal prosecution against the plaintiff.

Due to the plaintiff's knowledge of various criminal actions, including the information referenced above, Krasner and his conspirators placed a proverbial "hit" out on the plaintiff to prevent the exposure of their criminal activity.

**NATURE AND STAGE OF PROCEEDINGS**

The pro se Plaintiff filed this complaint on October 4, 2019.

The Court dismissed this complaint on April 9, 2020.

The Plaintiff appealed to the Third Circuit Court of Appeals on May 6, 2020 (20-1967).

On December 1, 2020, The Third Circuit Court of Appeals remanded in part and vacated in part the Court's April 9, 2020 dismissal and remanded the complaint for further proceedings.

On June 16, 2021, The Court dismissed this complaint for a second time.

The pro se Plaintiff appealed this complaint to the Third Circuit Court of Appeals for a second time on July 12, 2021 (21-2314).

On June 1, 2022, The Third Circuit Court of Appeals remanded in part and vacated in part the Court's June 16, 2021 dismissal and remanded the complaint, once again, for further proceedings.

**STATEMENT OF QUESTIONS INVOLVED**

Whether Plaintiff, Derrick Jacobs, is entitled to Summary Judgment for First Amendment Retaliation

Whether Plaintiff, Derrick Jacobs, is entitled to Summary Judgment for First Amendment Retaliation Malicious Prosecution

Whether Plaintiff, Derrick Jacobs is entitled to Summary Judgment for First Amendment Retaliation Conspiracy

Whether Plaintiff, Derrick Jacobs is entitled to Summary Judgment for violations of Pennsylvania Whistleblower Law

Whether Plaintiff, Derrick Jacobs is entitled to Summary Judgment for Intentional Infliction of Emotional Distress against the plaintiff

**STATEMENT OF UNDISPUTED FACTS**

    A. Prior to becoming Philadelphia District Attorney, Lawrence Krasner had proclaimed an adversarial relationship against the Philadelphia Police Department and Philadelphia Police Officers. A Philadelphia Inquirer article posted by Mensah Dean on January 12,

2018, Krasner stated in reference to Philadelphia Police Officers not being prosecuted in OIS in over twenty years stated "this ain't fair, this is biased." Krasner entered the DAO with a predetermined opinion that Philadelphia Police Officers should be prosecuted for OIS and the fact they were not were "bias."

B. Philadelphia Police Officer Ryan Pownall was involved in an OIS on June 8, 2017. The shooting resulted in the death of David Jones. OISI conducted an extensive investigation of the OIS. The plaintiff was an investigator assigned to OISI and participated in the investigation. The Pennsylvania Attorney General's Office ("PAGO") was assigned as prosecutors in the investigation due to a conflict of interest with the DAO involving Pownall. On November 3, 2017, Deputy Attorney General Christopher Phillips ("Phillips") held a conference with the plaintiff, and the sole adult witness. After the conference Phillips informed the plaintiff, that the investigation revealed there was no "probable cause" to arrest Pownall, and the investigation would be concluded with no charges. Phillips informed the Plaintiff the PAGO had wanted to confirm the facts of the investigation before determining/issuing conclusion. The plaintiff immediately informed his Commanding Officer, Lieutenant Steve Nolan, and the assigned detective Brian Newell of the PAGO conclusions. On November 13, 2017, Krasner's surrogate/associate Asa Khalif ("Khalif") stormed the PAGO where the conference was held, identifying himself as part of Black Lives Matter. Khalif demanded to speak with the Attorney General ("AG"). Khalif began to vandalize the facility and was subsequently arrested. While being placed under arrest Khalif began to yell "somebody should kill the Attorney General, and maybe we should kill the Attorney General." On January 2, 2018, Krasner became DA of Philadelphia. Without informing OISI, the assigned detective, and the Commanding Officer of OISI, Krasner and the DAO retrieved the Pownall OIS from the PAGO prior to the PAGO authoring the decision/findings of no criminal charges against Pownall. In May of 2018 Tripp contacted the assigned detective, Brian Newell. Tripp wanted Newell and the plaintiff sworn into a grand jury. The grand jury was to determine if criminal charges were to be filed against Pownall for the OIS involving David Jones on June 8, 2017. This was the first indication that something was amiss at the DAO. After receiving knowledge of the grand jury against Pownall and the swearing in, the plaintiff informed OISI personnel that all members would now have to be sworn into the grand

jury in order to discuss the case. After Krasner and Tripp authored the "presentment" used to indict Pownall for Murder and related charges. The plaintiff, after returning from vacations, viewed the presentment along with other OISI members. The presentment was littered with intentional fabrications and did not contain numerous items of exculpatory evidence, in violation of *Brady v. Maryland*. The plaintiff immediately the discrepancies with Hendershot, who agreed. *Note: The plaintiff was unaware that Hendershot had authored the illegal affidavit at the time.*

C.   On January 13, 2018, Stefon Crawley attempted to kill multiple police officers in the area of 2865 Kensington Avenue. Crawley was shot by police and arrested. **This was one day after the January 12, 2018 Philadelphia Inquirer article in which Krasner stated the lack of prosecutions in OIS is "biased."** Krasner, as a lawyer and now prosecutor had made this claim without any factual support, only the venom he possessed towards law enforcement officers, which continues to this very day.

D.   On February 20, 2018, Maurice Stephon Phillips pled guilty to murder. Prior to pleading guilty, Krasner and his new Conviction Integrity Unit ("CIU") attempted to "exonerate" Phillips by getting the defendant to lie, stating his confession was coerced by the plaintiff and his partner. This was an attempt to indict the plaintiff and his partner, which would cause their dismissal from the Philadelphia Police Department and cost the City millions of dollars. When that failed, Krasner continued to pressure the plaintiff's superiors to remove the plaintiff.

E.   On September 27, 2018, the plaintiff attempted to report the above listed acts of corruption and criminality by consulting with an attorney. The defendants immediately initiated a criminal proceeding against the plaintiff and threatened him with arrest unless he remained silent on reporting corruption.

F.   On August 1, 2019, defendant Tracy Tripp informed the plaintiff she was withdrawing the criminal prosecution of the plaintiff.

G.   On October 4, 2019, the plaintiff filed this complaint.

H.   On October 17, 2019, the plaintiff served defendants with this complaint.

I.   On November 18, 2019, Ralph Cipriano authored an article on the website BigTrial.net. The article outlined the allegations made by the plaintiff in this lawsuit. On that same date the plaintiff's Commanding Officer, Jason Hendershot threatened to confiscate the

plaintiff's City issued law enforcement vehicle. When the plaintiff informed Hendershot it was retaliation, he decided against taking the vehicle. Hendershot also shut down the plaintiff's mobile communication devices, preventing the plaintiff from receiving law enforcement notifications.

J.  On January 18, 2020, the plaintiff participated in a podcast to discuss this lawsuit and the criminal activity and corruption being committed by the defendants.

K.  On January 21, 2020, Hendershot informed the plaintiff Deputy Police Commissioner Dennis Wilson wanted disciplinary action taken against the plaintiff for his participation in the podcast, discussing corruption, criminality, and his federal lawsuit.

L.  On February 11, 2020, Inspector DF Pace authored and approved the retaliatory disciplinary charges against the plaintiff without the plaintiff violating any departmental rule or regulation. The plaintiff also did not commit any crime.

M.  On March 12, 2021, the defendants constructively discharged the plaintiff from his employment with the City of Philadelphia and the Philadelphia Police Department for the filing of his federal lawsuit(s) and his reporting of public corruption and criminality.

N.  On April 21, 2021, Ben Mannes of Philadelphia Weekly magazine authored an article outlining the plaintiff's lawsuit and reports of public corruption by the defendants. On the same date the Philadelphia Police Department's internal criminal division initiated a criminal investigation into the plaintiff.

O.  **Deposition of Lieutenant Jason Hendershot**: On November 17, 2023, the plaintiff deposed defendant Lieutenant Jason Hendershot ("Hendershot"). The plaintiff asked Hendershot the following questions during the deposition. *Note: Due to numerous FRCP discovery violations by counsel for the defendants, the plaintiff cited Hall v. Clifton Precision prior to the examination of defendant Hendershot.  On October 4, 2023, the Court prejudiced the plaintiff by restricting deposition questions of defendant Hendershot based upon the defendants' fabricated statement to the Court of an "ongoing" criminal investigation into former Philadelphia Police Officer Ryan Pownall. There are no facts in the record to support the fabricated statement and subsequent Order. The plaintiff cited facts submitted into the record of a document authored by defendant Hendershot of the "fact" there is no "probable cause" that exists of ever existed to support the arrest of former Philadelphia Police Officer Ryan Pownall. Plaintiff's counsel threatened to*

terminate the deposition, citing the prejudicial ruling of the Court. Hendershot deposition at 19-20. Counsel violated Hall at 24, to "coach" his client.

Q. ...In Jacobs' disciplinary documents you stated he divulged staffing levels. What staffing levels that was not publicly available did Jacobs divulge?

A. Staffing levels of the Officer Involved Shooting Investigation Unit.

Q. Were those staffing levels already available to the public?

A. I have no idea. I don't believe so.

Q. Did you check?

A. No, I did not. *Hendershot deposition at 31-32.*

Q. Prior to the podcast, did members of the Officer Involved Shooting Investigation Unit inform you, including the plaintiff, inform you that the District Attorney's Office was committing criminal acts?

A. I don't recall specific conversations and when they were. So I just don't recall.

Q. You don't recall members of your unit telling you in "group settings" that the District Attorney's Office was committing criminal acts. You don't recall any of that?

A. I don't recall "when" they occurred. *Hendershot deposition at 40-41*

Q. Did Detective Brian Newell tell you that the District Attorney's Office was committing criminal acts?

A. Not that I specifically remember.

Q. He didn't tell you that Tracy Tripp authored a false presentment to lock up Officer Ryan Pownall?

A. I don't recall.

Q. Detective Newell never prepared a report to you stating inconsistencies of Tracy Tripp's presentment in order to arrest Ryan Pownall?

A. A report? I never received an "official" report.

Q. Did he ever mark up the grand jury presentment showing the inconsistencies that Tracy Tripp placed in the presentment to arrest Ryan Pownall?

A. I vaguely remember something like that.

Q. And you did not consider that a criminal act?

A. I don't remember exactly what anyone else said.   *Hendershot deposition at 42-43.*

Q. …When you conducted the interview of Detective Jacobs and at the time when the interview was completed, based upon the questions that you asked and the answers that were provided on that date, did you subsequently seek to interview Deputy Police Commissioner Dennis Wilson?

A. No.

Q. So you did not attempt to reconcile any answer provided by Detective Jacobs in that interview, did you?

A. I felt there was no need to. *Hendershot deposition at 75.*

Q. Who was present during the plaintiff's disciplinary interview?

A. FOP representative. I believe it was Scott Bradley if I'm not mistaken.

Q. And FOP representative Scott Bradley stated he was a friend of Deputy Police Commissioner Dennis Wilson; is that correct?

A. I vaguely remember something like that, yeah. Again, did he say those exact words, I'm not sure, but yeah, something like that.

Q. When you informed FOP representative Scott Bradley and the plaintiff that Chief Inspector Frank Vanore had told Deputy Commissioner Wilson that his discipline of the Plaintiff would be looked at as retaliation, and he replied – he told Deputy Commissioner Wilson the same thing, did you agree with the FOP representative Scott Bradley's statement?

A. Yeah, I don't recall the "exact" conversation or what he said in regards to that. Again, it's years ago. *Hendershot deposition at 87-88.*

Q. Did there come a time where Inspector Smith, prior to him leaving the detective bureau, admonish you in front of the unit?

A. Yes.

Q. Okay.

A. It was either Inspector Smith or Chief Inspector Kelly. I can't recall which one.

Q. And what was the reason for that admonishment?

A. The reason for that admonishment was in regards to the presentment and subsequent arrest of Ryan Pownall. *Hendershot deposition at 91-92*

Q. You just stated that it was a result of the presentment and the subsequent arrest of former police officer Ryan Pownall. What about that presentment and that arrest caused

the chief inspector of the detective bureau and the inspector to admonish the lieutenant of the Officer Involved Shooting Investigation Unit?

A. So the admonishment was because I did not notify them and they found out through another source other than me that the presentment was signed by the grand jury and presiding grand jury judge and the subsequent arrest was occurring. I was admonished because I did not notify them. Hendershot deposition at 92-93.

Q. Prior to the filings of this lawsuit did you and the plaintiff discuss the impending retaliation that was going to be inflicted upon him by District Attorney Larry Krasner?

A. I don't remember the exact words that we spoke of, but "I do remember having conversations consisting of something around those lines." Exactly what was said, I could not tell you. But that's—that's my answer. I don't remember exactly what we spoke about every time. *Hendershot deposition at 110-111.*

Q. What did Deputy Commissioner Wilson order you to do as it related to Kia Ghee?

A. In summary to get her up to speed on the allegations or assumption that ADA Tripp had made against you involving the grand jury leak.

Q. Did you inform Deputy Commissioner Wilson at that time that Detective Jacobs did not commit a grand jury leak violation?

A. If my memory serves me correctly, and you know this; I was with my mother on her death bed. And I stepped away from my mother to advocate on your behalf when she was dying in bed, Jake. *Note: Hendershot became emotional and began to cry.*

Q. Take your time. Because that's not the way it occurred because both of us – *Note: Counsel for Hendershot (Mr. Gonzales) yelled Stop. Stop. Stop. Gonzales then threatened to end the deposition. The plaintiff stated "we both lost family members at that time, you know that. I lost my brother." Mr. Gonzales then stated "do not insult anyone here by playing the victim."*

Q. …Did you inform Deputy Commissioner Wilson that Tracy Tripp – what Tracy Tripp was alleging did not happen? That the plaintiff did not leak grand jury information?

A. I did inform him of that in my opinion.

Q. Did you inform him of that in September 2018?

A. I don't remember the exact time. The time that I was just responding to was in September – sometime between **September and November of 2019** when my mother was sick with cancer. *Hendershot deposition at 119-122.*

Q. You just stated you went to bat for me. How did you go to bat for me?

A. I went to bat for you when I spoke to Deputy Commissioner Wilson when I was with my mother and I told him that I did not believe you leaked any grand jury information. And that was based on the fact that, to my knowledge, you did not testify before the grand jury; therefore, how could you ever leak grand jury information if you were not privy to any. So to call you in front of the grand jury and allege that you did or ask you about something that you may have done, when "that person" knew that you did not participate, in my opinion, is just wrong. And I relayed that to the deputy commissioner and I probably relayed that to other people. Who? I don't know. I know I relayed that to you. And that's why I said I went to bat for you because I stood up for you because "I know you did not do that because you were never there."

Q. And as a result of Tracy Tripp, obviously, committing a criminal act, what action did you or Deputy Commissioner Wilson take against Tracy Tripp? *Note: Counsel once again objected to a relevant question. The plaintiff responded "the witness just stated that he knew that ADA Tracy Tripp was alleging something that could not have possibly happened as a result of the plaintiff attempting to report corruption." Hendershot deposition at 128-129.*

Q. Detective Sierra and Detective Jacobs approached you on numerous occasions informing you of the level of stress this matter was being inflicted upon them by Ms. Tripp, didn't they?

A. I can't say with any degree of certainty that it caused – that Detective Sierra ever informed me that it caused stress for him. I don't recall that conversation. I'm not denying it. I just don't recall it. It was "evident" that it did cause stress for you, yes. Hendershot deposition at 138.

P. **Deposition of Assistant District Attorney Tracy Tripp:** On November 16, 2023 the plaintiff deposed defendant Tracy Tripp. Prior to the examination, the plaintiff inquired of defendant Tripp's counsel, David Smith who provided him with information from the DAO that there was an ongoing criminal investigation into former Philadelphia Police

Officer Ryan Pownall. John Gonzales, counsel used fabricated information allegedly obtained from David Smith to obtain a prejudicial ruling from the Court limiting the acquisition of discovery through deposition questions by the plaintiff. Mr. Smith refused to provide the information and threatened the termination of the deposition of Tripp if the plaintiff continued to attempt to acquire the necessary discovery. *Tripp deposition at 9-11.*

Defendants on multiple occasions, after the plaintiff cited Hall v. Clifton Precision into the record, violated the rules of discovery and Objected to relevant deposition questions without asserting any privilege as required by the FRCP.

Q. Did you inherit the case involving the officer-involved shooting of Stefon Crawley?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 18.*

Q. Was Detective Derrick Jacobs the assigned investigator involving the officer-involved shooting of Stefon Crawley?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 20.*

Q. Is there any other investigation that you know of that will be conducted regarding former police officer Ryan Pownall?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 23.*

Q. Did you review the video surveillance footage of the officer-involved shooting involving former police officer Ryan Pownall in the shooting death of David Jones?

A. Objection. Direct the witness not to answer

Q. Did you withhold exculpatory evidence in violation of the District Attorney's Office policy and Brady v. Maryland when you presented the case to the grand jury (Pownall)?

A. Objection. Direct the witness not to answer. (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 25.*

Q. Did you provide the grand jury with all of the evidence that were known to you involving the officer-involved shooting involving former police officer Ryan Pownall in the shooting death of David Jones?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 26.*

Q. Did anyone other than Philadelphia District Attorney's Office SIU employees have knowledge of the grand jury presentment on September 4, 2018?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 30.*

Q. Did the District Attorney (Larry Krasner) order the Special Investigation Unit to illegally arrest Inspector James Smith and Detective Pat Smith knowing what was on the police radio transmissions was a lie as he alleged during the press conference?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did District Attorney Lawrence Krasner hold a press conference to announce the arrest of Inspector James Smith and Detective Pat Smith?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. And during that press conference, did District Attorney Larry Krasner state that Inspector James Smith identified himself as quote/unquote, town watch?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. And did the police radio transmissions bear out the fact that Inspector James Smith identified himself as a police inspector?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Was the reason that District Attorney Krasner targeted Inspector James Smith and his brother Detective Pat Smith because they stood up for the plaintiff and would not do what the District Attorney wanted them to do and retaliate against the plaintiff?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Why was Inspector James Smith arrested, Ms. Tripp?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did Inspector Smith commit any crime, Ms. Tripp?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did Detective Pat Smith commit any crimes. Ms. Tripp?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 59-61.*

Q. Did you tell Lieutenant Jason Hendershot you were going to arrest the plaintiff?

14

A. No, I don't "believe" so.

Q. You don't believe so?

A. No. I don't "recall" ever saying I am going to arrest "Derrick Jacobs."

Q. Was there ever a grand jury leak?

A. I can't answer that question, sir. *Tripp deposition at 62-63*

Q. Did you view the Ryan Pownall file showing that Asa Khalif was arrested for attempting to interfere in the Pownall matter?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you view the file showing that Asa Khalif was arrested for vandalism at the Pennsylvania Attorney General's Office?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 69-70.*

Q. Do you know former Assistant District Attorney Kathleen Lewis?

A. Yes.

Q. Did you ever have a meeting with Assistant District Attorney Kathleen Lewis in Judge Charles Ehrlich chambers?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you ever have a meeting inside Judge Charlie Ehrlich's chambers with Kathleen Lewis, yourself and Assistant District Attorney Brian Collins?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Was Kathleen Lewis the Assistant District Attorney assigned to the Stefon Crawley matter?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Stefon Crawley tried to kill multiple police officers; is that correct?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you ever clear the officers involved in the Stefon Crawley officer-involved shooting matter?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Detective Jacobs was the assigned detective in the Stefon Crawley officer-involved shooting; is that correct?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Stefon Crawley received a settlement of a quarter of a million dollars or close to it as it related to that officer-involved shooting; is that correct?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. District Attorney Larry Krasner's former firm represented Stefon Crawley in that almost of a quarter of a million dollar settlement; is that correct?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you ever clear Officer Timothy Stephan and Officer Jason Reid in the officer-involved shooting involving Stefon Crawley?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Stefon Crawley's DNA was on Officer Timmy Stephan's gun; is that correct?

A. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 70-73.*

Q. Did you ever speak to District Attorney Larry Krasner as it related to a possible grand jury leak by Detective Jacobs?

A. Yes.

Q. What did District Attorney Larry Krasner instruct you to do when you provided him with that information?

A. I'm going to object to that. I think that is protected information – privilege information (Mr. Smith, counsel for Tripp). *Plaintiff: Are you asserting attorney/client privilege? Employee privilege? What type of privilege are you asserting here? Mr. Smith: I'm asserting any privilege that might be applicable. But it would include attorney/client.*

Q. Does District Attorney Larry Krasner or did District Attorney Larry Krasner ever represent you in any matter?

A. No.

Q. Did you ever have a conversation with Inspector James Smith regarding the plaintiff's race?

A. No. *Note: It took defendant Tripp approximately fifteen (15) seconds to answer that question (in contrast the Pownall OIS took approximately one point seven (1.7) seconds).*

Q. What was the nature of your conversation with Inspector Smith as it related to the plaintiff?

A. Objection to the form of the question. The witness testified no. And you're asking a follow-up question as if there was a conversation. *Plaintiff: The previous question related to the plaintiff's race, which took her an awful long time to respond. The next question is what conversation, if any, she had with Inspector Smith as it related to the plaintiff. Tripp deposition at 75-77.*

Q. Did Lieutenant Hendershot ever ask you for a declination memorandum that you would no longer criminally prosecute the plaintiff?

A. Objection to the form of the question. I do not "believe" there was ever a criminal prosecution (Mr. Smith, counsel for Tripp). *Plaintiff: That wasn't the question. Mr. Smith: That's precisely the question you asked. Plaintiff: The precise question is, did Lieutenant Jason Hendershot ever ask you for a declination memorandum that you would no longer be criminally prosecuting the plaintiff? That's the question. Tripp deposition at 78.*

Q. Did you state to Detective Jacobs that his attorney would not mind you having a conversation with Detective Jacobs informing him that the criminal charges are being withdrawn?

A. No. That question assumes a bunch of words and phrases that I did not say.

Q. You never mentioned Greg Pagano during that conversation?

A. I did. But that was not your question.

Q. Did you inform the plaintiff that Attorney Greg Pagano would not mind you speaking to me informing me that the criminal charges against me were being withdrawn?

A. I did not say that, sir.

Q. Why would you mention Greg Pagano?

A. Because he was your lawyer at that time was my understanding.

Q. Why as a prosecutor would you approach a party without his counsel?

A. That assumes I approached you, sir.

Q. Are you testifying here today that I approached you?

A. No, sir. *Tripp deposition at 85-86.*

Q. Do you see this document, Ms. Tripp?

A. Yes.

Q. It's Lieutenant Hendershot at 5:20 p.m. on January 30. It states: I am in need of either a declination memorandum from the District Attorney's Office – strike all that. I am in need of either a declination memorandum from the DAO in reference to the investigation of Detective Jacobs or the notes of testimony from when you "withdrew prosecution" in front of Judge Coleman. I know we've talked about this before, and you offered to provide the notes of testimony. In November 2019, I "officially" asked you for the notes of testimony again. To date, I have not received anything from the DAO regarding this. The police department needs something that "officially" indicates that Detective Jacobs is no longer under "criminal investigation" and/or does not face future "criminal charges" in reference to this matter. As we historically always have from the DAO. If this is not possible, I would respectfully request to interview you and Judge Coleman so there would be some type of official documentation that "charges were withdrawn" from Detective Jacobs. Did I read that correctly?

A. Yes, sir.

Q. And that's something that Lieutenant Hendershot sent to you. You are the person he's referring to; is that correct?

A. I believe so, yes.

Q. It says, prosecution, criminal investigation. And I believe somewhere it say criminal charges. Let me make sure. It may not. Criminal charges. So it says, prosecution, criminal investigation and criminal charges. And charges were withdrawn in that document that was sent to you by Detective – sorry, Lieutenant Jason Hendershot. You previously testified that there was no criminal prosecution, there was no criminal charges. Why would Lieutenant Hendershot submit that document to you?

A. Because Lieutenant Hendershot didn't understand the grand jury process.

Q. Are you stating that a Philadelphia Police Lieutenant misunderstood the term prosecution, criminal investigation and criminal charges?

A. No, that's not what I said. *Tripp deposition at 90-92.*

Q. Did Lieutenant Hendershot ever inform you there was no probable cause to arrest former Police Officer Ryan Pownall?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Is preparing an affidavit of arrest without probable cause and inserting information that is not truthful, is that a crime?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. If a Philadelphia Police offer (s/b Officer) plants evidence on a suspect that leads to his arrest, is that a crime?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. You are licensed to practice law in the State of Pennsylvania; is that correct?

A. Yes.

Q. And there is rules that need to be followed to continue to be licensed to practice law in the State of Pennsylvania; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

*Tripp deposition at 96-97.*

Q. Did you ever see a document stating there is no probable cause to arrest Police Officer Ryan Pownall?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you ever reconcile the evidence to the affidavit regarding the arrest of Ryan Pownall?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you ever observe probable cause to arrest Police Officer Ryan Pownall?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

*Tripp deposition at 101-102.*

Q. Ms. Tripp, as we sit here today, is there probable cause to arrest Ryan Pownall?

A. *Tripp's counsel David Smith responded: For shooting an unarmed man in the back twice and killing him while he was running away without – without any weapon, I will direct the witness not to answer that question. It's objectionable.*

Q. I am glad you brought that up. So, we are going to add some stuff too. Did Ryan Pownall know that David Jones was unarmed when he shot him based on the knowledge that you have, Ms. Tripp.

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Well you wanted to insert that he was unarmed. You want to play cop. Did Ryan Pownall believe that David Jones was armed when he shot him, Ms. Tripp?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. …Did you provide the entire video and place that in the grand jury information or did you withhold it?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. You observed the surveillance video. Isn't that correct, Ms. Tripp?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

*Tripp deposition at 105-107.*

Q. Do you know if Mike Garmisa ever represented David Jones?

A. I have no idea.

Q. Did you ever view David Jones criminal history?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Part of your duties as a prosecutor is to review the evidence thoroughly; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did Mike Garmisa represent David Jones in his last arrest?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. You stated Mike Garmisa is now the Chief of either the Conviction Integrity Unit or the Special Investigation Unit; is that correct?

A. I believe just the Conviction Integrity Unit.

Q. So if Mike Garmisa represented David Jones in the past, would that be a conflict of interest for the District Attorney's Office?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

*Tripp deposition at 110-112.*

Q. ADA Mike Bonner was a member of the Special Investigations Unit of the Philadelphia District Attorney's Office while you were there; is that correct?

A. Yes.

Q. And you, also stated that you worked with, excuse me, Mike Garmisa at the Public Defender's Office; is that correct?

A. Yes.

Q. Do you see the screen?

A. Yes.

Q. It says Docket No. CP-51-CR-0003557-2009. And it states Commonwealth of Pennsylvania v. David Jones; is that correct?

A. Yes.

Q. And does it list ADA Mike Bonner and Public Defender Mike Garmisa as participants in this matter?

A. It does.

Q. When you were conducting the Pownall officer-involved shooting investigation, did you observe that docket?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. And the duty of a prosecutor is due diligence; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. If you exercise due diligence, you would have known that Mike Garmisa represented David Jones; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you ever ask Mike Bonner, did he ever have any interaction with David Jones?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. So there was no due diligence done in this matter. The matter was just lock up Ryan Pownall; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

*Tripp deposition at 119-121.*

Q. Did you provide Samantha Melamed of the Philadelphia Inquirer with information regarding Stefon Crawley?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Does the District Attorney's Office contact Philadelphia media sources in order to propagandize their targeting of Philadelphia Police Officers?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Have you uncovered any evidence that would lead to probable cause to arrest Philadelphia Police Officer Ryan Pownall?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

*Tripp deposition at 122-123.*

Q. Did Detective Brian Newell… ever tell you the facts that were contained in the grand jury presentment were incorrect?

A. He told me he believed they were incorrect – some of them were incorrect.

Q. …What did you do after Detective Newell told you the facts as he understood them and the grand jury presentment were incorrect?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you do anything after Detective Newell told you the grand jury presentment was incorrect?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did you attempt to reconcile the "inconsistencies" Detective Newell brought to your attention?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. So, we just going to let a Philadelphia Police Officer who almost got killed, go to jail because the District Attorney wants him to; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. District Attorney Larry Krasner campaigned on locking up police officers; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Did Larry Krasner fulfill a campaign promise by locking up Philadelphia Police Officers?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. That's why Detective Jacobs is sitting here, right, because District Attorney Larry Krasner told you to initiate the criminal charges that was brought against Detective Jacobs; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. The reason Detective Jacobs is sitting here is because he was exposing corruption at the District Attorney's Office; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp).

Q. Because everyone you spoke to regarding Detective Jacobs told you he was an outstanding investigator; is that correct?

A. Objection. Direct the witness not to answer (Mr. Smith, counsel for defendant Tripp). *Tripp deposition at 124-127.*

P. **Deputy Police Commisioner Dennis Wilson Deposition**

Q. Chief Inspector of communications oversees police radio; is that correct?

A. That's what I just said, yeah.

Q. Okay. While you were the chief inspector of communications did you have an opportunity to listen to a police radio call involving Inspector Smith?

A. I did not listen to that.

Q. Did you ever inform Inspector Smith that the district attorney and the Philadelphia Police Department set up him and his brother Patrick Smith?

A. Hold on. Objection. You're not answering any of these questions. *Wilson deposition at 44. Note: In violation of Hall v. Clifton Precision, the defendants took a break and a coaching session/conference occurred in violation of the FRCP. After the conference, once again, the defendants threatened termination of the deposition and refused to answer any questions.*

Q. In October of 2019 did Police Commissioner Coulter direct you to have a conversation with Detective Jacobs regarding his Whistleblower allegations?

A. No.

Q. Commissioner Coulter never communicated with you regarding Jacobs' whistleblower allegations?

A. She didn't communicate that to me. *Wilson deposition at 64-65.*

Q. Did you ever inform Commissioner Coulter that you were initiating a disciplinary investigation into the plaintiff?

A. I probably would have told her that. *Wilson deposition at 80.*


P. **Deposition of Inspector DF Pace**

Q. Did you know whether any of the statements that Jacobs made were true or false?

A. I listened to the entire podcast and I "heard your voice" make those statements. *Note: prior to deposing the defendant the plaintiff has never spoken to defendant Pace. This would have been an audio recording, so without a comparison or someone "confirming"*

*it was Jacobs' voice on the recording defendant Pace would not know the "sound" of
Jacobs' voice.*

Q. …The issue is the statements that were made on the podcast, did you have any reason
to believe that those statements were false?

A. It's immaterial to me whether the statements were false or not.

Q. …Did you know at the time that Jacobs had a Federal Civil Rights complaint for
alleged criminal actions against him?

A. No, I did not. And I don't know whether that's true or not. Nor would it have factored
in my decision.

Q. Did you hear on the podcast that I discussed my Federal Civil Rights litigation?

A. I do not recall. *Pace deposition at 20-26.*

## ARGUMENT

This case was originally filed in October 2019. The plaintiff alleged while employed as a
Philadelphia Police Detective, he observed several acts of corruption and criminality by
high ranking City of Philadelphia officials in the Philadelphia District Attorney's Office,
The Philadelphia Police Department, and the City Solicitor's Office. The plaintiff asserts
when he attempted to exposed his observations of public corruption and criminality, the
defendants immediately conspired and initiated costly speech-chilling actions to not only
prevent the plaintiff from exposing their illegal activity but to also send sub zero speech-
chilling messages to any other person(s) that would consider the same feat(s). What the
discovery has confirmed is the defendants clearly and intentionally trampled of the First
Amendment Constitutional Rights of the plaintiff with the full support and knowledge of
City of Philadelphia. The defendants are unapologetic for their violations of the
plaintiff's Civil Rights, stating "it doesn't matter" they violated the plaintiff's
Constitutional Rights. The facts will conclude that after the plaintiff participated in
constitutionally protected acts the defendants immediately conspired and retaliated with
speech-chilling actions after every occurrence.

*First,* On September 27, 2018, the plaintiff sought consultation on how to report the
corruption and criminality by high ranking public officials at the Philadelphia District
Attorney's Office. On that same date, high ranking public officials learned the plaintiff

was attempting to report their corruption. As a result the defendants immediately initiated a fabricated criminal proceeding against the plaintiff in order to chill his speech from reporting their corruption. The defendants alleged a "grand jury leak" when they knew no leak occurred. The defendants NOW claim the transcripts relating to the "grand jury" leak are LOST, which eliminates their ability to provide evidence of the leak claim/LIE. Furthermore, they knew the plaintiff did not participate in the grand jury.

*Second,* the plaintiff filed this lawsuit on October 4, 2019. On the same date the plaintiff informed the Philadelphia Police Commissioner of the corruption and criminal actions the DAO had perpetrated against the plaintiff. The plaintiff asked Commissioner Coulter for PA Whistleblower protections. After not receiving a response the plaintiff from Commissioner Coulter, the plaintiff followed up with an email on October 6, 2019. Commissioner Coulter responded "Received Sir" on October 7, 2019. On October 17, 2019, the plaintiff served the defendants with this complaint. On October 18, 2019, Chris Palmer from the Philadelphia Inquirer contacted the plaintiff. The only parties who were served at the time were Krasner and Tripp. It was later learned Chris Palmer is an "associate" of Krasner. On November 18, 2019, Krasner's journalistic antagonist, Ralph Cipriano authored an article on BigTrial.net website. The article was about the plaintiff's recently filed lawsuit in this matter. The defendants immediately, once again retaliated against the plaintiff. On that very date, the plaintiff's Commanding Officer Lieutenant Jason Hendershot retaliated by summoning the plaintiff to headquarters to announce he was taking the plaintiff's City issued vehicle. Hendershot also terminated the plaintiff's mobile communications. Both acts would have caused the plaintiff not to be able to respond to OIS. After the plaintiff informed Hendershot his actions were in retaliation to the plaintiff's recently files lawsuit, Hendershot did not take the plaintiff's City issued vehicle, but he did not restore the plaintiff's mobile communications.

*Third,* On Saturday, January 18, 2020, the plaintiff participated in a recorded podcast titled search warrant. On Friday, January 17, 2020, the plaintiff informed Hendershot he would be participating in the podcast. On Tuesday, January 21, 2020, the plaintiff informed Hendershot he participated in the podcast. What the plaintiff did not tell

Hendershot was that the podcast was recorded. On that same date, the defendants initiated a disciplinary proceeding against the plaintiff.

*Fourth,* On April 21, 2021, Ben Mannes of Philadelphia Weekly magazine published an article about the plaintiff's lawsuit in this matter, how he had attempted to expose the corruption and criminality by the defendants and the defendants' retaliation against the plaintiff as a result. On that same date, the defendants, through the Philadelphia Police Department's internal criminal division, initiated a criminal investigation against the plaintiff as a result of the Philadelphia Weekly article. The criminal investigation was to violate the plaintiff's Fourth Amendment Rights and illegally obtain access to the plaintiff's electronic communications.

## CRIMINAL/RETALIATORY ACTIONS TAKEN AGAINST THE PLAINTIFF

1. The facts show the defendants' (a) initiated a criminal proceeding (b) the proceeding was initiated for a purpose other than obtaining justice (c) there is a causal connection between the protected activity and initiation of the criminal proceeding (d) the proceeding ended in the plaintiff's favor. The facts will show the defendants initiated the criminal proceeding against the plaintiff in retaliation for reporting public corruption. This fact is supported by the defendants' admissions.

2. This illegal criminal proceeding against the plaintiff stems from an OIS involving Police Officer Ryan Pownall, which led to the death of David Jones on June 8, 2017. On June 8, 2017, Lieutenant Steve Nolan ("Nolan") was the Commanding Officer of OISI and the first responding supervisor to the scene. Detective Brian Newell ("Newell") was the assigned Detective to the Pownall OIS. Due to a conflict with the DAO involving Pownall, the prosecution was being handled by the PAGO, who assigned DAG Christopher Phillips. On November 3, 2017 Phillips informed the plaintiff after a conference there would not being any criminal charges brought against Pownall after review of the evidence. The plaintiff notified his Commanding Officer (Nolan) and the assigned Detective (Newell) of the PAGO's decision not to prosecute. That was the last involvement by the plaintiff in the Pownall investigation prior to Lawrence Krasner being sworn in as District Attorney.

3. On January 2, 2018 Krasner was sworn in as District Attorney. Krasner immediately targeted the plaintiff and his partner in February 2018, by contacting the plaintiff's superiors, stating the plaintiff's partner was taking "pro police" interviews relating to the Pownall OIS because he was a "FOP" member. After investigation, the plaintiff's superiors informed Krasner there was no evidence in support of his claims and every member of OISI is an "FOP" member.

> Inspector,
>
> Per our phone conversation regarding the District Attorney's Office claim that Det. Sierra's interviews for the P/O Pownall and P/O Ruch OIS incidents are "pro-police", I have reviewed all of the interviews that Det. Sierra conducted, or assisted in conducting, relating to both matters.
>
> Regarding the Pownall discharge, Det. Sierra interviewed the below individuals:
>
> - Dominic Junior Delgado  (interview conducted with Det. Jacobs)
> - Luis Romero
> - Sgt. Hoffman
> - P/O Mahoney
> - P/O Rivera
>
> Regarding the Ruch discharge, Det. Sierra interviewed the below individuals:
>
> - Tyisha Jones
> - Lt. Frank
> - P/O Strubinger
>
> If its possible to learn from the DAO more details as to the specific interview/s, we can address them.
>
> However, with regard to the Pownall OIS incident, it should be noted that the Pennsylvania Attorney General's Office investigated this matter. The AGO had all investigative material for approximately five (5) months and made no mention that any of the interviews conducted by OIS Unit personnel were "pro-police". On the contrary, the AGO personnel indicated that the depth/scope of the investigation, including interviews, was complete. Additionally, the Pownall OIS incident was reviewed by the UFRB, comprised of Deputy Commissioners and Police Advisory Commission (PAC) personnel on 8-3-17, and there was no indication that any of the interviews were "pro-police" (the UFRB has an inclusion on their review sheet noting the quality of the investigation).
>
> It should further be noted that the new District Attorney, upon learning the composition of the OIS Unit, questioned the inclusion of Det. Sierra as an OIS Unit investigator due to his affiliation with the Fraternal Order of Police (FOP). If that were the impetus (FOP affiliation), all of the OIS Unit personnel are FOP members and would be precluded from the OIS Unit.

4. Prior to becoming Philadelphia District Attorney, Lawrence Krasner had proclaimed an adversarial relationship against the Philadelphia Police Department and Philadelphia Police Officers. A Philadelphia Inquirer article posted by Mensah Dean ten days after Krasner became District Attorney on January 12, 2018, Krasner stated in reference to Philadelphia Police Officers not being prosecuted in OIS in over twenty years stated "this ain't fair, this is biased." Krasner entered the DAO with a predetermined opinion that Philadelphia Police Officers should be prosecuted for OIS and the fact they were not were "bias."

## DA Krasner on lack of charges in police shootings: 'This ain't fair, this is biased'

by Mensah M. Dean, Posted: January 12, 2018



JOSE MORENO/ STAFF PHOTOGRAPHER

Reinforcing a position he took as a candidate, new Philadelphia District Attorney Larry Krasner on Thursday night signaled his skepticism over the lack of prosecutions against city police for shooting suspects — and said his office won't be shy about ending the near-two-decade trend.

Addressing a roomful of lawyers, judges, and community activists, Krasner noted that Philadelphia police have been involved in 50 fatal shootings since 2010 — and every one was deemed justified and unworthy of charges by the prosecutor's office.

5. The very next day, January 13, 2018, Stefon Crawley ("Crawley") attempted to kill multiple police officers in the area of 2865 Kensington Avenue. Crawley was originally represented by defendant Tripp's Public Defenders Office. The plaintiff was the assigned detective/investigator of the first Officer Involved Shooting ("OIS") with Krasner as District Attorney. The original Assistant District Attorney assigned to this OIS was Jahlee Hatchett. Crawley was yelling at the officers, "ya'll going have to kill me" while attempting this feat. Crawley possessed an illegal stolen firearm equipped with an extended magazine that he attempted deploy in an effort to kill the Officers. Police Officer Timothy Stephan ("Stephan") became engaged with Crawley and attempted to disarm him. Crawley then attempted to rob Stephan of his police issued firearm (Crawley's DNA retrieved from Stephan's firearm) during the struggle. Police Officer Jason Reid ("Reid") responded to Stephan's call for help. Upon arrival Reid observed Stephan in a struggle with Crawley and heard a single gunshot and Crawley subsequently fleeing on foot from the altercation with Stephan. Reid drew his firearm and fired in the direction of the fleeing Crawley, striking him. During the incident Crawley was shot, arrested on location, and transported to the hospital for treatment of his injuries. The Philadelphia District Attorney's Office ("DAO") did not contact the plaintiff and did not

clear the officers to testify against Crawley. After Tripp joined the DAO Crawley, Krasner's former law partner, James Funt, begin representing Crawley. After the DAO intentionally did not clear the Officers/Victims (Stephan and Reid) to testify, the DAO subsequently withdrew all charges against Crawley. Krasner's DAO then took it a step further and arrested Sergeant Jason Reid, who was then terminated by the Philadelphia Police Department ("PPD"). Reid succeeded by defeating Krasner's fabricated charges and has vindicated himself admirably. Upon information and belief Reid is in the process of reinstatement to the Philadelphia Police Department. Prior to the withdrawal of charges the plaintiff was contacted by ADA Kathleen Lewis. Ms. Lewis wanted the plaintiff to know she was not affiliated with SIU of the DAO.

Stefon Crawley

Kathleen Lewis
Sun 1/6/2019 1:09 PM
To Derrick Jacobs <Derrick.Jacobs@Phila.gov>.

Detective Jacobs,

Good afternoon. I am the ADA who is assigned to Commonwealth v. Stefon Crawley, the actual trial, not the SIU end of things. I have a discovery question, which I cannot check in PIINS myself, since I do not have access. Defense counsel has requested photographs of the defendants clothing. It is my understanding that his clothing was bagged, but not sure if it was photographed. Can you please let me know if this is the case, and if so, send me the photographs.

Thank you in advance for your help.

Best,
Kate

----------
*Kathleen D. Lewis*
Assistant District Attorney
Major Trials
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107
P: 215-686-6103
F: 215-686-6111
kathleen.lewis@phila.gov

After this email from ADA Lewis a conference was held by Judge Charles Ehrlich in his chambers. Present during the conference were ADA Lewis, Tripp, ADA Brian Collins, and an unnamed party from the City Solicitor's Office. After the conference ADA Lewis informed law enforcement personnel outside the courtroom she could no longer talk about the Crawley prosecution without an attorney. Soon after, the charges against Crawley were withdrawn by the DAO. The reason given for the withdrawal by the DAO was "Nolle Prossed, Prosecutorial Discretional, (2) Officers not cleared to testify." After the withdrawal of the charges Crawley's counsel and Krasner's former law partner, James Funt, filed a civil lawsuit against the City of Philadelphia ("City") on December 20, 2019. Prior to the filing of the civil lawsuit by Crawley, Krasner's DAO had to smear Reid and tilt/tip the scales in the attempted cop killer's favor. On **December 11, 2019,**

ADA Brian Collins ("Collins"), the same Collins present during the Judge Enrlich conference, contacted Detective Daniel Murawski ("Murawski") for the radio transmissions of the Crawley investigation (Note: DAO withdrew charges against Crawley on February 11, 2019). Collins acknowledges the plaintiff is the assigned investigator but could he get the information from "someone else."

From: "Brian M. Collins" <Brian.M.Collins@Phila.gov>
Date: 12/11/19 4:16 PM (GMT-05:00)
To: Daniel Murawski <Daniel.Murawski@Phila.gov>
Subject: PS 18-01

Good afternoon,

I was reviewing the file for this case and noticed that the officers were transmitting on East band and the 25th District band before, during, and after the incident but I do not see the radio transmission in my file. Do we have a copy of those recordings? I believe that Detective Jacobs had this investigation and Lt Hendershot was with IAD when it happened and took the interviews of the discharging officers so he is screened. If there is someone else I should ask about these recordings, please let me know.

Thank you
Brian

Brian M. Collins

Assistant District Attorney
Special Investigations Unit
Philadelphia District Attorney's Office
Three South Penn Square
Philadelphia, PA 19107

Telephone 215-686-8740

Collins authors in his email that he was "reviewing" the case. This case was "nolle pros" ten (10) months earlier and he wanted the information from "someone else" other than the assigned detective, Jacobs. So what else happens on **December 11, 2019**. Krasner's known propagandist, Samatha Melamed of the Philadelphia Inquirer, author an article smearing now Police Sergeant Jason Reid.



## Philadelphia police sergeant caught on video punching a handcuffed man is arrested

The charges echo allegations made by defense lawyers, who have rung alarm bells over Reid's unusually history of citizen complaints, including 10 allegations of physical abuse, and uses of force, including the shootings of six people in the course of duty.

ADVERTISEMENT

*Philadelphia Police Sgt. Jason Reid, arrested on charges of assault, tampering with evidence, falsifying reports and obstruction of the administration of law.
Philadelphia Police Department / Philadelphia Police Department*

 by Samantha Melamed
Updated Dec 11, 2019

Just a **December 11, 2019** coincidence, I suppose.

Well let's see if we can locate so other "public concerning" coincidences by Krasner's DAO in this Crawley matter. On December 20, 2019, nine days later, Krasner's former law office files a civil complaint against Officers Stephan and Reid, alleging assault and

battery. Stephan and Reid were being represented by the defendants' current counsel (John Gonzales). Krasner and his former firm had a problem collecting their ill-gotten gains. The conspirators needed statements/depositions from Stephan and Reid and a problem still existed. After almost three and a half (3-1/2) years later Stephan and Reid were not criminally clear to testify and that was holding up the "check." On May 28, 2021, enter Tripp and Collins from DAO. Tripp and Collins authored a "Declination Memorandum" from the DAO indicating no criminal charges would be pursued by against the heroes (Stephan and Reid) by the DAO.



**DISTRICT ATTORNEY'S OFFICE**
**SPECIAL INVESTIGATIONS**
THREE SOUTH PENN SQUARE
PHILADELPHIA, PENNSYLVANIA 19107-3499

LAWRENCE S. KRASNER
District Attorney

### Declination Memorandum

TO:        Lieutenant Jason Hendershot #148, Officer-Involved Shooting Investigation Unit
           Philadelphia Police Department

FROM:    Tracy Tripp, Supervisor, Special Investigations Unit
           ADA Brian M. Collins

DATE:    Friday, May 28th, 2021

RE:        Police Shooting Investigation #18-01
           DC: 18-24-003574, SIU #18-S-01-0006
           2865 Kensington Avenue
           **Police Officer Timothy Stephan #3287, PR #245844, 24th District**
           **Police Officer Jason Reid #4415, PR #248029, 24th District**

Based on my review of the information received by this Office to date in the above-referenced case, this Office does not intend to pursue criminal charges against the above police officers for their police discharges on January 13th, 2018.

Tracy Tripp, Supervisor
Special Investigations Unit

No additional evidence in support/defense of the Officers had been discovered. Nothing had changed since January 13, 2018, other that "people needed to get paid." After the depositions of Stephan and Reid were secured and administered. Crawley, who attempted to kill multiple police officers and his cohorts, got "paid."



CITY OF PHILADELPHIA

LAW DEPARTMENT
One Parkway
1515 Arch Street
Philadelphia, PA 19102-1595

### GENERAL RELEASE

STEFON CRAWLEY
c/o James A Funt, Esquire
Greenblatt, Pierce, Funt and Flores, LLC
123 S. Broad Street
Philadelphia, PA 19102

In Reply Please Refer To:
File No. 104113
Date:   January 31, 2022
Payable within 45 days
after receipt of the executed
Release & W-9 form

**The lower portion of this form is a release.  Please read it carefully before signing.**

**STEFON CRAWLEY**
**v.**
**CITY OF PHILADELPHIA, et al.**
**PCCP December Term 2019, No. 3131**

For and in consideration of the sum of Two Hundred Twenty-Five Thousand Dollars,

($225,000.00), I, **STEFON CRAWLEY**, do hereby remise, release and forever discharge the City

of Philadelphia, its agents, servants, workers or employees, and any and all other persons,

associations or organizations, whether known or unknown, foreseen or unforeseen, of all actual

and/or potential liability accrued and hereafter to accrue on account of and from all, and all manner

of, actions and causes of action, claims and demands whatsoever, either in law or equity, especially

a claim for injuries and/or damages sustained on or about January 13, 2018 at or around the

Philadelphia, Pennsylvania which against the City of Philadelphia,

its agents, servants workers or employees, ever had, I, **STEFON CRAWLEY**, now have, or which

my heirs, executors, administrators or assigns, or any of them, hereafter can, shall or may have,

6.  On February 20, 2018, Maurice Stephon Phillips ('Phillips") entered a guilty plea for the
murder of his four year old daughter. If Krasner and his CIU had their way, this killer
would be walking the streets of Philadelphia looking for prey. Phillips was represented by
the Public Defender's Office that employed Tripp at the time. While Tripp was still

employed at the Public Defender's Office that represented Phillips, he pled guilty in 2017 to Third Degree Murder.  Tripp and Krasner's CIU had other "ideas" for Phillips prior to his sentencing on February 20, 2018. Krasner's CIU had attempted to indict/arrest the plaintiff and his partner after Krasner's CIU convinced Phillips to recant his confession and state it was coerced by the plaintiff and his partner. Phillips was assured of his "exoneration" by Krasner's CIU if he recanted the confession provided to detectives. There was only one problem, Krasner's Chief of Homicide Anthony Voci informed Krasner the investigation by the detectives were beyond reproach and this was not the hill to die on in his efforts of retaliation against the detectives. Even so, the public needs to know the types of individuals that Krasner wants to unleash on the citizens (mostly minority) of Philadelphia. Phillips was in an upstairs bedroom with 5-6 children playing with a handgun while the children were watching television (SpongeBob). While playing recklessly and negligently with the handgun he shot his four year old daughter in the back of head, killing her (the bullet exited the head of the four year old and penetrated the television screen where SpongeBob was playing). It gets worse. Phillips then wipes the blood of his four year daughter onto the shirt of his five year old daughter. Phillips then assaults the five year old daughter forcing her to say she shot her four year old sibling. Phillips then tampers, once again, with the crime scene and moves his four year old daughter to another bedroom. After calling the children's mother, he tells a thirteen year old sibling to tell the police her five year old sibling shot her four year old sister. Finally Phillips hides the gun and flees the location with the children (including the decedent) inside. That's just a quick summary of the type of person Larry Krasner wants on the streets of Philadelphia and he will do whatever is necessary to achieve his goals of retaliation and retribution against sworn law enforcement officers. Tripp and Krasner are not "criminal justice reformers" just "Criminals." These are the types of "exonerations" Krasner's Conviction Integrity Unit ("CIU") obtain. Has anyone notice not "one" malpractice suit against any of the lawyers who represented the "exonerees." Didn't they have a fiduciary responsibility client(s). Not "one" attorney were able to uncover the deception of the PPD and DAO until the "savior's" arrival.

# Maurice Phillips, Philadelphia Father, Admits To Shooting 4-Year-Old Girl

Maurice "Stephon" Phillips has been charged with third-degree murder.

**Emma Prestwich — The Huffington Post Canada**

Apr 19, 2016, 01:23 AM EDT

A Philadelphia father has been charged with third-degree murder after he confessed to shooting his daughter by accident.

Maurice Phillips, 30, admitted to shooting four-year-old Tahirah Saturday, police told WPVI.

"It was a stupid, idiotic act. He was completely reckless in doing this and, unfortunately, a four-year-old lost her life," said Capt. James Clark of the Philadelphia Police Homicide Unit.

People at the home initially told police the girl's five-year-old sibling had accidentally shot in her in the head while playing with a gun, according to Philly.com, but Phillips later turned himself in Saturday evening to say he did it.



Phillips fled the home after the shooting, according to police, which they believe happened in a bedroom where Tahirah and her six

After the gun accidentally went off, police say Phillips hit Tahirah's five-year-old sister and wiped blood on her shirt.

He hit the girl, police told WPVI, to make it look like she was being punished.

He then put Tahirah into another bedroom and called his fiancé. Once she came home, he changed clothes and fled.

He faces charges of third-degree murder, involuntary manslaughter, endangering the welfare of children, possession of an instrument of crime and recklessly endangering another person.

34

7. In May 2018, Tripp contacted the assigned Detective to coordinate the swearing in of the plaintiff and Newell to a grand jury. After being sworn-in the plaintiff learned the grand jury involved the Pownall OIS. On August 2, 2018, Tripp contacted the plaintiff regarding his "potential" involvement (testimony) in the grand jury. The plaintiff informed Tripp he did not agree with her narrative and informed her of his conversation with Christopher Phillips on November 3, 2017. The plaintiff ended the conversation by indicating he would be going on vacation in a few weeks and would not be available after then. After the conversation the plaintiff informed OISI members of the conversation and indicated to them that Tripp would not be calling on him to present the truth to the grand jury regarding the Pownall OIS.

8. In August 2018, the plaintiff's superiors attempted to get sworn-in to the Pownall OIS grand jury. Present to be sworn-in were Chief Inspector James Kelly, Inspector James Smith, Lieutenant Robert Otto, and Lieutenant Jason Hendershot. Patricia Cummings ("Cummings") and Tracy Tripp were present from the DAO. Tripp and Cummings refused to swear-in Lieutenant Otto to the Pownall OIS grand jury. As a result, no one was sworn-in to the grand jury and Hendershot returned to OISI headquarters. The plaintiff's superiors, Tripp, and Cummings held a conference at the DAO headquarters. During the conference, the plaintiff's superiors learned Tripp and Cummings wanted the plaintiff and his partner removed from OISI because of their race and being the only minorities in the unit. The plaintiff superiors also learned that Hendershot was "working" with the DAO to illegally arrest Pownall. The plaintiff's superiors became so irate they went to OISI headquarters and berated Hendershot in the presence OISI members. Hendershot slumped and cowered when confronted with his departmental (not yet criminal) violations. The plaintiff's superiors (Inspector James Smith) subsequently (August 2018) informed Deputy Police Commissioner Dennis Wilson ("Wilson") of Tripp and Cummings request that the plaintiff and his partner be removed because of their race and the fact they were the only minorities. Wilson was also informed of Tripp and Cummings nefarious intentions as they related to the Pownall OIS grand jury.

9. On August 30, 2018, Hendershot secretly, without informing his superiors, prepared an illegal affidavit to obtain and arrest warrant that knowingly contained intentional falsified information to arrest former Philadelphia Police Officer Ryan Pownall for the OIS

involving David Jones. Hendershot also did not inform OISI members of his authoring of the illegal affidavit.



10. On September 1, 2018, Krasner associate, Asa Khalif posted a "tweet" on Twitter stating "according to several sources" Pownall will be arrested on Tuesday (September 4, 2018). On September 4, 2018, Krasner held a press conference with Tripp to announce the unsealing of the "Presentment" and indictment of former Police Officer Ryan Pownall.

11. On September 27, 2018, Tripp and Hendershot learned the plaintiff was consulting with counsel about "something" and confronted the plaintiff. Hendershot contacted the plaintiff and informed him that Tripp contacted him and threatened to prosecute the entire OISI if she could not ascertain who spoke with an attorney in court today (September 27, 2018). The plaintiff informed Hendershot there is no need to threaten the other unit members; he was the person consulting with the attorney about Tripp's and the DAO

corruption and criminality. *Note: The plaintiff was unaware at the time of the conversation Hendershot was the author of the illegal affidavit against Pownall. The plaintiff had had numerous conversations with Hendershot regarding the criminal activities at the DAO prior to September 27, 2018.*

12. After the plaintiff's superiors consultations/conferences/clashes with Tripp, Cummings, and Hendershot; Wilson, on orders from Krasner, transferred Chief Inspector James Kelly and Inspector James Smith from Detective Headquarters. In 2018 Wilson replaced Kelly and Smith with Chief Inspector Frank Vanore and Inspector Ben Naish. Fearing Lieutenant Otto would be present and document their nefarious actions, Vanore contacted Wilson and had Otto transferred from Detective Headquarters. When plaintiff's superiors asked Wilson why they were being transferred, he would not provide an answer/reason.

13. On October 16, 2018, the plaintiff and his partner received court notices from Tripp to appear for grand jury C-55 on October 18, 2018. The plaintiff realizing this was the same number used in the Pownall OIS grand jury contacted Tripp to see if the court notice was sent in error. Tripp informed the plaintiff the Court notices were not sent in error. On October 18, 2018 the plaintiff and his partner learned they were the "targets" of Tripp's fabricated grand jury leak scheme. The scheme had to be rescheduled to November 9, 2018. On Friday, November 9, 2018, in the presence of the plaintiff's lawyer, Greg Pagano ("Pagano"), Tripp, and Judge Robert Coleman, Coleman informed the plaintiff he could be arrested and had 5th Amendment issues as a result of Tripp's fabricated scheme of leaking grand jury information. Totally demoralized as to how this corruption has metastasized, the plaintiff left the City and visited his family for support. That same date, after his arrival, the plaintiff contacted Pagano and informed him he would not be subjected to Tripp's and the DAO criminal actions that are being perpetrated against him. The plaintiff further stated that he could report to work on Monday morning and be arrested and embarrassed. Pagano agreed with the plaintiff's assessment of the situation and indicated he had spoken to Tripp. Pagano informed the plaintiff that Tripp just wanted the plaintiff to remain silent until after the Ryan Pownall OIS criminal trial. The plaintiff informed Pagano he would not be accepting Tripp's and the DAO "terms." Upon the plaintiff's returned to work he continually and almost daily requested action(s) from Hendershot and Philadelphia Police Department and requested the criminal prosecution

of Tripp for her violations of the law and the plaintiff's rights. The plaintiff also informed Hendershot he wanted the criminal persecution being committed against him stopped immediately. For almost a year, the plaintiff endured these criminals' oppressive actions.

14. In May of 2019, Hendershot informed the plaintiff Tripp would no longer be prosecuting the plaintiff because the transcripts relating to the prosecution was "lost." The plaintiff realized this was a lie and the defendants' exit strategy against the undeterred plaintiff. The plaintiff continued to pester Hendershot for confirmation the criminal prosecution/persecution against him had been withdrawn. Hendershot informed the plaintiff and his partner, he would receive confirmation in June. Hendershot never provided the plaintiff with the confirmation from Tripp.

15. On August 1, 2019, after being sworn in for another grand jury by a different Judge and ADA, Tripp approached the plaintiff after he walked the Judge to the elevator. When the Judge got on the elevator, Tripp approached the plaintiff. It was if the criminal/sniper Tripp was "lurking" waiting for the plaintiff to finish his conversation with the Judge. Tripp hastily began to inform the plaintiff she was withdrawing criminal prosecution against the plaintiff. *Note: Tripp never informed the plaintiff why she was withdrawing prosecution.* After the plaintiff ignored the Tripp multiple times, he finally acknowledged her presence. Tripp went on to say she notified Hendershot of the decision last week and she did think that "Greg" (plaintiff's attorney) would mine her speaking with the plaintiff and informing him of the withdrawal of charges against him.

16. On October 4, 2019, with the withdrawal of the fabricated illegal charges, the plaintiff filed this complaint. Also on October 4, 2019, the plaintiff contacted Police Commissioner Christine Coulter ("Coulter") asking for "Whistleblower" protections. After not receiving a response, the plaintiff contacted Coulter again on the

17. October 6, 2019. Coulter responded "Received Sir" on October 7, 2019, without any additional information. *Note: The plaintiff had not served the defendants with this complaint and was waiting for "Whistleblower" protections from the Philadelphia Police Department prior to service.*

18. On October 17, 2019 the plaintiff served the defendants with this complaint. On October 18, 2019, Chris Palmer of the Philadelphia Inquirer immediately contacted the plaintiff regarding the lawsuit and Pownall. *Note: Chris Palmer is a "known" associate of*

*Krasner and the plaintiff had not informed anyone, including the Police Commissioner of the lawsuit. The only parties with knowledge of the lawsuit, other than the plaintiff, were Krasner and Tripp.*

19. On October 23, 2019, after not receiving the declination memorandum from Tripp the plaintiff contacted his attorney, Pagano, to see if he had heard anything regarding the withdrawal of charges against the plaintiff. Pagano informed the plaintiff he had not received anything is writing from Tripp.



20. On November 18, 2019, Ralph Cipriano a "known Krasner nemesis," published an article on the website BigTrial.net. The article addressed the plaintiff's lawsuit and the criminal actions committed by the DAO in the Pownall prosecution and against the plaintiff.

21. On November 18, 2019, Hendershot contacted the plaintiff and asked him to come to headquarters after he's done with court. When the plaintiff arrived at headquarters Hendershot informed him he was taking his police issued vehicle. Hendershot proceeded to shut down the plaintiff's mobile communications, denying the plaintiff departmental communications. The plaintiff recently learned it was on orders from defendant Wilson (Hendershot deposition). When Hendershot threatened to take the plaintiff's City issued

police vehicle, the plaintiff informed Hendershot it was retaliation for his recently filed lawsuits.

22. On November 18, 2019, the plaintiff authored another memorandum to Police Commissioner Coulter.

23. On November 26, 2019, Wilson summoned the plaintiff to his office and informed the plaintiff he would not allow the plaintiff to speak with Coulter. Wilson informed the plaintiff there is nothing he could do to stop the DAO's "victimization" of the plaintiff. Wilson suggested the plaintiff contact the PAGO. The plaintiff informed Wilson the PAGO has a conflict of interest. Wilson informed the plaintiff to contact the PAGO first and if unsuccessful then contact the US Attorney. The plaintiff informed Wilson of the BigTrial article (Wilson indicated he had read the article) and Chris Palmer's attempts to contact the plaintiff (Palmer also attempted to contact the plaintiff again on November 19, 2019). Wilson informed the plaintiff he did have any problem with the plaintiff reaching out to media outlets with his corruption concerns at the DAO. The plaintiff contacted Hendershot immediately upon leaving the meeting with Wilson and informed him what occurred during meeting. Hendershot provided the plaintiff with a contact at the PAGO. The plaintiff contacted the PAGO who confirmed the conflict of interest. The plaintiff immediately informed Hendershot and asked if he could inform Wilson so that the US Attorney could be contacted. The plaintiff wanted to honor the conversation with Wilson November 26, 2019. The plaintiff asked Hendershot almost daily if he contacted Wilson. Each time Hendershot said he had not heard from Wilson. *Note: The only time the plaintiff did not ask Hendershot about contacting Wilson was when Hendershot's mother died in 2019.*

24. On January 13, 2020, the plaintiff informed Hendershot he had an interview with the disciplinary board regarding Tripp and will be doing a "podcast" this weekend. *Note: Plaintiff didn't really know anything about podcast at the time.*

25. On January 14, 2020 Hendershot contacted the plaintiff about the DAO (Clarke Beljean) approving charges against Federal Correction Officer, Aaron Booker ("Booker") (Note: The plaintiff worked with and was friends with Booker's father) . The plaintiff informed Hendershot he was still at the disciplinary. When the plaintiff arrived at headquarters Hendershot informed the plaintiff he would process the arrest of Booker. The plaintiff