## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS

      V.

CITY OF PHILADELPHIA, et al.

CIVIL COMPLAINT NUMBER:  19-CV-4616

## PLAINTIFF'S DERRICK JACOBS RESPONSE TO DEFENDANTS' RULE 56 MOTION FOR SUMMARY JUDGMENT

SUBMITTED BY:

DERRICK JACOBS
PLAINTIFF
PRO SE
PO BOX 1454
BERLIN, MD 21811
derrickjacobs9116@gmail.com

                                      Derrick Jacobs
                                      Plaintiff
                                      Pro Se
                                      Date: January 12, 2024

## PLAINTIFF'S OPPOSITION/RESPONSE TO DEFENDANT TRIPP'S MOTION FOR SUMMARY JUDGMENT

### PRELIMINARY STATEMENT

The plaintiff commenced this matter on October 4, 2019, prior to the Covid-19 pandemic. What the plaintiff has endured since prior to the commencement of this matter is historical prejudice at the hands of white people. The Court and defendants have continually told the plaintiff what is relevant and what is not relevant. The Court and defendants have consistently misrepresented the record and inserted their "perceived" facts and outright lies into the record in an effort to destroy the Black plaintiff. The Court has clearly accepted the White facts instead of the right facts. The Court deems the black plaintiff as beneath civility and has continually disrespected the former officer of the court while heralding criminals as officers of the court. To quote a respected black person that has endured similar persecution before triumph "this is a high-tech lynching" by the Court, and/or its law clerks, who believe they are playing video games while destroying the plaintiff and his family. The Court and defendants would have you believe the plaintiff's accusations are unfounded and not based on facts. The plaintiff has another matter in which not one request for recusal was made and that Court has ruled against the plaintiff a number of times and not once did the plaintiff deem that Court's actions as bias. Quite the contrary, that Court listened to the arguments and made decisions based upon the facts articulated by the parties, not a predetermined agenda. The pro se plaintiff has also showed legal minds and non legal minds the filings. The plaintiff could not find one person that could state the Court's actions were not bias.

## I.   <u>PLAINTIFF'S RESPONSE TO DEFENDANT TRIPP'S INTRODUCTION</u>

The plaintiff disputes the defendant Tripp's assertion that she did not conspire with fellow defendants, named and unnamed, to bring "baseless" charges against the plaintiff. The plaintiff disputes that she did not conspire to have him terminated from employment with the help of the Philadelphia Police Department. Defendant Tripp initiated a baseless criminal proceeding against the plaintiff without intent to administer justice.  The plaintiff disputes defendant Tripp's claim that after extensive discovery there is "no evidence" to support the plaintiff's claims. To the contrary, there is a plethora of evidence to compel a "jury" of the plaintiff's "peers" to render a judgment in the plaintiff's favor. This is including defendant Hendershot's deposition testimony that stated Tripp's actions against the plaintiff were "wrong." The plaintiff did not "resign" from his employment. The plaintiff was "constructively discharged" by criminals from his employment. Defendants Hendershot authored a fabricated document showing the plan to constructively discharge the plaintiff. The plaintiff disputes the criminal actions of defendant Tripp are protected by immunity. Tripp's actions were administrative and criminal, which are not protected by immunity.

## II.   <u>FACTUAL BACKGROUND</u>

1.  Admitted.

2.  Denied. This event never occurred. There is zero evidence in the record this event ever occurred. The only reference to this comes from a known and proven liar, defendant Tracy Tripp. Tripp attempts to justify this fabrication by stating transcripts in a homicide/murder trial were lost. When asked at her deposition was

there ever a grand jury leak, defendant Tripp responded, "I can't answer that question, sir." ***Tripp deposition at 63, lines 12-13.***

```
12 │ Q.  Was there ever a grand jury leak?
13 │ A.  I can't answer that question, sir.
```

Where are contemporaneous notes of the "certain statements" made by FOP attorney Fortunato Perri? Were the "certain statements," the cow jumped over the moon? Were the "certain statements," the dish ran away with the spoon? There is nothing in any part of this record of any "certain statement" or grand jury leak.

3. Denied. The plaintiff was present in the courtroom, standing right above Mensah Dean from the Philadelphia Inquirer watching him write notes on his pad. Nothing that Mr. Perri stated "on the record" could lead anyone to "understand" that a leak of grand jury information occurred, because the grand jury leak story is a fabrication.

4. Denied. Hendershot testified at his deposition the grand jury leak story was a farce. ***Hendershot deposition at 137, lines 4-9.***

```
4 │        Q.     But you knew that what she was alleging
5 │ wasn't true; is that correct?
6 │        A.     Yes.
7 │        Q.     But the Philadelphia Police Department
8 │ allowed her to continue with this farce and stress
9 │ out their employees; is that correct?
```

5. Denied. Tripp testified at her deposition she did not know when the "statements" were made to Mr. Perri.

6. Admitted. To the extent the plaintiff had a consultation with an attorney and a Commonwealth prosecutor attempted to violate the Constitutional Rights of the

plaintiff by attempting to use the plaintiff's Commanding Officer to obtain the privilege information. To date the plaintiff has not revealed the details of the consultation. The plaintiff has not released the privilege of the consultation.

7. Denied. Defendant Tripp admitted the criminal proceeding to Judge Coleman, Attorney Greg Pagano, and Jacobs' Commanding Officer Lieutenant Jason Hendetrshot. Defendant also informed defendant Hendershot the only reason the speech chilling criminal prosecution/persecution of the plaintiff ended was because of "lost transcripts."

8. Denied. Both the plaintiff's counsel and Commanding Officer confirmed the criminal proceeding and prosecution of the plaintiff. Also the defendants in the arguments (ECFs 28, 33) acknowledged the criminal proceedings being initiated and later withdrawn.

9. Denied. Defendant Tracy Tripp "approached" the plaintiff on August 1, 2019 and informed him she was "withdrawing" the criminal charges against the plaintiff. When asked, why would you as a prosecutor, contact a person represented by counsel; Tripp responded that's assuming I approached you. The plaintiff followed up with, are you saying I approached you? Tripp responded that's not what I'm saying. *There would not be a reason to just "inform" the plaintiff the "investigation" is over. Q. Why as a prosecutor would you approach a party without his counsel? A. That assumes I approached you, sir. Q. Are you testifying here today that I approached you? A. No, sir. Tripp Deposition page 86.*

10. Denied. Defendant Tracy Tripp informed defendant Jason Hendershot she was "withdrawing prosecution" because of "lost transcripts" against the plaintiff.

11. Denied. The plaintiff did participate in the podcast. The plaintiff did not "disparage" anyone. The plaintiff has factual knowledge of at least three criminal actions committed by the defendants prior to the January 18, 2020 podcast. The defendants illegally arrested former Philadelphia Police Officer Ryan Pownall. The defendants illegally and intentionally let an attempted murderer of multiple police officers go free and file a civil rights lawsuit. The defendants conducted an illegal criminal proceeding against the plaintiff in an effort to prevent him from exposing their criminal actions.

12. Denied. This was an external investigation initiated by Philadelphia District Attorney Larry Krasner. Krasner has a pattern and practice of using the Philadelphia Police Department's disciplinary process (DF Pace) to target sworn law enforcement officers.

13. Denied. Defendant Wilson never heard the podcast. Defendant Wilson is a known liar, who intentionally lied to millions of Americans to advance corruption.

14. Denied. Defendant Wilson used defendant Hendershot to keep Krasner and Tripp "up to speed" regarding the plaintiff by providing information to their attorney Kia Ghee.

15. Denied. This was an "external" retaliatory order by Krasner.

16. Admitted.

17. Denied. Immediately (four (4) minutes) following the disciplinary interview, defendant Hendershot sent confirmation to Chief Inspector Frank Vanore the "mission" was accomplished. Hendershot informed Vanore he would be requesting disciplinary charges against the plaintiff.

18. Admitted.

19. Denied.

20. Denied.

21. Denied. The known and proven liar Dennis Wilson contradicts thousand of Philadelphia Police Officers who would disagree with Conduct Unbecoming an Officer is a "minor violation."

22. Denied. Defendants forced the plaintiff into retirement. The defendants intentionally redirected the plaintiff's communication intended for the Police Commissioner to Krasner's attorney Kia Ghee. This allowed the defendants to force the plaintiff to use his accrued sick/vacation/holiday time while waiting for a response from the Police Commissioner. Defendant Jason Hendershot then began to calculate how long it would take for the plaintiff to use all of his time and be forced into retirement. Hendershot then prepared a fabricated document on March 4, 2020 to Vanore indicating the plaintiff informed him he would leave the department in March 2021. Plaintiff never resigned from the Philadelphia Police Department. He was forced into retirement by the defendants.

## III. **PROCEDURAL BACKGROUND**

The plaintiff disputes the defendants' procedural background.

## IV. **ARGUMENT**

### A. **Legal Standard**

To successfully oppose a motion for summary judgment, the non-moving party must designate specific factual averments through the use of permissible material that

demonstrate a triable factual dispute. *Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).*

**B.**  **Section 1983 Retaliation**

The plaintiff has demonstrated the conduct was committed by a person(s) acting under the color of state law, and the complained-of-conduct deprived the plaintiff of rights secured under the Constitution or federal law. *Baloga v. Pittston (3rd Cir. 2019).* The plaintiff has also demonstrated that he was engaged in a constitutionally protected activity; suffered an "adverse action" by governmental officials and; there is a causal link between the exercise of his constitutional rights and the adverse action taken against him. The plaintiff and his Commanding Officer spoke on numerous occasions regarding the pending retaliation that would be inflicted on the plaintiff by District Attorney Larry Krasner when the lawsuits were filed. ***Hendershot Deposition, Pages 110 lines 21-24 and 111 lines 1-6.***



```
21          Q.      Prior to the filings of this lawsuit,
22   did you and the Plaintiff discuss the impending
23   retaliation that was going to be inflicted upon him
24   by District Attorney Larry Krasner?

                    JASON HENDERSHOT                        111

 1          A.      I don't remember the exact words that
 2   we spoke of, but I do remember having conversations
 3   consisting of something around those lines.  Exactly
 4   what was said, I could not tell you.  But that's --
 5   that's my answer.  I don't remember exactly what we
 6   spoke about every time.
```

**C.**  **Plaintiff Suffered Retaliatory Criminal Prosecution**

Both, the plaintiff's former Commanding Officer defendant Jason Hendershot and the plaintiff's former attorney Greg Pagano informed the plaintiff Tripp was criminally prosecuting him and the only reason she withdrew the prosecution

were because of "lost transcripts." The defendants now claim it was only an "investigation." One thing is consistent with the defendants' investigation. The plaintiff is the "only" one interviewed and/or involved in the "investigation/prosecution."



Lt. Hendershot
5:20 PM, Jan 30

I am in need of either a Declination Memorandum from the DAO, in reference to the investigation of Detective Jacobs or the Notes of Testimony from when you withdrew prosecution, in front of Judge Coleman.

I know we've talked about this before and you offered to provide the "Notes of Testimony".

In November of 2019, I officially asked you for the Notes of Testimony again.

To date, I have not received anything from the DAO, regarding this.

The Police Department needs something that officially indicates that Detective Jacobs is no longer under criminal investigation and or does not face future criminal charges in reference to this matter, as we historically always have from the DAO.

If this is not possible, I would respectfully request to interview you and Judge Coleman, so there would be some type of official documentation that charges were withdrawn from Detective Jacobs.

< G **Greg Pagano ATT...** ⌄ ⋮

Wednesday, October 23, 2019

Greg, Tracy Tripp told me and my Lieutenant that she was withdrawing the Contempt of Court charges against me because they lost the transcripts. She said told my Lieutenant that she would provide the declination memo and inform you. Since I haven't heard back I wanted to check in and see if she spok

**View all** >

11:46 AM

Hey Jake. Hope you're well. That's been my understanding but I have not received anything in writing.

11:51 AM

11:54 AM 

### D. Defendants Conspired to Terminate the Plaintiff's Employment

The plaintiff has clearly established the conspiracy between the parties and non-parties in this matter. *The defendants' investigation into the plaintiff lasted four (4) minutes. Defendant Wilson never listened to the podcast before implementing Krasner's orders against the plaintiff. DF Pace and Wilson exonerated Pace of the violations they disciplined the plaintiff.*

### 1. The evidence clearly shows the defendants "Constructively Discharged" the Plaintiff

The record showed that defendant Hendershot prepared fabricated documents, including in which, he calculated weekly/bi-weekly the estimated departure of the plaintiff a year in advance of the plaintiff's separation date. Hendershot then submitted the fabricated document to Chief Inspector Frank Vanore.

Detective Jacobs' status

Jason Hendershot <Jason.Hendershot@Phila.gov>
Wed 3/4/2020 3:19 PM
To: Frank Vanore <Frank.Vanore@phila.gov>
Good afternoon Chief Inspector Vanore,

Just wanted to keep you informed about Detective Jacobs' status:

For the last two (2) months or so, Detective Jacobs has mentioned on several occasions that he intends to "run time" for a year and then retire. He never committed to a date, but indicated that it would be in March. I informed Detective Jacobs that he would have to officially request to "run time" and when he was ready to officially do so, I would make the appropriate request through the chain-of-command.

In February, I informed Detective Jacobs that I was going to take him off of the "wheel", because I could not allow him to be the lead investigator on an OIS. Detective Jacobs understood and agreed that he should not be the lead investigator going forward, due to him getting ready to "run time".

In February, Detective Jacobs received 75-18s for violation of departmental policy. He pleaded not guilty and requested a hearing. Since that point, he believed that he was being "targeted" by the PPD.

On February 25, Detective Jacobs informed Sgt. Farrell that he was off sick and was unsure of when he would return to work. Detective Jacobs was carried sick and as of today (3-4-2020) has not returned to work. Since he has been off sick for more than 9 consecutive calendar days, I contacted him and informed him that he needed to provide me with a sick note, and that in order for him to return to work, he would have to be seen by a doctor at 19th & Fairmount. At this point, during our phone conversation, Detective Jacobs informed me that he was IOD from stress, caused by the PPD. In addition, Detective Jacobs informed me that he had filed another lawsuit against the PPD, including PC Outlaw, pertaining to his 75-18s. At this point, I informed Detective Jacobs that I would look into whether or not stress is something an employee can be carried as IOD.

I contacted the Safety Office and stress does not fall under IOD. Detective Jacobs remain in sick status until cleared to return to duty by the city doctor at 19th & Fairmount.

I relayed this information to Detective Jacobs and it was obvious that he was documenting the information being relayed to him. I say that because he asked who the C/O of the Safety Office was. Detective Jacobs stated that he was going to submit a doctor's note and memorandum, requesting to be carried IOD. He added that he wanted the disapproval in writing.

As of now, I have not received his sick note or his memorandum.

Lastly, I do not believe that Detective Jacobs should remain assigned to the OISI Unit for now. He has given every indication that he does not plan on being assigned to the unit long-term. In addition, his claim about being under intense stress would render him incapable of participating in an OIS investigation.

I am respectfully requesting that Detective Jacobs be detailed to another unit within the bureau, until he is fit for duty and cleared by the city doctor.

If approved, I am respectfully requesting that a detective be detailed in to the OISI Unit, in his absence.

Jason

Lt. Jason Hendershot #148
Philadelphia Police Department
Officer-Involved Shooting Investigations
Office #215-683-1866
Cell # 215-410-1829

The evidence will also show the investigation and decision to discipline the plaintiff took less than four (4) minutes. The plaintiff signed his disciplinary interview on January 30, 2020 at 1:29 PM. *Hendershot authored an email to Chief Inspector Frank Vanore with the interview attached at 1:33 PM. Hendershot informed Vanore four (4) minutes after the interview the plaintiff would be disciplined. Vanore responded at 1:35 PM, Received. I think that's acting in concert.*

NAME (print): *DETECTIVE DERRICK JACOBS #9116*

SIGNATURE: _____

UNIT: *OISI*

DATE & TIME: *1/30/2020    1:29PM*

WITNESSES: _____

RE: Jacobs Interview

Frank.Vanore <Frank.Vanore@phila.gov>
Thu 1/30/2020 1:35 PM
To: Jason Hendershot <Jason.Hendershot@Phila.gov>
Received


Frank Vanore
Chief Inspector
Detective Bureau
Office Number 215-686-3320
Cell 215-359-6606


-------- Original message --------
From: Jason Hendershot <Jason.Hendershot@Phila.gov>
Date: 1/30/20 2:33 PM (GMT-05:00)
To: "Frank.Vanore" <Frank.Vanore@phila.gov>
Subject: Jacobs Interview

Good afternoon Chief Inspector Vanore,

I interviewed Detective Jacobs today and attached his interview for your review.

I kept the interview focused on whether or not he had permission to participate in the
Podcast and whether or not he had permission to divulge staffing levels in our Unit.

He added that he is a Whistle Blower and that he brought this to the attention of PC Coulter
and D/C Wilson.

I will prepare the request for disciplinary action, since he violated policy.

Jason

The defendants violated departmental policy and the Constitution in their
retaliation of the plaintiff. Defendant Wilson indicated the plaintiff's
Constitutional Rights does not matter. A four (4) minute investigation is all
you need (*see Nicoletti*). ***Wilson April 4, 2022 Deposition, page 257, lines 5-
11 (Jacobs v. City of Philadelphia 19-cv-4615)***

```
 5              You can't testify here today
 6      exactly what Plaintiff Jacobs
 7      violated?
 8      A.      I don't have to, it don't
 9      matter.  Someone else did the
10      investigation; they determined you
11      violated the policy.
```

Chief Inspector Frank Vanore only took two (2) minutes to verify
Hendershot's "thorough and complete" investigation.

2. **The evidence clearly shows defendant Tripp participated in the conspiracy and retaliatory disciplinary process of the Plaintiff**

The plaintiff contacted Hendershot. Hendershot contacted Tripp. Tripp contacted Krasner. Krasner contacted Wilson. There was no reason Hendershot had to keep Krasner's attorney Kia Ghee "up to speed" in 2019 regarding the plaintiff.

3. **The evidence clearly shows a meeting of the minds**

Hendershot's testimony proves the meeting of the minds when Wilson ordered Hendershot to keep Krasner "up to speed" through his attorney Kia Ghee.

E. **Defendant Tracy Tripp's actions are not protected by Qualified Immunity**

Tripp was not performing any prosecutorial function while engaged in her criminal activity. Tripp's illegal and fabricated investigation(s) were administrative and never rose to the level of prosecutorial. Employment title does not equal immunity. Tripp's actions are akin to Police Officers planting/fabricating evidence. *See Buckley v. Fitzsimmons*

1. There is zero evidence in the record (or anywhere else) of there ever being a grand jury leak. On the contrary, the fabrication of a grand jury leak was only devised when Hendershot informed Tripp the plaintiff was attempting to report the corruption and criminality committed by her and the Philadelphia District Attorney's Office. Someone produce any evidence, anywhere, by anyone of a grand jury leak...I'm waiting. Tripp was asked that question, her response...I can't answer that question, sir. *Tripp deposition at 63, lines 12-13.*

```
12   Q.   Was there ever a grand jury leak?
13   A.   I can't answer that question, sir.
```

Tripp could not answer the question under oath because it was a lie then, it's a lie now, and it will be a lie at trial.

Defendant Hendershot confirmed the grand jury story was a fabrication during his deposition.

JASON HENDERSHOT                                    128

```
 1        Q.     You just stated you went to bat for me.
 2   How did you go to bat for me?
 3        A.     I went to bat for you when I spoke to
 4   Deputy Commissioner Wilson when I was with my mother
 5   and I told him that I did not believe you leaked any
 6   grand jury information.  And that was based on the
 7   fact that, to my knowledge, you did not testify
 8   before the grand jury; therefore, how could you ever
 9   leak grand jury information if you were not privy to
10   any.
11        So to call you in front of the grand
12   jury and allege that you did or ask you about
13   something that you may have done, when that person
14   knew that you did not participate, in my opinion, is
15   just wrong.  And I relayed that to the deputy
16   commissioner and I probably relayed that to other
17   people.  Who?  I don't know.  I know I relayed that
18   to you.  And that's why I said I went to bat for you
19   because I stood up for you because I know you did not
20   do that because you were never there.
21        Q.     And as a result of Tracy Tripp,
22   obviously, committing a criminal act, what action did
23   you or Deputy Commissioner Wilson take against Tracy
24   Tripp?
```

Geftman Reporting Associates
610-608-1040

JASON HENDERSHOT                    129

```
 1              MR. GONZALES:  Objection.  You have to
 2       rephrase the question because you're saying
 3       that Tracy Tripp engaged in a criminal act.  I
 4       don't know that this witness has testified to
 5       that so I don't know how he could answer the
 6       question.
 7              MR. JACOBS:  The witness just stated
 8       that he knew that ADA Tracy Tripp was alleging
 9       something that could not have possibly
10       happened as a result of the Plaintiff
11       attempting to report corruption.
12  BY MR. JACOBS:
13       Q.      What actions did you take or Deputy
14  Commissioner Wilson take against Tracy Tripp for her
15  violating the Plaintiff's constitutional rights as an
16  assistant district attorney?
17              MR. GONZALES:  I'm going to object.  He
18       can't answer that.  You put all these
19       preambles in there and assumptions about --
20       can you just rephrase and ask a factual
21       question?
22  BY MR. JACOBS:
23       Q.      Did you contact anyone when you learned
24  that the Plaintiff was being targeted by Tracy Tripp?
```

Geftman Reporting Associates
610-608-1040

```
 4       Q.      But you knew that what she was alleging
 5  wasn't true; is that correct?
 6       A.      Yes.
 7       Q.      But the Philadelphia Police Department
 8  allowed her to continue with this farce and stress
 9  out their employees; is that correct?
```

```
 3       A.      I can't say with any degree of
 4  certainty that it caused -- that Detective Sierra
 5  ever informed me that it caused stress for him.  I
 6  don't recall that conversation.  I'm not denying it.
 7  I just don't recall it.  It was evident that it did
 8  cause stress for you, yes.
```

V.    **DEFENDANT TRACY TRIPP CONCLUSION**

For the foregoing reasons, the defendants' motion for summary judgment should be
DENIED.

**PLAINTIFF'S OPPOSITION/RESPONSE TO DEFENDANTS DENNIS WILSON, DF**

**PACE, AND JASON HENDERSHOT MOTION FOR SUMMARY JUDGMENT**

1. Denied. The defendants confirm the Court's error indicating ECF 29 was "deemed" the
   Plaintiff's Fourth Amended Complaint.

2. Denied.

3. Admitted.

4. Admitted.

5. Denied.

6. Denied. The Court threatened the pro se Plaintiff with dismissal if any "new evidence"
   was included in the filings.

7. Admitted.

8. Denied. Officer Involved Shooting Investigation Unit ("OISI").

9. Denied. The plaintiff never revealed/disclosed any confidential information during a
   *Podcast.* ***Hendershot deposition at 60, lines 4-11.***

```
 4   BY MR. JACOBS:
 5          Q.      And you also don't know whether or not
 6   that information is publicly available, do you?
 7          A.      I thought it was confidential.  I just
 8   didn't know.  I guess I was wrong.
 9          Q.      Oh, you were wrong.  Meanwhile, I sit
10   here unemployed because you were wrong; is that
11   correct?
```

10. Denied. Hendershot admitted Wilson retaliation against plaintiff began after the plaintiff filed his lawsuits and before the podcast. What the evidence also shows is the Deputy Police Commissioner of the Philadelphia Police Department, defendant Dennis Wilson, was informed of the Philadelphia District Attorney's Office illegal activity against the plaintiff at the earliest in 2018 (Inspector James Smith) and at the latest between September 2019 and November 2019. The defendant chose not to protect the plaintiff from the illegal activity and instead decided to participate in the illegal activity against the plaintiff by fabricating departmental violations. ***Hendershot Deposition at 119-122.***

```
12          Q.      Okay.  So Kia Ghee -- strike that.
13                  What did Deputy Commissioner Wilson
14     order you to do as it related to Kia Ghee?
15                  MR. GONZALES:  Objection.  Asked and
16          answered.  You can answer it again.
17                  THE WITNESS:  In summary to get her up
18          to speed on the allegations or assumption that
19          ADA Tripp had made against you involving the
20          grand jury leak.
21     BY MR. JACOBS:
22          Q.      Did you inform Deputy Commissioner
23     Wilson at that time that Detective Jacobs did not
24     commit a grand jury leak violation?
```

JASON HENDERSHOT                     120

1          A.      If my memory serves me correctly, and

2    you know this; I was with my mother on her death bed.

3    And I stepped away from my mother to advocate on your

4    behalf when she was dying in bed, Jake.

5          Q.      Take your time.  Because that's not the

6    way it occurred because both of us --

7               MR. GONZALES:  Stop.  Stop.  Stop.  Do

8          not make a statement.  If you have a question,

9          you ask it.  The fact that we're going where

10         we're going is ridiculous, reprehensible and

11         absolutely outrageous.  So do not make a

12         statement please, sir.  Do not make a

13         statement or we're going to end this.

14              MR. JACOBS:  We both lost family

15         members at that time, you know that.  I lost

16         my brother.

17              MR. GONZALES:  Do not insult anyone

18         here by playing the victim --

19              MR. JACOB:  I'm not insulting --

20              MR. GONZALES:  -- what about me.  You

21         have a question, you ask the question, but

22         that's it.  We don't need a statement or a

23         speech to try to make us feel compassion of

24         some sort.  Ask the question.

JASON HENDERSHOT                    121

```
1   BY MR. JACOBS:
2        Q.    The timeline is different than what you
3   are alleging here, Lieutenant.
4             MR. GONZALES:  You're making a
5        statement.  I said ask a question.
6   BY MR. JACOBS:
7        Q.    When did Deputy Commissioner Wilson
8   contact you?
9             MR. GONZALES:  About what?
10            MR. JACOBS:  He just said at the time
11       he brought it up and it was during that time.
12       I'm going to be respectful, so that you may
13       put a date on the record.  Because at this
14       time you were not a party to this litigation.
15            MR. GONZALES:  All I asked is --
16  BY MR. JACOBS:
17       Q.    The question was, did you inform Deputy
18  Commissioner Wilson that Tracy Tripp -- what Tracy
19  Tripp was alleging did not happen?  That the
20  Plaintiff did not leak grand jury information?
21       A.    I did inform him of that in my opinion.
22       Q.    Did you inform him of that in September
23  of 2018?
24       A.    I don't remember the exact time.  The
```

Geftman Reporting Associates
610-608-1040

JASON HENDERSHOT                    122

```
1   time that I was just responding to was in September
2   -- sometime between September and November of 2019
3   when my mother was sick with cancer.
```

11. Denied. This is a fabrication by the defendants. The host, not the plaintiff, cited public news articles at the beginning of the podcast, which included the plaintiff's years of experience and assignments. **HERE ARE EXCERPTS FROM THE PODCAST.**

***Host Introduction: ...****The murder rate in Philadelphia has skyrocketed...essentially the decriminalization of criminal events and the support of criminals as suppose to victims... is really brought into light here with this guest especially when it comes to political hit jobs as it pertains to people masquerading as prosecutors...this guest brings...an officer clearly was the subject of a political hit job...that guest being Detective Jacobs from the Philadelphia Police Department...if I understand it correctly has over twenty years experience as a detective in the homicide as well as the officer involved investigations unit...Detective Jacobs welcome to search warrant.*

***Jacobs:*** *Thank you for having me.*

***Host:*** *There was an article that Ralph Cipriano an investigative reporter out of Philadelphia had issued...title of the article Detective: District Attorney tampered with witness in officer involved shooting.* https://www.bigtrial.net





MONDAY, NOVEMBER 18, 2019

**Detective: D.A. Tampered With Witness In Officer Involved Shooting**

**By Ralph Cipriano**
for BigTrial.net

Derrick "Jake" Jacobs was one of the detectives assigned to investigate the 2017 fatal police shooting of dirt biker David Jones.

The victim was black; Ryan Pownall, the officer who pulled the trigger, was white. Jacobs, who is black, says that race played no part in his investigation, which exonerated the officer, neither did any supposed loyalty to his fellow cops.

"If it's a bad shooting, there's nothing you can do about it," said Jacobs, a veteran detective of 20 years who formerly worked homicide before he was assigned to the Philly P.D.'s Officer Involved Shooting Investigation Unit. "The facts are the facts," the detective said, and "you can't get around them."

**Jacobs:** ...that's why I say on November 9... I say my law enforcement career ended is because at that point in time, which she alleged about myself ...tarnished my reputation as an officer of the court...she say I'm leaking grand jury information, she says I'm contempt of court, she basically saying I'm a bad cop.

**Host:** ...with no proof... what so ever...no proof of it.

**Jacobs:** ...she knew when brought...when she started this investigation with me... it was a total farce, it was a total lie...she did it to keep me quiet...she did it to ensure my silence until after the Pownall trial.

**Host:** ...what's your status now...?

**Jacobs:** ...she alleges that the only reason she didn't prosecute me is because the transcripts of the proceedings were lost...so this is a lie...she said the transcripts of the court proceeding were lost, so she could not proceed with the charges against me, that's what she told my superior...I knew no transcripts existed...at this point...she needs to be removed...she's the worst of the worst in our profession. We...you can't have officers of the court operate the way she's operating whether it's against a law enforcement officer or a civilian...it doesn't make a difference if you're corrupt, you're corrupt....the facts are the facts...I do have all the knowledge of the false investigation and the proceedings that she brought against me. I know they're a hundred percent false.

**Host:** Jesus Christ... so we got a false grand jury presentment and then we have ...transcripts that are missing...what happened...?

**Jacobs:** ...as fate would have it I was getting sworn into another grand jury...for when I was a homicide detective...while I was getting sworn in ADA Tripp was there...of course I have zero contact... with her I don't have too much to say to her after what she did to

*me and my family over the past year…or longer now…after I'm sworn in… I'm leaving the building and she almost chases me down to say Detective Jacobs I told your Lieutenant that I'm withdrawing the charges against you, I told him that last week. So I hope he had told you… to be honest with you I ignored her until she kept going on and on and on about her withdrawing the charges against me and I just said ok and I just date and time stamped that conversation. Then she said I don't think that my FOP appointed attorney would have any problems with me communicating this information to you. Another thing she had told my Lieutenant was that there was going to be a fake admonishment conducted by her against me in the judge's chambers to ensure…that I don't leak again, not that I ever leaked but I was gonna have the judge read me the riot act just to scare me.*

**Host:** *…Tripp is doing Krasner's bidding it's obvious that Krasner hates police continues to try…even making this up, why couldn't Krasner be charged with a hate crime because he hates police…somebody pursue that angle because he's so inconsistent…prejudice.*

**Jacobs:** *…I would love for the U.S. Attorney to take a look at what they are doing in that office and they could start with my case…I've been an investigator for over twenty years, I've worked homicide…I done ran the gambit as far as investigations…I'm sure I could present and put together my case to have Tripp arrested…I have enough evidence for probable cause.*

**Host:** *…we got to reach out to McSwain, that's the U.S. Attorney down there right.*

**Jacobs:** *…what I can tell you is I have all the documents…my story is going to never change…from Tripp she will probably go from here, from here, here, here…she gonna lie*

*from here, here, here... she committed a criminal act against me, although I filed a civil case against her, her acts were criminal.*

**Host:** *...we definitely got to get a hold of McSwain...*

**Jacobs:** *...I've tried...my current Commissioner who's outgoing I reached out to her through emails...to try and get the criminal referral because I wrote her an email stating that all... these attacks against me occurred while I was in the performance of my duties...and I think I need to be protected and ....first she sent me a response saying received sir...a two word response...then I didn't get anything else back...then I sent a memorandum what's called up the chain...like through all levels supervisory ...and then it got denied ...and I got called down to...we call it the third floor in Philadelphia where upper management and the brass lives...the deputy commissioner's met with me and said...they don't want to meet with me because they don't want to be witnesses in this...so I follow their advice...of course I can't file my criminal complaint with the district attorney's office... so I suggested I go to the federal government...to the U.S. Attorney...he said I should not...go to the Attorney General's Office,  I told him that the Attorney General has a conflict only because the part of my lawsuit I named Attorney General Phillips...I still attempted it, that's what the deputy asked me to do, that's what I did...once that got shot down for reasons that I just explained that it's a conflict...I'm trying to get them now to present this to the U.S. Attorney again, and for the last month or so I've been hearing crickets...so now... while I am trying to do this civil suit, I am also trying to find out how to contact someone in the federal government to present this criminal complaint.*

**Host:** ...what you described... cannot go on. This is a manipulation of the criminal justice system in a major U.S. city that cannot go on...because it adversely impacts the ability of law enforcement to do their job...you got people becoming victims of political vindictiveness this certainly fits in the arena of that with ... the head is corruption you can't put up with it...we can't put up with it anymore...and we'll pursue what we can ...I just thought of another entity on the federal level is very interested in what you just described.

**Jacobs:** ...I appreciate any help you can provide honestly...you don't want to look at it like this because it's the district attorney's office...but when you operate it with all of the corruption...it's almost like a criminal enterprise.

**Host:** ...exactly it's a RICO situation...false grand jury presentments and bulls*t transcripts missing...they'll invent sh*t I suppose...that's what she's done

**Jacobs:** ...here's the thing she also said ... that questions her ethics if what's she's telling my lieutenant is true then she's been having ex parte conversations... with the judge about my case without me or my attorney present while these decisions were taking place...I've never heard of that happening...I've already spoke with the ethics board and I relayed this information to them...if these conversations took place either she lied...if I'm a betting man I would say that she lied because I can't see a judge entertaining this nonsense but who knows.

**Host:** ...it should blow your average citizen's mind...you're susceptible to this...you're susceptible to having someone come up with a... false grand jury presentment and jam you up...you got people running the show that can put out false grand jury presentments and that's gotta end.

*Jacobs:* ...who's to say... if I didn't have my I's dotted and my T's crossed...if my face wouldn't be on the news being indicted for contempt of court...they want to silence me and I'm sure they're upset they failed...she represents a clear and present danger to the City.

After reviewing the above excerpts from the podcast; how could defendant Dennis Wilson not recall any of the podcast statements when he listened to it? How could defendant, DF Pace not remember when he listened to the podcast the plaintiff referencing his litigation?

12. Denied. Below excerpt from podcast.

*Host:* ...what you described... cannot go on. This is a manipulation of the criminal justice system in a major U.S. city that cannot go on...because it adversely impacts the ability of law enforcement to do their job...you got people becoming victims of political vindictiveness this certainly fits in the arena of that with ... the head is corruption you can't put up with it...we can't put up with it anymore...and we'll pursue what we can ...I just thought of another entity on the federal level is very interested in what you just described.

*Jacobs:* ...I appreciate any help you can provide honestly...you don't want to look at it like this because it's the district attorney's office...but when you operate it with all of the corruption...it's almost like a criminal enterprise.

13. Denied. Below excerpt from podcast

*Jacobs:* ...that's why I say on November 9... I say my law enforcement career ended is because at that point in time, which she alleged about myself ...tarnished my reputation

*as an officer of the court...she say I'm leaking grand jury information, she says I'm contempt of court, she basically saying I'm a bad cop.*

**Host:** *...with no proof... what so ever...no proof of it.*

**Jacobs:** *...she knew when brought...when she started this investigation with me... it was a total farce, it was a total lie...she did it to keep me quiet...she did it to ensure my silence until after the Pownall trial.*

**Host:** *...what's your status now...?*

**Jacobs:** *...she alleges that the only reason she didn't prosecute me is because the transcripts of the proceedings were lost...so this is a lie...she said the transcripts of the court proceeding were lost, so she could not proceed with the charges against me, that's what she told my superior...I knew no transcripts existed...at this point...she needs to be removed...she's the worst of the worst in our profession. We...you can't have officers of the court operate the way she's operating whether it's against a law enforcement officer or a civilian...it doesn't make a difference if you're corrupt, you're corrupt....the facts are the facts...I do have all the knowledge of the false investigation and the proceedings that she brought against me. I know they're a hundred percent false.*

14. Admitted. Below excerpts from podcast

**Host:** *...exactly it's a RICO situation...false grand jury presentments and bulls\*t transcripts missing...they'll invent sh\*t I suppose...that's what she's done*

**Jacobs:** *...here's the thing she also said ... that questions her ethics if what's she's telling my lieutenant is true then she's been having ex parte conversations... with the judge about my case without me or my attorney present while these decisions were taking place...I've never heard of that happening...I've already spoke with the ethics board and*

*I relayed this information to them...if these conversations took place either she lied...if I'm a betting man I would say that she lied because I can't see a judge entertaining this nonsense but who knows.*

**Host:** *...it should blow your average citizen's mind...you're susceptible to this...you're susceptible to having someone come up with a... false grand jury presentment and jam you up...you got people running the show that can put out false grand jury presentments and that's gotta end.*

**Jacobs:** *...who's to say... if I didn't have my I's dotted and my T's crossed...if my face wouldn't be on the news being indicted for contempt of court...they want to silence me and I'm sure they're upset they failed...she represents a clear and present danger to the City.*

15. Denied. This was an "external" order from Krasner to retaliate against the plaintiff. There was never an "internal investigation." Wilson stated he listened to the podcast and knew immediately the plaintiff violated policy. When asked what the plaintiff stated on the podcast Wilson could not recall. When asked what policy the plaintiff violated Wilson stated it doesn't matter. How after listening to the podcast, Wilson did not recall this below excerpt.

**Jacobs:** *...I've tried...my current Commissioner who's outgoing I reached out to her through emails...to try and get the criminal referral because I wrote her an email stating that all... these attacks against me occurred while I was in the performance of my duties...and I think I need to be protected and ....first she sent me a response saying received sir...a two word response...then I didn't get anything else back...then I sent a memorandum what's called up the chain...like through all levels supervisory ...and then*

*it got denied ...and I got called down to...we call it the third floor in Philadelphia where upper management and the brass lives...the deputy commissioner's met with me and said...they don't want to meet with me because they don't want to be witnesses in this...so I follow their advice...of course I can't file my criminal complaint with the district attorney's office... so I suggested I go to the federal government...to the U.S. Attorney...he said I should not...go to the Attorney General's Office,  I told him that the Attorney General has a conflict only because the part of my lawsuit I named Attorney General Phillips...I still attempted it, that's what the deputy asked me to do, that's what I did...once that got shot down for reasons that I just explained that it's a conflict...I'm trying to get them now to present this to the U.S. Attorney again, and for the last month or so I've been hearing crickets...so now... while I am trying to do this civil suit, I am also trying to find out how to contact someone in the federal government to present this criminal complaint.*

How could DF Pace not recall the plaintiff discussing his litigation? The only thing he recalls is the plaintiff stating criminal enterprise and clear and present danger. He can only recall what Krasner and Wilson ordered him to recall. Neither Wilson, Pace, or Hendershot could indicate what policy the plaintiff violated during their four minute investigation. *See above excerpts from podcast.*

16. Denied. Plaintiff alleges the disciplinary charges were a result of his reporting of public corruption and matters of public concern and the subsequent filings of lawsuit(s). Hendershot admitted during the deposition he advocated on the plaintiff's behalf "prior to the podcast" to keep Wilson from immediately retaliating against the plaintiff.

```
                        JASON HENDERSHOT                    120

   1         A.       If my memory serves me correctly, and
   2    you know this; I was with my mother on her death bed.
   3    And I stepped away from my mother to advocate on your
   4    behalf when she was dying in bed, Jake.
   5         Q.       Take your time.  Because that's not the
   6    way it occurred because both of us --
```

```
                        JASON HENDERSHOT                    122

   1    time that I was just responding to was in September
   2    -- sometime between September and November of 2019
   3    when my mother was sick with cancer.
```

17. Denied.

18. Denied. *Rule 56. Based upon the clearly disputed facts with supporting documentation contrary to the defendants' assertions. The defendants are not entitled to summary judgment.*

19. Admitted. There is not one material fact in the record that entitles the defendants to summary judgment.

20. Denied. Clearly the plaintiff has presented "specific facts" disputing the defendants' assertions. Furthermore, if a motion for summary judgment is to be GRANTED, it should be granted in favor of the plaintiff.

21. Admitted?

22. Admitted?

**A. The defendants have not made a showing sufficient for an entry of summary judgment in their favor. On the contrary, the defendants' argument substantiates the granting of summary judgment in the plaintiff's favor.**

23. The plaintiff has proven he engaged in a constitutionally protected conduct; the defendants took action sufficient to deter an ordinary person from engaging in such conduct; and a causal connection between the two. *Palardy v. Township of Millburn, 906 F.3d 76, 80-81 (3rd Cir. 2018).* The plaintiff has clearly established the above.

24. Admitted?

25. Admitted? *Also see Javitz v. City of Luzerne (3rd Cir. 2019) where specifically Javitz learned of the public corruption as a result of her employment.*

26. Admitted?

27. Admitted.

28. Denied. The plaintiff's speech on the podcast addressed his litigation for violation of his constitutional rights and the criminal activity at the Philadelphia District Attorney's Office. *The defendants' argue it interfered with the employer's interest but the defendants never notified Coulter or Outlaw of the disciplinary actions against the plaintiff. Both Philadelphia Police Commissioner Coulter and Philadelphia Police Commissioner Outlaw indicated the defendants never informed them of the disciplinary actions/retaliation perpetrated on the plaintiff. Commissioner Coulter testified during her deposition (Jacobs v. City of Philadelphia 19-cv-4615) she could think of no reason she would not be notified of the disciplinary actions perpetrated against the plaintiff. Coulter further stated she never had any knowledge of the plaintiff doing anything to undermine the reputation of the Philadelphia Police Department.*

## Departmental and Criminal violations by Command Staff

**Danielle.Outlaw** <Danielle.Outlaw@phila.gov>
To: Derrick Jacobs <derrickjacobs9116@gmail.com>
Cc: Patrick Quinn <Patrick.Quinn@phila.gov>

Wed, Aug 26, 2020 at 4:51 PM

Detective Jacobs,


Thank you for forwarding to me your memorandum dated August 3, 2020. I understand from that correspondence that you sent an earlier memorandum to me, but I did not receive it. After looking into the issues raised by your memorandum, I learned that you filed a lawsuit against the City of Philadelphia, the District Attorney's Office, District Attorney Lawrence Krasner, and Assistant District Attorney Tracy Tripp. Because the issues raised by your memorandum are the subject of pending litigation, I am unable to comment further. Please direct all future inquiries to Jennifer MacNaughton, Esq., City of Philadelphia Law Department (Jennifer.MacNaughton@Phila.gov).


Very Sincerely,




Danielle M. Outlaw
Police Commissioner
Philadelphia Police Department
750 Race Street, Room 314
Philadelphia, PA 19106
(P) 215.686.3367
(F) 215.625.0612




```
 9   BY MR. JACOBS:
10      Q.  Have you ever seen any incident
11   involving Detective Jacobs on T.V.?
12      A.  No, I haven't.
13              Let me rephrase that.
14              In your years as both a
15   homicide investigator and the Officer
16   Involved Shooting Team, I'm sure there have
17   been times where you have been on television.
18   BY MR. JACOBS:
19      Q.  Yes.  Let me rephrase.
20              Have you ever seen Detective
21   Jacobs on television disparaging the
22   Philadelphia Police Department?
23      A.  I have not.
24      Q.  Have you ever heard of Detective
```

### Deputy Commissioner Christine M. Coulter
### April 28, 2022

|  | Page 87 |
|---|---|

```
 1   Jacobs violating policy that disparaged the
 2   Philadelphia Police Department?
 3      A.  I have not.
```

Former Philadelphia Police Commissioner Christine Coulter April 28, 2022 deposition

Page 86, lines 10-24 and Page 87 lines 1-3. *Jacobs v City of Philadelphia 19-cv-4615*

```
18   Q.  Did Deputy Police Commissioner
19   Wilson inform you that he was initiating a
20   disciplinary investigation against Plaintiff
21   Jacobs?
22   A.  He did not.
```

*Former Philadelphia Police Commissioner Christine Coulter April 28, 2022 deposition,*

*page 59, lines 18-22. Jacobs v City of Philadelphia 19-cv-4615.*

29. Denied. There is not a scintilla of information in the record of an issue with grand jury confidentiality or a breach in the working relationship with District Attorney's Office. Furthermore, the defendants never notified the Police Commissioners of the retaliatory disciplinary actions taken against the plaintiff.

30. Denied. The defendants have not presented any evidence supporting this claim. On the other hand, the plaintiff has presented evidence of corruption and the plaintiff has presented evidence of constitutional rights violations.

**B. The defendants are not entitled to summary judgment in their favor regarding the Plaintiff's 1983 Conspiracy claim. On the contrary, the plaintiff has proven the defendants acted in concert in the retaliation against the plaintiff.**

31. The plaintiff has clearly showed the defendants acted in concert to deprive the plaintiff of constitutionally protected rights.

32. Defendant entered into an agreement with defendant Hendershot initially to violate the plaintiff's sixth amendment right to counsel when she learned of the plaintiff's attempts to expose her criminal activity. Defendant Tripp then initiated a criminal proceeding against the plaintiff without probable cause. Defendant Wilson initiated a retaliatory disciplinary action against the plaintiff when he attempted to publicly expose corruption.

33. The plaintiff has provided evidence showing the defendants have achieved a "meeting of the minds.

34. The plaintiff have met this burden

35. The plaintiff has clearly established constitutional rights violations.

36. There is a plethora of evidence supporting the plaintiff's claims.

37. The record is undisputed the plaintiff engaged in a protected activity. The defendants initiated an action to deter an ordinary person from that activity.

### C. Defendants are not entitled to summary judgment in their favor regarding the Plaintiff's Pennsylvania Whistleblower Law claim

38. The relevant portions of the Pennsylvania Whistleblower Law are § 1421-1428

39. The plaintiff clearly showed he engaged in a protected activity by consulting with an attorney to ascertain the best avenue for reporting criminal activity and corruption. Defendant Tripp learned of that consultation and initiated a fabricated criminal proceeding to deter the plaintiff from engaging in that protected activity. The proceeding was initiated without a legitimate person and never rose above the administrative level. The plaintiff prevailed in the criminal proceeding. The plaintiff also requested protections from numerous public officials as a result of his attempts to report public corruption.

40. The plaintiff has shown and the defendants have admitted to the causal connection between the plaintiff's protected activity and defendants' retaliation.

41. The plaintiff has clearly established the defendants' violations of his constitutional rights.

42. The plaintiff has proven by a preponderance of the evidence presented there was not a separate reason, other that retaliation, for the actions against the plaintiff.

43. The plaintiff clearly has reported waste and wrongdoing and there is no evidence to the contrary.

44. The plaintiff has specified the alleged waste and wrongdoing committed by the defendants.

45. The defendants waste a wrongdoing reported by the plaintiff is clearly documented.

46. The plaintiff has submitted "concrete facts" is support of his claims.

47. The defendants have not placed any facts into the record in support of the plaintiff's termination/constructive discharge

48. The plaintiff allegations are supported by factual documentation.

49. Denied. The podcast excerpts clearly showed the exhaustive efforts of the plaintiff to numerous officials to report on matters of public concern. *The defendants retaliation against the plaintiff began well before the podcast.*

50. Denied. *Four (4) minutes for entire investigation. Google 2018 Philadelphia Police Department Budget Testimony.https://phlcouncil.com/wp-content/uploads/2017/04/FY18-Police-Budget-Testimony-final-4.12.17.pdf*   The defendants have proven there was zero investigation. The defendants have proven this was retaliation against the plaintiff for his execution of his constitutional rights. Defendant Hendershot authored a fabricated email to Chief Inspector Frank Vanore on March 4, 2020. Hendershot, knowing the plaintiff could not return to work without being terminated was observed calculating the remaining vacation, sick, holiday hours of the plaintiff. After the calculation defendant Hendershot learned the plaintiff would run out of time in March 2021 and placed that information into the email to Vanore. Hendershot fabricated the email indicating the plaintiff intended to "run time" and leave the Philadelphia Police Department in March 2021.

Detective Jacobs' status

Jason Hendershot <Jason.Hendershot@Phila.gov>
Wed 3/4/2020 3:49 PM
To: Frank.Vanore <Frank.Vanore@phila.gov>

Good afternoon Chief Inspector Vanore,

Just wanted to keep you informed about Detective Jacobs' status:

For the last two (2) months or so, Detective Jacobs has mentioned on several occasions that he intends to "run time" for a year and then retire. He never committed to a date, but indicated that it would be in March. I informed Detective Jacobs that he would have to officially request to "run time" and when he was ready to officially do so, I would make the appropriate request through the chain-of-command.

In February, I informed Detective Jacobs that I was going to take him off of the "wheel", because I could not allow him to be the lead investigator on an OIS. Detective Jacobs understood and agreed that he should not be the lead investigator going forward, due to him getting ready to "run time".

In February, Detective Jacobs received 75-18s for violation of departmental policy. He pleaded not guilty and requested a hearing. Since that point, he believed that he was being "targeted" by the PPD.

On February 25, Detective Jacobs informed Sgt. Farrell that he was off sick and was unsure of when he would return to work. Detective Jacobs was carried sick and as of today (3-4-2020) has not returned to work. Since he has been off sick for more than 9 consecutive calendar days, I contacted him and informed him that he needed to provide me with a sick note, and that in order for him to return to work, he would have to be seen by a doctor at 19th & Fairmount. At this point, during our phone conversation, Detective Jacobs informed me that he was IOD from stress, caused by the PPD. In addition, Detective Jacobs informed me that he had filed another lawsuit against the PPD, including PC Outlaw, pertaining to his 75-18s. At this point, I informed Detective Jacobs that I would look into whether or not stress is something an employee can be carried as IOD.

I contacted the Safety Office and stress does not fall under IOD. Detective Jacobs remain in sick status until cleared to return to duty by the city doctor at 19th & Fairmount.

I relayed this information to Detective Jacobs and it was obvious that he was documenting the information being relayed to him. I say that because he asked who the C/O of the Safety Office was. Detective Jacobs stated that he was going to submit a doctor's note and memorandum, requesting to be carried IOD. He added that he wanted the disapproval in writing.

As of now, I have not received his sick note or his memorandum.


Lastly, I do not believe that Detective Jacobs should remain assigned to the OISI Unit for now. He has given every indication that he does not plan on being assigned to the unit long-term. In addition, his claim about being under intense stress would render him incapable of participating in an OIS investigation.

I am respectfully requesting that Detective Jacobs be detailed to another unit within the bureau, until he is fit for duty and cleared by the city doctor.

If approved, I am respectfully requesting that a detective be detailed in to the OISI Unit, in his absence.

Jason

Lt. Jason Hendershot #148
Philadelphia Police Department
Officer-Involved Shooting Investigations
Office #215-683-1866
Cell # 215-410-1829

The above document is a complete fabrication and never occurred. During Hendershots'

deposition I asked counsel for the computerized access records of the plaintiff's payroll

to prove Hendershot was accessing the records on a weekly/bi-weekly basis and calculating when the plaintiff would run out of his accrued sick/vacation/holiday time and the defendants' retaliation plan of constructively discharging the plaintiff would end. The defendants have refused to provide this evidence in discovery. When I filed a motion to compel defendants of this discovery, the court denied the plaintiff the access to the evidence proving the plan to "constructively discharge" the plaintiff from his employment a year earlier.  The Court deemed the evidence request not relevant.

51. Denied.

## PLAINTIFF'S OPPOSITION/RESPONSE TO DEFENDANTS DENNIS WILSON, DF PACE, AND JASON HENDERSHOT BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

**I.**  **Relevant Background**

**The plaintiff incorporates the above listed facts as if fully set herein.**

Plaintiff disputes the defendants' relevant background

**II.**  **Statement of Facts**

**The plaintiff incorporates the above listed facts as if fully set herein.**

The plaintiff disputes the defendants Statement of Undisputed Facts.

**III.**  **Statement of Issues Presented**

**The plaintiff incorporates the above listed facts as if fully set herein.**

The plaintiff disputes the Statement of Issues as represented by the defendants.

**IV.**  **Standard of Review**

**The plaintiff incorporates the above listed facts as if fully set herein.**

V.    **Argument**

    **A. Defendants are not entitled to judgment in their favor as they relate to Plaintiff's First Amendment Retaliation claims.**

The plaintiff was engaged in a constitutionally protected action. The defendants engaged in conduct that would deter an ordinary person from engaging in that constitutionally protected conduct. The defendants have admitted to the causal connection between the constitutionally protected conduct and the defendants' retaliatory action.

    i.   *Plaintiff engaged in constitutionally protected conduct when he discussed his litigation during the podcast. The plaintiff only discussed publicly available information during the podcast. The defendants have not presented any evidence to the contrary. The plaintiff also spoke about a matter of public concern during the podcast.* The plaintiff only discussed his litigation and publicly available information of the podcast. The host, not the plaintiff, recited the plaintiff credentials at the outset of the podcast from the information obtained from the November 18, 2019 BigTrial.net article.



MONDAY, NOVEMBER 18, 2019

**Detective: D.A. Tampered With Witness In Officer Involved Shooting**

By Ralph Cipriano
for BigTrial.net

Derrick "Jake" Jacobs was one of the detectives assigned to investigate the 2017 fatal police shooting of dirt biker David Jones.

The victim was black; Ryan Pownall, the officer who pulled the trigger, was white. Jacobs, who is black, says that race played no part in his investigation, which exonerated the officer; neither did any supposed loyalty to his fellow cops.



"If it's a bad shooting, there's nothing you can do about it," said Jacobs, a veteran detective of 20 years who formerly worked homicide before he was assigned to the Philly P.D.'s Officer Involved Shooting Investigation Unit. "The facts are the facts," the detective said, and "you can't get around them."

The confidential "staffing levels" the plaintiff discussed can publicly be located at the following location *https://phlcouncil.com/wp-content/uploads/2017/04/FY18-Police-Budget-Testimony-final-4.12.17.pdf*. When defendant Hendershot was confronted with this information, during his deposition, he provided the following response..

```
 4   BY MR. JACOBS:
 5        Q.    And you also don't know whether or not
 6   that information is publicly available, do you?
 7        A.    I thought it was confidential.  I just
 8   didn't know.  I guess I was wrong.
 9        Q.    Oh, you were wrong.  Meanwhile, I sit
10   here unemployed because you were wrong; is that
11   correct?
```

*Hendershot deposition page 60, lines 4-11.*

So now that it has been established the defendants' fabrication of the plaintiff identifying himself at the outset of the podcast as a detective with many years of experience at the outset is a lie.  It has also been established the defendants' fabrication of the plaintiff revealing confidential information to the public is a lie. Therefore, what is unequivocal is the defendants are liars trying to cover up their corruption and criminal activity. Now let's tackle the plaintiff speaking as a private citizen. The Philadelphia Police Department's Social Media Policy (Directive 6.10) states the following:

> G.  Employees who are off-duty, and using privately-owned property to engage in the personal use of social media, do not represent the City of Philadelphia, the Philadelphia Police Department, or any official position maintained by either entity.  Under such conditions, employees represent only themselves and their personal interests.

The defendants had a plan as indicated by defendant Hendershot's memo to Chief Inspector Frank Vanore four (4) minutes after the plaintiff signed his interview. The decision to discipline the plaintiff was made long before the interview. The plan was to "lock" the plaintiff into the word "podcast" and "staffing levels."

> Good afternoon Chief Inspector Vanore,
>
> I interviewed Detective Jacobs today and attached his interview for your review.
>
> I kept the interview focused on whether or not he had permission to participate in the Podcast and whether or not he had permission to divulge staffing levels in our Unit.

Their plan had two flaws. One, the "staffing levels" were already public. Two, they did not expect the plaintiff to answer honestly to the word "podcast" (which was new to the plaintiff) and include defendant Wilson as the Commissioner's "designee" allowing the plaintiff to go public with his corruption allegations.

> Q. Did you obtain approval from the Police Commissioner or her designee to participate in this Podcast?
> A. No, not for a Podcast; however, I received permission from Deputy Commissioner Wilson during a conversation I had with him in his office on November 26 2019, to go public with my corruption allegations.

The decision to discipline the plaintiff was already made. The defendants have not placed any evidence in the record to refute the plaintiff's interview that he received permission from the Commissioner's designee, Deputy Police Commissioner Dennis Wilson, on November 26, 2019 (prior to the podcast), to go public with his public corruption allegations. The defendants were asked multiple times during their depositions if this fact was ever reconciled and they all responded that it was not. Wilson's

credibility is beyond repair after multiple lies told to the public. Next, the defendants' argument indicating the plaintiff's reporting of corruption on the podcast, threatened the working relationship with the District Attorney's Office is without merit. There is zero evidence in the record to support such a claim. On the contrary, both former Philadelphia Police Commissioners indicated they were never informed of the defendants' nefarious activity. If there was a "workplace" environment issue, why did Wilson inform the plaintiff he could not stop the "victimization" of the plaintiff by the District Attorney's Office? The plaintiff discussed criminal actions committed against him and his pending litigation. This is clearly a matter of public concern. ***See Javitz (3rd Circuit 2019).***

ii.  *Plaintiff was charged, investigated, and constructively discharged based upon his constitutionally protected free speech during the podcast.*

The plaintiff clearly discussed the retaliatory actions of the defendants as a result of him reporting corruption. The defendants have retaliated against the plaintiff every time the plaintiff attempted to expose the corruption by these public officials on matters of public concern. On September 27, 2018 (fabricated grand jury leak). On November 18, 2019 (communication shut down and threatened vehicle confiscation). On January 18, 2020 (disciplinary action and charges). On March 5, 2020,(vehicle confiscation). On April 21, 2021(criminal investigation Philadelphia Police Department). Hendershot's own documentation proves there was

never an "investigation." He informed Vanore four (4) minutes after interviewing the plaintiff he would be requesting disciplinary charges.

iii.   *Defendant Wilson was intimately involved in the retaliation against the plaintiff. Wilson NEVER listened to the podcast and was ordered to conspire to terminate the plaintiff's employment by Krasner.* Wilson said he listened to a podcast that was not publicly available. When asked what the plaintiff said on the podcast that warranted him to initiate a disciplinary investigation, Wilson could not provide an answer. That is because he never listened to the podcast. How could Wilson listen to the podcast by January 21, 2020 and request disciplinary action against the plaintiff before the Philadelphia Police Department received the CD on January 24, 2020.



From: Jason Hendershot
To: Kia Ghee
Subject: FW: Action and report
Date: Tuesday, January 28, 2020 2:42:51 PM

Sent via the Samsung Galaxy S7, an AT&T 4G LTE smartphone

-------- Original message --------
From: Jason Hendershot <Jason.Hendershot@Phila.gov>
Date: 1/24/20 2:46 PM (GMT-05:00)
To: Nicole Judge <Nicole.Judge@Phila.gov>
Subject: RE: Action and report

I can swing by Monday morning on my way in and pick it up if that's okay

Sent via the Samsung Galaxy S7, an AT&T 4G LTE smartphone

-------- Original message --------
From: Nicole Judge <Nicole.Judge@Phila.gov>
Date: 1/24/20 2:45 PM (GMT-05:00)
To: Jason Hendershot <Jason.Hendershot@Phila.gov>
Subject: Action and report

Lt,

I have the CD in reference to Det Jacobs interview. I will have it in the office if you can get someone to pick it up.

Thank you,

Sgt. Nicole Judge #8563
Detective Bureau

Question, how could Wilson listen and request disciplinary action against the plaintiff on January 21, 2020 when the Philadelphia Police Department did not receive the CD of the podcast until January 24, 2020? Here is another fabrication by defendant Henershot playing "both sides." Clearly the text between the plaintiff and Henershot indicated the request was before the receipt of the CD and it was requested by Wilson. In an email to Vanore on January 27, 2020, he indicates to Vanore he never informed the plaintiff it was Wilson requesting the disciplinary action. If that is the case

43

why would the plaintiff be asking Hendershot on January 24, 2020 if he had received the action and report from Wilson.

Email from Jacobs to D/C Wilson

Jason Hendershot <Jason.Hendershot@Phila.gov>

Mon 1/27/2020 10:33 AM

To: Frank.Vanore <Frank.Vanore@phila.gov>

1 attachments (195 KB)

Jacobs email to DC Wilson.pdf;

Chief Inspector Vanore,

I handed Detective Jacobs a notice of his interview, regarding his Podcast, which is scheduled for Thursday, January 20th at 10AM.

Upon handing him his notice, he handed me a 3 page letter, addressed to D/C Wilson. Jacobs informed me that he had emailed the letter to D/C Wilson directly.

Note: I never informed Jacobs that D/C Wilson was taking disciplinary action him, I informed Jacobs that I would be conducting an interview in reference to the Podcast. page two, last paragraph, Jacobs states that D/C Wilson ordered him not to communicate any matters to the DAO. That is not accurate. I ordered Jacobs NOT to communicate with the DAO, regarding any matter, via email, without my knowledge or permission.

If Wilson did not request disciplinary against the plaintiff on January 21, 2020, who did? The only parties in the Philadelphia Police Department with knowledge on January 20, 2020, were the plaintiff and defendant Hendershot.

**B. Defendants are not entitled to summary judgment in their favor as to Plaintiff's 1983 Conspiracy claim**

**The plaintiff incorporates the above listed facts as if fully set herein**

The defendants clearly acted in concert to deprive the plaintiff of his constitutionally protected rights.

**C. Defendants are not entitled to summary judgment in the favor as to Plaintiff's Pennsylvania Whistleblower Law claim.**

On October 4, 2019, prior to serving the defendants with this complaint, the plaintiff asked then Police Commissioner Christine Coulter for Whistleblower protections from retaliation. Defendant Hendershot also testified the plaintiff had numerous conversations with him regarding the pending retaliation from the District Attorney.

```
21          Q.      Prior to the filings of this lawsuit,
22     did you and the Plaintiff discuss the impending
23     retaliation that was going to be inflicted upon him
24     by District Attorney Larry Krasner?
```

JASON HENDERSHOT                                    111

```
1           A.      I don't remember the exact words that
2      we spoke of, but I do remember having conversations
3      consisting of something around those lines.  Exactly
4      what was said, I could not tell you.  But that's --
5      that's my answer.  I don't remember exactly what we
6      spoke about every time.
```

*Hendershot deposition page 110, lines 21-24 and page 111, lines 1-6*

Clearly the plaintiff made "good faith" reports of corruption, including several to his Commanding Officer, Hendershot.

45

i.   *Plaintiff was clearly a whistleblower and retaliated against as a result. Plaintiff made numerous good faith reports to multiple superiors.* The plaintiff, prior to September 27, 2018, was a decorated and highly respected Law Enforcement Officer. Immediately upon defendant Tracy Tripp learning of the plaintiff's consultation with an attorney attempting to report the District Attorney's Office corruption, the plaintiff's law enforcement career spiraled out of control into the abyss.

ii.   *The charges against the plaintiff were clearly a result of him being a whistleblower and the defendants clearly violated PA Whistleblower Law. The defendants conducted an investigation that lasted less than four (4) minutes. The results of the one interview "investigation" culminated with the charge of Conduct Unbecoming an Officer. The penalty includes TERMINATION.*

## VI.   <u>SUPPLEMENTAL FACTS IN SUPPORT OF THE PLAINTIFF ARGUMENT IN OPPOSITION OF THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

1. <u>Credibility</u>

   a. Tracy Tripp: Tripp presented fabricated documents during the deposition of the plaintiff. Tripp attributed the documents to the plaintiff. When the plaintiff requested the fabricated documents, Tripp has now claimed "privilege" because the relate to the Twenty-Ninth Investigating Grand Jury, which the plaintiff was approved by Judge Robert Coleman to view after being sworn into the grand jury as a sworn law enforcement officer. After stating she was

informed by Detective Newell the grand jury presentment was incorrect,
Tripp's attorney (David Smith) violated Hall v. Clifton Precision numerous
times, directing the witness not to answer without asserting a privilege.

```
14   BY MR. JACOBS:
15   Q.  Did Detective Brian Newell, who was the
16   investigation in the officer -- in the Ryan
17   Pownall officer-involved shooting, did he ever
18   tell you the facts that were contained in the
19   grand jury presentment were incorrect?
20   A.  He told me he believed they were incorrect --
21   some of them were incorrect.
```

*Tripp deposition page 124, lines 14-21*

```
4        What did you do after Detective Newell told
5   you the facts as he understood them and the grand
6   jury presentment were incorrect?
7              MR. SMITH:  Objection.  Direct the
8              witness not to answer.
9   BY MR. JACOBS:
10  Q.  Did you do anything after Detective Newell
11  told you the grand jury presentment was incorrect?
12             MR. SMITH:  Objection.  Direct the
13             witness not to answer.
14  BY MR. JACOBS:
15  Q.  Did you attempt to reconcile the
16  inconsistencies Detective Newell brought to your
17  attention?
18             MR. SMITH:  Objection.  Direct the
19             witness not to answer.
20  BY MR. JACOBS:
21  Q.  So, we just going to let a Philadelphia Police
22  Officer who almost got killed, go to jail because
23  the District Attorney wants him to; is that
24  correct?
```

*Tripp deposition, page 125, lines 4-24*

```
15   Q.  Did Larry Krasner fulfill a campaign promise
16   by locking up Philadelphia Police Officers?
17              MR. SMITH:  Objection.  Direct the
18       witness not to answer.
19   BY MR. JACOBS:
20   Q.  That's why Detective Jacobs is sitting here,
21   right, because District Attorney Larry Krasner
22   told you to initiate the criminal charges that was
23   brought against Detective Jacobs; is that correct?
24              MR. SMITH:  Objection.  Direct the
```

*Tripp deposition page 126, lines 15-24*

```
1        witness not to answer.
2    BY MR. JACOBS:
3    Q.  The reason Detective Jacobs is sitting here is
4    because he was exposing corruption at the District
5    Attorney's Office; is that correct?
6              MR. SMITH:  Objection.  Direct the
7        witness not to answer.
8    BY MR. JACOBS:
9    Q.  Because everyone you spoke to regarding
10   Detective Jacobs told you he was an outstanding
11   investigator; is that correct?
12             MR. SMITH:  Objection.  Direct the
13       witness not to answer.
```

*Tripp deposition page 127, lines 1-13*

b.  Dennis Wilson: Wilson has allowed Philadelphia Police Officers to be
transferred and/or arrested on orders from Larry Krasner. The plaintiff
attempted to address Wilson's credibility issues but was denied by the Court.

```
15        Q    Who transferred Chief Inspector Kelly?
16        A    Ultimately the commissioner would do that,
17   but a decision was made to make changes in the upper
18   command and that's something we always did.  That
19   wasn't my decision.
20        Q    Who made that decision?
21        A    I'm not sure.  That would ultimately be
22   the police commissioner, like I said.  Commissioner
23   would move a chief inspector.  The department is not
24   going to move a chief unless the commissioner agrees
```

```
20        Q      Did District Attorney Krasner order you to
21   transfer Chief Inspector Kelly?
22             MR. GONZALES:  Objection.
23             MR. SMITH:  Objection.
24             MR. GONZALES:  I'm instructing him not to
```

*Wilson deposition page 162, lines 20-24*

```
1         answer.  That has nothing to do with your case.
2   BY MR. JACOBS:
3         Q      Did District Attorney Kranser order you to
4   transfer Inspector Smith?
5             MR. SMITH:  Objection.
6             MR. GONZALES:  Objection.  This has
7        nothing to do with your case.  Just ask
8        questions about your case.
```

*Wilson deposition page 163, lines 1-8*

Wilson was the Deputy Police Commissioner of Investigations. In 2018 after the confrontation with Tripp and Cummings over the illegal Pownall arrest and the retaliation against the plaintiff from the Officer Involved Shooting Investigation Unit ("OISI"), Wilson transferred Chief Inspector Kelly and Inspector James Smith on orders from Krasner as a result of their support for the plaintiff. Wilson would have you believe he did not participate in their transfer, which is why he would not provide the plaintiff's superiors with the reasoning for their transfer. **Wilson made the following statement, a lie, during the press conference on June 25, 2020** *"On June 1 I was the incident commander…I was on-site, I and I alone gave the approval to…to use CS gas. I did this based upon what I could see. We had several conversations. I knew*

*the rules of engagement. Commissioner Outlaw wanted me to call her prior to using any CS gas. I did that at 52nd and Market. I did not do that during the protest on 676. Things happened quickly, I didn't call the Commissioner, I gave the approval and it was me and me alone like, like I said. For that, For violating the rules of engagement and the Commissioner's trust I am going to take a voluntary demotion to my previous civil service rank which is Chief Inspector and I believe that's going to happen immediately…and that's what I have Commissioner."* During defendant Wilson's deposition, the plaintiff recited Wilson's press conference statement with the following questions. Was that a true statement then? Is that a true statement now? The defendants stopped the deposition.

```
4     Q.      How long before you approved
5     the use of tear gas, were you in
6     communication with Police Commissioner
7     Outlaw?
8     A.      Immediately before, but I'm not
9     exactly sure of the time.
```

***Wilson Deposition April 4, 2022, lines 4-9 Jacobs v, City of Philadelphia 19-cv-4615***

The Court issued an Order denying the plaintiff the opportunity to obtain justice by displaying Wilson "complete" role in the retaliation against the plaintiff and his "clear lack of credibility." Wilson intentional lies allowed Krasner and Danielle Outlaw ("Outlaw") to illegally arrest Richard Nicoletti III.

After the PPD conducted a fabricated retaliatory "internal" investigation by defendant DF Pace on orders from Krasner, Richard Nicoletti III was arrested and terminated. Once again, Wilson denied any involvement in the "internal" investigation of Nicoletti which led to disciplinary charges for not violating any departmental policy.

```
17    Q.       Was SWAT Officer Nicoletti
18    disciplined for any reason?
19    A.       Yes.
```

*Wilson Deposition April 4, 2022, page 32, lines 17-19 Jacobs v. City of Philadelphia 19-cv-4615*

```
13    BY MR. JACOBS:
14    Q.       What is the departmental policy
15    for the application of pepper spray to
16    a person or persons wearing goggles or
17    a mask?
18    A.       The SOP at SWAT contradicts the
19    fact that he failed to follow policy,
20    if that's where you're going with
21    this.
22             SWAT's own SOP says that he did
23    the right thing.
```

*Wilson Deposition April 4, 2022, page 33, lines 13-23 Jacobs v. City of Philadelphia 19-cv-4615*

So if SWAT's own SOP says he did the right thing, how did **DF Pace's** "internal" investigation say he did the wrong thing?

18      BY MR. JACOBS:

19      Q.      And when you say SOP, that

20      means standard operating procedure.

21              Is that correct?

22      A.      Yes.

23      Q.      So Officer Nicoletti was

24      following standard operating

25      procedure.


12      Q.      So is it safe to say, that

13      Officer Nicoletti was disciplined for

14      following standard operating

15      procedures?

16      A.      All right.

17              For one, I had nothing to do

18      with the investigation.  It was an

19      Internal Affairs investigation.  They

20      determined he did not follow policies.

*Wilson Deposition April 4, 2022, page 34(18-25) and page 35 (12-20) Jacobs*

*v. City of Philadelphia 19-cv-4615 (once again, Wilson had nothing to do*

*Pace's IAD decision of wrongly disciplining an officer who did not violate*

*departmental policy).*

```
 9     Q.  Can you think of any reason why
10   Deputy Police Commissioner Wilson would not
11   inform you that he was initiating a
12   disciplinary investigation into Plaintiff
13   Jacobs?
14     A.  I can't.
15     Q.  And you already stated that you
16   never listened to any podcast that Plaintiff
17   Jacobs participated in?
18     A.  No, I haven't.
19     Q.  You do not know what Plaintiff
20   Jacobs said on any podcast?
21     A.  No, I don't.
22     Q.  Have you ever known Detective Jacobs
23   to smear the Philadelphia Police Department?
```

```
 3     A.  No, I don't.  I don't have any
 4   first-hand information of that.
 5   BY MR. JACOBS:
 6     Q.  Would Defendant Deputy Commissioner
 7   Wilson initiating a disciplinary
 8   investigation into a plaintiff in pending
 9   litigation, in your opinion, would that seem
10   retaliatory?
11             MR. SHEEHAN: Objection to
12   form.
13     A.  I don't know when or at any time
14   when Wilson, such as myself, was informed
15   that there was litigation, so I wouldn't
16   know -- if someone knew there was litigation
17   and it wasn't a legitimate reason, that would
18   be retaliation.  But it would have to have
19   both of those factors.  You would have to
20   know that you were a defendant and you would
21   have to know that what you were alleging
22   wasn't true in order for it to retaliate.
23   But I have no knowledge of what Deputy Wilson
24   knew or the investigation personally.
```

*Former Philadelphia Police Commissioner Christine Coulter April 28, 2022*

*deposition page 66 (9-23) and page 67 (3-24) Jacobs v. City of Philadelphia*

*19-cv-4615.*

The defendants argue their violations of the plaintiff's First Amendment Rights were necessary under Pickering. If this was even close to a true statement why would the Philadelphia Police Commissioner not be informed?

c. Jason Hendershot: It is clear defendant Hendershot was an operative "playing both sides" in an effort to protect his own interest. First Hendershot informed the plaintiff defendant Wilson and Krasner began their retaliatory actions immediately following the plaintiff's filings of lawsuits against them. Hendershot stated during his deposition that he had to act as an advocate on behalf of the plaintiff between September 2019 and November 2019. Hendershot also informed stated during the deposition during that period of time he had to keep Krasner's attorney, Kia Ghee, "up to speed."

JASON HENDERSHOT                    120

```
1        A.     If my memory serves me correctly, and
2   you know this; I was with my mother on her death bed.
3   And I stepped away from my mother to advocate on your
4   behalf when she was dying in bed, Jake.
5        Q.     Take your time.  Because that's not the
6   way it occurred because both of us --
```

*Hendershot deposition page 120, lines 1-6*

JASON HENDERSHOT                    122

```
1   time that I was just responding to was in September
2   -- sometime between September and November of 2019
3   when my mother was sick with cancer.
```

*Hendershot Deposition page 122, lines 1-3*

```
12        Q.      Okay.  So Kia Ghee -- strike that.
13              What did Deputy Commissioner Wilson
14   order you to do as it related to Kia Ghee?
15              MR. GONZALES:  Objection.  Asked and
16        answered.  You can answer it again.
17              THE WITNESS:  In summary to get her up
18        to speed on the allegations or assumption that
19        ADA Tripp had made against you involving the
20        grand jury leak.
21   BY MR. JACOBS:
22        Q.      Did you inform Deputy Commissioner
23   Wilson at that time that Detective Jacobs did not
24   commit a grand jury leak violation?
```

*Hendershot deposition page 119, lines 12-24*

Hendershot further stated he knew the grand jury leak was a fabrication and

Krasner would retaliate against the plaintiff.

```
4         Q.      But you knew that what she was alleging
5    wasn't true; is that correct?
6         A.      Yes.
7         Q.      But the Philadelphia Police Department
8    allowed her to continue with this farce and stress
9    out their employees; is that correct?
```

*Hendershot deposition page 137, lines 4-9*

```
21        Q.      Prior to the filings of this lawsuit,
22   did you and the Plaintiff discuss the impending
23   retaliation that was going to be inflicted upon him
24   by District Attorney Larry Krasner?
```

```
                    JASON HENDERSHOT                    111

1         A.      I don't remember the exact words that
2    we spoke of, but I do remember having conversations
3    consisting of something around those lines.  Exactly
4    what was said, I could not tell you.  But that's --
5    that's my answer.  I don't remember exactly what we
6    spoke about every time.
```

*Hendershot deposition page 110 (21-24) and page 111 (1-6)*

The problem with Hendershot's credibility is he has intentionally falsified official documents, including affidavits and warrants. This is clearly a matter of public concern. The plaintiff is a member of various communities that are affected by this illegal activity. Hendershot originally engaged in criminal activity of behalf of Krasner with fabrication of the affidavit, criminal complaint, and arrest warrant to arrest former Philadelphia Police Office Ryan Pownall.

### AFFIDAVIT OF PROBABLE CAUSE

I, Philadelphia Police Lieutenant Jason Hendershot, Badge #148, Officer Involved Shooting Investigation Unit, being duly sworn according to law, hereby depose and state as follows:

1. I am a Lieutenant employed by the Philadelphia Police Department and presently assigned to the Officer Involved Shooting Investigation Unit. I have been a sworn law enforcement officer with the Philadelphia Police Department since 1997. In my capacity as a law enforcement officer and Lieutenant with the Philadelphia Police Department, I have been involved in numerous arrests and investigations.

2. I have been advised of the facts gathered during the investigation of **Ryan Pownall** who, while a Philadelphia Police Officer and on duty, shot and killed David Jones. The investigation utilized the resources of the Twenty-Ninth County Investigating Grand Jury (MISC. N0.0006987-2016), which issued Presentment No. 4 under Notice C-55. That Presentment, which is attached to this Affidavit and incorporated by reference herein, sets forth the factual basis of the probable cause supporting the issuance of an arrest warrant for Ryan Pownall, who lives at 8606 Bridle Road,  Philadelphia, PA, for violating the Penal Laws of Pennsylvania on June 8, 2017, in the City and County of Philadelphia.

3. Based on this information, there is probable cause to believe that **Ryan Pownall,** Violated the following provisions of the Pennsylvania Crimes Code:

Title 18 Pa.C.S.  § 2501 – Criminal Homicide
Title 18 Pa.C.S.  § 907 – Possessing an Instrument of Crime (M2)
Title 18 Pa.C.S.  § 2705 – Recklessly Endangering Another Person (M2)

The facts set forth in the foregoing affidavit are true and correct to the best of my knowledge, information and belief.

Issuing Authority Signature

Affiant Signature

COMMONWEALTH OF PENNSYLVANIA
COUNTY OF PHILADELPHIA

DC #2017-25-047393                          DKT#

CRIMINAL COMPLAINT

### Commonwealth of Pennsylvania v. Ryan Pownall

I, the undersigned, do hereby state under oath or affirmation:
(1)   My name is: Police Lieutenant Jason Hendershot
(2)   I accuse: Ryan Pownall
       Who lives at 8606 Bridle Road
       With violating the Penal Laws of Pennsylvania on or about: June 8th 2017
       In the County of Philadelphia
(3)   the acts of the accused were:

Refer to the attached, Presentment No. 4
County Investigating Grand Jury Twenty-Nine
MISC. NO. 0006987-2016

In violation of Pennsylvania Penal Laws, section and title:
**CHARGES:**

Title 18 Pa.C.S. § 2501 – Criminal Homicide
Title 18 Pa.C.S. § 907 – Possession of an Instrument of Crime (M1)
Title 18 Pa.C.S. § 2705 Recklessly Endangering Another Person (M2)

All of which is against the peace and dignity of the Commonwealth of Pennsylvania.

(4) I ask that a warrant of arrest or a summons be issued and the accused be required to answer the charges  I have made.  This complaint has been reviewed and approved by A.D.A. Tracy Tripp.

(5) I swear to or affirm the within complaint is true and correct, and sign it before a Philadelphia Common Pleas Court Judge

_Signature of Affiant_

On Thursday, August 30th 2018, the above named affiant swore of affirmed that the facts set  forth were true and correct to the best of his/her knowledge, information and belief, and signed it in my presence. I believe the within affiant to be a responsible person and that there is probable cause for the issuance of process.

Signature of
issuing Authority

Seal

**WARRANT OF ARREST**

COMMONWEALTH OF PENNSYLVANIA } SS.     NO.  285380
COUNTY OF PHILADELPHIA

To Lt. Jason Hershot #148 _____, or any other authorized
        (Serving Officer)

person, in the name of the Commonwealth of Pennsylvania, you are commanded to take into custody

Ryan Pownall, wlm, _____
        (Name)                                          (if unknown, description)

_____

if   he   be found in the said Commonwealth, and bring   him   before us at
        (he, they)                                              (him, them)

2301 S. 24th Street Phila, PA to answer the Commonwealth upon the complaint or
        (address)

citation of Lt. Jason Hershot #148, OISI Unit charging   him   with
                                                              (him, them)

CC 2501 Criminal Homicide; CC 907 Possessing an Instrument
of a crime (M2), CC 2705 Recklessly Endangering another person, and further to be dealt with
                                                      (M2)

according to law, and for such purposes this shall be your sufficient warrant. Witness the hand and official

seal of   Robert P. Coleman _____ this date _____ 20__
        (Judge)

Bail to be demanded: $ _____    _____

C.C. No. _____

How does the plaintiff know the affidavit, criminal complaint, and arrest
warrant was illegal and false only based upon his knowledge and information
of the investigation alone you ask? **Hendershot admitted there was never
any probable cause to arrest Pownall**

A thorough review of all evidence collected during the Officer Involved Shooting Investigation,
interviews of witnesses, and analysis of video, leads us to believe that the aforementioned facts do
not rise to the level of probable cause to recommend criminal charges against former Police Officer
Ryan Pownall.

Those are Hendershot's words not the plaintiff's. How do you lose probable cause? Answer: You don't, there was never probable cause. Pownall was illegally arrested on orders of Lawrence Krasner. It does not stop there for the illegal activity of the DAO and PPD in its targeting of law enforcement officers. Here are email exchanges between the assigned investigator in the Walter Wallace Officer Involved Shooting ("OIS") and ADA Vini Corrigan of the Philadelphia District Attorney's Office. After Corrigan tells the investigator to falsify her affidavit and remove the "aggressive" actions of Wallace so they can charge the Officers, the investigator refuses. Hendershot then has the investigator's affidavits/application for search warrants voided. Hendershot then falsifies the affidavit and warrant upon request of Corrigan and removes the aggressive actions of Wallace.

From: Daphne Smith <Daphne.Smith@Phila.gov>
Sent: Tuesday, October 27, 2020 1:28 PM
To: Vincent Corrigan <Vincent.Corrigan@Phila.gov>
Cc: Jason Hendershot <Jason.Hendershot@Phila.gov>
Subject: CCI and Medical Search Warrants for PS20-29

Good afternoon ADA Corrigan,
Attached are the search warrants for CCI and Medical Records for Walter Wallace.

Regards,
Det. Daphne Smith#660
Officer Involved Shooting Investigation Unit
ORI: PAPEP0000
(215) 683-1886/67
(215) 683-1868 fax
2301 S. 24th St. (Basement)
Phila. PA. 19145

**From:** Vincent Corrigan <Vincent.Corrigan@Phila.gov>
**Sent:** Tuesday, October 27, 2020 3:42 PM
**To:** Daphne Smith <Daphne.Smith@Phila.gov>
**Subject:** Re: CCI and Medical Search Warrants for PS20-29

I cannot approve the warrants in their current form. The following changes are necessary:

a) Do not refer to the weapon as a "butcher knife." We have the knife please refer to it by it's size.
b) eliminate the phrase "aggressively approaching" use walking towards or similar wording instead.
c) eliminate "lunged at the officers" substitute continued to approach the officers with the knife in his hand or similar language.

Please resubmit the warrants with the changes.

Thanks

Vini

Vincent Corrigan
Assistant Investigations Unit
Special Investigations Unit
3 S Penn Sq 18th Floor
Philadelphia, Pa., 19107

Phone: 215-686-8754
Cell:  215-834-2962
Fax: 215-686-5880
Email: Vincent.Corrigan@phila.gov

**From:** Vincent Corrigan <Vincent.Corrigan@Phila.gov>
**Sent:** Tuesday, October 27, 2020 3:50 PM
**To:** Daphne Smith <Daphne.Smith@Phila.gov>
**Subject:** Re: CCI and Medical Search Warrants for PS20-29

The date and time of the CCI search is yesterday (10/26) at 9:26pm. No warrant was approved for a search at that time and the date of the search itself will need to be changed. Hopefully a search was not conducted at that time. If a search did take place at that time it was without a warrant.

Vincent Corrigan
Assistant District Attorney
Special Investigations Unit
3 S Penn Sq 18th Floor
Philadelphia, Pa., 19107

Phone: 215-686-8754
Cell:  215-834-2962
Fax: 215-686-5880
Email: Vincent.Corrigan@phila.gov

Re: CCI and Medical Search Warrants for PS20-29

Daphne Smith <Daphne.Smith@Phila.gov>
Tue 10/27/2020 4:12 PM

To: Vincent Corrigan <Vincent.Corrigan@Phila.gov>

The Search warrant for CCI is just a formality. An exigent request was made to Police Radio yesterday and they sent the CAD report. This is normal practice. After reviewing the body cameras and all video circulating social media it is my opinion that my description of the decedents actions is accurately reflected in the probable cause for my warrant. Mr. Wallace did more than merely walk towards the Officers and he did in fact lunge at the Officers. I can change the description of the knife to that of a ten inch chef knife but that is the only change that I see that is warranted.

Regards,
Del. Daphne Smith#660
Officer Involved Shooting Investigation Unit
ORI: PAPEP0000
(215) 683-1866/67
(215) 683-1868 fax
2301 S. 24th St. (Basement)
Phila PA 10145

As a result of this exchange, Hendershot did the following:



**Commonwealth of Pennsylvania** } ss:
CITY AND COUNTY OF PHILADELPHIA

APPLICATION FOR
**SEARCH WARRANT**
AND AFFIDAVIT

| | |
|---|---|
| Det. Daphne Smith    660    OISI | WARRANT CONTROL NO. **231221** |
| *(Name and Affiant)    (Badge No.)    (Department)* | ISSUED TO DISTRICT/UNIT OISI |
| being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below. | DATE OF APPLICATION 10/27/2020 |

IDENTIFY ITEMS TO BE SEARCHED FOR AND SEIZED (Be as specific as possible)

Medical records for Walter Wallace DOB 10/5/93  27/B/M, including but not limited to X-rays and CAT scans for treatment received on 10/26/20 MRN#468803879 in reference to an Officer Involved shooting incident that occurred on 10/26/2020 at 6124 Locust Street

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSONS TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.)

Penn Presbyterian Medical Center - 51 North 39th Street Phila. PA 19104

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (If proper name is unknown, give alias and/or description)

Penn Presbyterian Medical Center  Medical Records Department

| VIOLATION OF (Describe conduct or specify statute) | YEAR/DIST./COMPLAINT NO. |
|---|---|
| Penna. Cride Code C2702-1 Aggravated Assault Against Law Enforcement Officer | 2020-18-073445 |

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES (Set out your instructions below)

On 10/26/2020 at approx. 3:49PM Police responded to 6124 Locust Street for a report of a person screaming. Upon arrival, a male later identified as Walter Wallace 27/B/M exited the residence armed with a butcher knife and began aggressively approaching the Officers. The Officers backpedalled, all the while ordering Wallace to multiple times to drop the knife. Wallace continued to disregard the Officers commands and lunged at the Officers causing them to discharge their firearms multiple times. Wallace was transported to Presbyterian hospital where he was pronounced deceased by Dr. Seaton at 4:06pm.

*Declined by ADA Vincent Corrigan 10/27/2020*

ATTACH ADDITIONAL PAPER (75-51) IF NECESSARY       ☐ CHECK HERE IF ADDITIONAL PAPER IS USED.

**PLEASE SEE REVERSE SIDE OF THIS PAGE FOR INSTRUCTIONS**

| SIGNATURE OF AFFIANT          BADGE NO.          DIST./UNIT | |
|---|---|
| Det. Daphne Smith  660    OISI | Sworn to (or affirmed) and subscribed before me this ___ day of ___ 20 ___ |
| | *(Signature of Issuing Authority)*     (SEAL) |

| COURT LOCATION | |
|---|---|
| 1301 Filbert Street | Date Commission Expires ___ |

| RESULT OF SEARCH | DATE and TIME OF SEARCH | ARREST | JUDGE'S DISPOSITION |
|---|---|---|---|
| | ☐ A.M. ☐ P.M. | ☐ Yes ☐ No | ☐ Dac. ☐ Held for Court ☐ Further Hearing ☐ Held or Committed |

PROPERTY SEIZED

☐ Yes  ☐ No   (If "Yes" list inventory below)

IF ADDITIONAL SPACE REQUIRED, USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT.

I certify, subject to the penalties and provisions of 18 Pa. C.S. §4904(b) that this is a true and correct listing of all items seized.

| Signature of Person Seizing Property          Badge No. | OTHER OFFICERS PARTICIPATING IN SEARCH |
|---|---|

SIGNATURE OF WITNESS TO INVENTORY (Name and Address)

**TO LAW ENFORCEMENT OFFICER:** WHEREAS, facts have been sworn to or affirmed before me by written affidavit(s) attached hereto from which I have found probable cause, I do authorize you to search the above described premises or person, and to seize, inventory, and make return according to the Pennsylvania Rules of Criminal Procedure, the above described items.

* ☐ This Warrant should be served as soon as practicable but in no event
later than _____ ☐ A.M. ☐ P.M. ___ 20 ___
and shall be served only during daytime hours of 6 A.M. to 10 P.M.
Issued under my hand this _____ day of ___
20 ___ at _____ M o'clock. (Issue time must be stated)
(SEAL)
_____
*(Signature of Issuing Authority)*

** ☐ This warrant should be served as soon as practicable but in no
event later than _____ ☐ A.M. ☐ P.M. ___ 20 ___ ,
and may be served anytime during day or night.
Issued under my hand this _____ day of ___
20 ___ at _____ M o'clock. (Issue time must be stated)
(SEAL)
_____
*(Signature of Issuing Authority)*

Court Location _____

Date Commission Expires _____  Title of Issuing Authority _____

*The issuing authority should specify a date and time (not more than (2) days after issuance. Pa. R. Crim. P. 2005(a).
**If issuing authority finds reasonable cause for issuing a nighttime warrant on the basis of additional reasonable cause set forth in the accompanying affidavit and wishes to issue a nighttime search warrant, only then shall be completed. Pa. R. Crim. 2006(b).

75-173 (Rev. 6/14)

ORIGINAL APPLICATION - RETAINED BY AFFIANT

Investigation Report                          Philadelphia Police Department

| ☒ CONTINUATION (51) | YEAR 20 | DISTRICT/UNIT 18 | DC NUMBER 73345 | REPORT DATE 10/28/20 | Page 2 of 2 |
|---|---|---|---|---|---|
| COMPLAINANT P/O MATARAZZO AND P/O MUNZ | | | CLASSIFICATION ASSAULT | COMPLAINT NUMBER | CODE 415 |
| INVESTIGATOR | | | BADGE NUMBER | PAYROLL NUMBER | |

CONTINUATION FOR SEARCH AND SEIZURE WARRANT # 331323

Officer Involved Shooting Investigation Unit Control # PS 20-29

On 10-26-2020, at approximately 3:50 PM, Police Officers ███████████████ were operating a marked patrol vehicle, in full uniform and responded to a radio call for a "Person screaming/armed with a knife" at 6124 Locust Street. Upon arrival, the officers encountered the decedent, Walter William Wallace, DOB: 10-5-1993, exiting the front door of 6124 Locust Street, who walked off the front porch, holding a 12" knife in his right hand. The officers immediately began to back step away from him, ordering him to drop the knife, while drawing their weapons. Wallace continued to advance towards the officers with the knife, while the officers continued to order Wallace to drop the knife. The officers backed away to the opposite side of the street and around a parked auto, all the while giving verbal commands to Wallace to stop and drop the knife.

Wallace's mother, K.B. and Wallace's brother, J.B., attempted to intervene, by pushing/grabbing Wallace in the middle of the street and sidewalk without success. Wallace walked between two parked cars and as he neared the street, he advanced quickly towards the officers, with the knife still in hand, slowed his advancement and walked towards them. In response, both officers discharged their weapons, fatally wounding Wallace.

Wallace was transported and later pronounced at Presbyterian Hospital at 4:06 PM.

Your affiant requests Walter Wallace's medical records, maintained by Penn Presbyterian Hospital, 51 N. 39th Street, Philadelphia, PA 19104, in an effort to preserve and protect any potential evidence or investigative information, relevant to this investigation.

I certify that this filing complies with the provision of the Public Access Policy of the Unified Judicial System of Pennsylvania; Case records of the Appellate and Trial Courts that require confidential information and documents differently than non-confidential information and documents.

_____          148          0151
(SIGNATURE OF AFFIANT)          BADGE#          DISTRICT/UNIT

Sworn to (or affirmed) and subscribe before me this 29th

Day of ___October___   ___2020___

_____                          (SEAL)
SIGNATURE OF ISSUING AUTHORITY

| SIGNATURE | SIGNATURE |
|---|---|

**Commonwealth of Pennsylvania**
CITY AND COUNTY OF PHILADELPHIA } SS:

APPLICATION FOR
**SEARCH WARRANT**
AND AFFIDAVIT

Lieutenant Jason Hendershot #148, OISI Unit

WARRANT CONTROL NO.
**231223**

OISI Unit / 6001

October 28, 2020

being duly sworn (or affirmed) before me according to law, deposes and says that there is probable cause to believe that certain property is evidence of or the fruit of a crime or is contraband or is unlawfully possessed or is otherwise subject to seizure, and is located at particular premises or in the possession of particular person as described below.

IDENTIFY ITEMS TO BE SEARCHED FOR AND/OR SEIZED (be as specific as possible)
Medical records for Walter Wallace, DOB: 10/05/1993, including but not limited to X-Rays and CAT scans for treatment received on 10/26/2020, MRN#468803879, in reference to an Officer-Involved Shooting incident that occurred on 10/26/2020 at 6124 Locust Street in Phila., PA

SPECIFIC DESCRIPTION OF PREMISES AND/OR PERSON TO BE SEARCHED (Street and No., Apt. No., Vehicle, Safe Deposit Box, etc.)
Penn Presbyterian Medical Center, 51 North 39th Street Phila., PA 19104

NAME OF OWNER, OCCUPANT OR POSSESSOR OF SAID PREMISES TO BE SEARCHED (if proper name is unknown, give alias and/or description)
Penn Presbyterian Medical center - 51 North 39th Street, Medical Records Department

VIOLATION OF (Describe conduct or specify statute)
Penn Presbyterian Medical Center - Custodian of Records

PCC 2702 and related offenses

YEAR AND COMPLAINT NO.
2020-18-073445

PROBABLE CAUSE BELIEF IS BASED ON THE FOLLOWING FACTS AND CIRCUMSTANCES (See special instruction below):
See continuation sheet

*Approd by:*
*A-DA Corrigan*

ATTACH ADDITIONAL PAPER (75-41) IF NECESSARY   CHECK HERE IF ADDITIONAL PAPERS IS USED.
PLEASE SEE REVERSE SIDE OF THIS PAGE FOR INSTRUCTIONS

SIGNATURE OF AFFIANT   BADGE NO.   DISTRICT
Lieutenant Jason Hendershot #148, OISI Unit

Sworn to and subscribed before me this ___ day of Oct 20

| RESULT OF SEARCH | DATE AND TIME OF SEARCH | | ARREST | JUDGE'S DISPOSITION | | | |
|---|---|---|---|---|---|---|---|
| | 10/30/2020   1015 | □ A.M. ☑ P.M. | □ Yes □ No | □ Disc. | □ Held for Court | □ Further Pending | □ Fixed or Cancelled |

PROPERTY SEIZED
(If "Nil" list Inventory below)

*CCI, pending fax*

IF ADDITIONAL SPACE REQUIRED, USE REVERSE SIDE — INVENTORY MUST APPEAR ON ALL COPIES OF THE WARRANT

148.

SIGNATURE OF WITNESS TO INVENTORY (Name and Address)

---

**Please note the intentional fabrication by Hendershot with the approval of Corrigan and to the detriment of the Officers. Wallace "slowed his advancement and walked towards them," in response the Officers to shot and killed Wallace. Hendershot authored the illegal activity requested by the DAO.**

*Note: One of the discharging Officers in the Wallace OIS was killed and never received the justice he deserved. The other officer is still under investigation for the Wallace OIS by the DAO (3+ years later). The City also settled with the Wallace family for over 2.5 million dollars.*

d. DF Pace: Pace approved charges based upon a four (4) minute investigation. Pace based his conclusion of information provided by Hendershot, which has been proven incorrect. Pace also approved charges against SWAT Officer Richard Nicoletti III for not violating departmental policy. Pace retired from the police department and sold his home as a result of approving retaliatory disciplinary charges against the plaintiff and Christina Mellett. Mellett filed a lawsuit against Pace and the City of Philadelphia, which the City settled for approximately 300k. When the plaintiff attempted to depose Pace on these issues the defendants initially took a long break and abruptly ended the deposition. The funny thing about DF Pace's discipline of the plaintiff was the fact he was under "investigation" for violating the Philadelphia Police Department's Social Media Policy (6.10) the same time as the plaintiff. Wilson and Pace decided he did not violate the police, which culminated in mandatory training. The parties, at the same time, determined the plaintiff violated the policy.

```
22   heard.
23        Q.    And at that time you had also filed a
24   Federal Civil Rights complaint for your actions on
```

Geftman Reporting Associates
610-608-1040

Pace deposition page 26, lines 23-24

1  social media; is that correct?

2      A.      I don't know if that was

3  contemporaneous or not.  But I did not file anything

4  against the City.

5      Q.      But your actions were widespread as a

6  result of the Plain View Project; is that correct?

7      A.      My actions were widespread.  I'm sorry,

8  I don't quite understand what you're trying to say.

9      Q.      The Plain View Project cast a stain

10  upon the Philadelphia Police Department; is that

11  correct?

12      A.      Upon the Philadelphia Police Department

13  or on me?

14      Q.      Upon the Philadelphia Police

15  Department.

16          MR. GONZALES:  I'm going to object.

17      When you say the Plain View Project, what are

18      you referring to?  Associated with the Plain

19      View Project?  The evidence that they

20      allegedly uncovered?  The actions of the

21      police officers in posting certain things?

22      When you say the Plain View Project, can you

23      be more specific?

24  BY MR. JACOBS:

Pace deposition page 27, lines 1-24

```
 1        Q.     Mr. Pace, what do you need me to
 2   clarify?
 3        A.     Well, you're saying the Plain View
 4   Project cast a stain upon the police department.  I'm
 5   not sure I --
 6        Q.     When the Plain View Project was
 7   authored, did it receive a lot of negative press
 8   attention?
 9        A.     Well, depends on whose side you were on
10   I suppose.  It did receive press attention, I'll
11   certainty agree with that.
12        Q.     Was the press attention positive?
13        A.     Again, it depends on who you
14   consider -- the Plain View Project would consider
15   positive.  I considered it negative against me.
16        Q.     Did anyone charge you with conduct
17   unbecoming of an officer unspecified?
18        A.     No.
19        Q.     Did anyone consider your actions
20   egregious?
21        A.     No.
22        Q.     So when the court dismissed your
23   allegations on January 13, 2020, did the City of
24   Philadelphia discipline you in any way?
```

Pace deposition page 28, lines 1-24

1  A. Well, I think you're conflating two

2 issues here.

3  Q. No, I'm not. Did the City of

4 Philadelphia, the Philadelphia Police Department,

5 discipline you in any way for your actions on social

6 media?

7  A. The answer to your question is no, but

8 that's two separate issues.

9  Q. So you can make statements on social

10 media that go under negative press coverage but

11 Jacobs can't discuss his own Federal litigation

12 without it being determined egregious by you; is that

13 correct?

14  MR. GONZALES:  Objection.

15  Argumentative.  You can answer if you

16  understand.

17  THE WITNESS:  I disagree with your

18  position that I made a negative statement.

19 BY MR. JACOBS:

20  Q. And I disagree with your position that

21 I made a negative statement.  It's of no consequence.

22 That's the point.  That's the whole point.  You're

23 deeming my actions at the same period of time as

24 being egregious while not looking at yourself,

Pace deposition page 29, lines 1-24

e.   The Court: The plaintiff has submitted "new evidence" and DENIED leave to amend.

The Court has inserted facts into the record as evidence in error.

The Court has allowed the defendants to violate the FRCP.

The plaintiff was forced to adhere to these "tactics." The plaintiff's tax dollars pays for these tactics.

FRCP Rule 26 states a party "must" and "without" awaiting a discovery request.

FRCP Rule 37(a)(4) states "evasive" or "incomplete: answers "must" be treated as a failure to disclose.

The plaintiff (former decorated officer), without any provocation, has had security called on him.

## VII.   **CONCLUSION**

PA Supreme Court Justice Dougherty authored a nineteen page Concurring OPINION in the Pownall matter.

**The Concurring Opinion started with the following:**



**Justice Dougherty ended his Concurring Opinion in the following manner:**

procedural justice and that guilt is decided upon the basis of sufficient evidence."
Pa.R.P.C. 3.8, Comment.

Little that has happened in this case up to this point reflects procedural justice.  On the contrary, the DAO's prosecution of Pownall appears to be "driven by a win-at-all-cost office culture" that treats police officers differently than other criminal defendants.   DAO CONVICTION INTEGRITY UNIT REPORT, OVERTURNING CONVICTIONS — AND AN ERA 2 (June 15, 2021), available at tinyurl.com/CIUreport (last visited July 19, 2022).  This is the antithesis of what the law expects of a prosecutor.

Based upon the above listed facts contained herein, it is without question the plaintiff is a Whistleblower within the meaning of Pennsylvania Law. It is also without question the plaintiff reported on matters of public concern and was exercising his First Amendment Rights afforded to him by the United States Constitution. Wherefore, the defendants' Motion for Summary Judgment is factually deficient and should be DENIED.

**CERTIFICATE OF SERVICE**

I, Derrick Jacobs, Plaintiff within the above-captioned matter, hereby certify that a true and correct copy, according to the Federal Rules of Civil Procedure was sent via email upon the following on the date shown below,

Date:   1/12/2024

_____

Derrick Jacobs,

Plaintiff

Pro se