IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DERRICK JACOBS                 :              CIVIL ACTION
                               :
        v.                     :
                               :
CITY OF PHILADELPHIA, et al.   :              NO. 19-4616

MEMORANDUM

Bartle, J.                                    March 21, 2024

Plaintiff Derrick Jacobs, a former Philadelphia Police Detective proceeding pro se, has sued Defendants Philadelphia Police Lieutenant Jason Hendershot, Deputy Philadelphia Police Commissioner Dennis Wilson, and Philadelphia Police Inspector DF Pace (the "Philadelphia Police Defendants") as well as Defendant Tracy Tripp, a former Philadelphia Assistant District Attorney. He alleges conspiracy to retaliate and retaliation under 42 U.S.C. § 1983 for violations of his First Amendment rights. Before the court are the cross-motions of all Defendants and Plaintiff for summary judgment.

I.

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  A dispute is genuine if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 254 (1986).  The court views the facts and draws all inferences in favor of the nonmoving party.  See <u>In re Flat Glass Antitrust Litig.</u>, 385 F.3d 350, 357 (3d Cir. 2004).

Summary judgment is granted when there is insufficient record evidence for a reasonable factfinder to find for the nonmovant.  See <u>Anderson</u>, 477 U.S. at 252.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]."  <u>Id.</u>  In addition, Rule 56(e)(2) provides that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion."  Fed. R. Civ. P. 56(e)(2).

II.

The court first considers Defendants' motions for summary judgment on Plaintiff Jacobs's remaining Section 1983 claims.[1]  At this point the court views the undisputed facts in the light most favorable to Jacobs.

---

1.    Jacobs amended his complaint several times.  Defendants requested clarification and this court determined that the

Jacobs at all times relevant was a detective with the Philadelphia Police Department, and as such, was an employee of the City of Philadelphia.  He was assigned to the Officer Involved Shooting Investigation ("OISI") unit.  OISI was comprised of six investigating officers including Jacobs and a commanding officer, Defendant Lieutenant Jason Hendershot.

On June 8, 2017, Philadelphia Police Officer Ryan Pownall shot a civilian while he was on duty.  The shooting was investigated by the OISI unit.  Jacobs participated in the investigation and among other tasks interviewed eyewitnesses, gathered evidence, and relayed his findings to prosecutors.

On the application of the Philadelphia District Attorney's Office, Judge Robert Coleman of the Court of Common Pleas of Philadelphia County convened a grand jury to investigate the Pownall shooting and to determine if criminal charges were appropriate (the "Pownall grand jury").  The case was prosecuted by Defendant Assistant District Attorney Tracy Tripp.  In May 2018, OISI officers including Jacobs were brought before the Pownall grand jury and sworn to secrecy by Judge Coleman.  On August 2, 2018, Tripp met with Jacobs to prepare him to testify before the Pownall grand jury.  He was ultimately

---

operative complaint was a combination of his Fourth and Fifth Amended Complaints (Doc. #46). Jacobs was then denied leave to amend his complaint a sixth and seventh time (Docs. #59, #77).

never summoned to testify as a fact witness.  Jacobs states that
he was the only OISI officer who did not testify as a fact
witness.

On September 4, 2018, the grand jury returned a
presentment that recommended bringing homicide charges against
Pownall.  Jacobs reviewed the presentment and based on his
involvement in the police investigation believed that it
referenced inaccurate evidence.  In particular, he asserted that
the presentment relied on statements from an eyewitness who
Jacobs interviewed and who later recanted his observations.
Jacobs maintains that what followed was retaliation for his
attempts to expose the allegedly improper prosecution of
Pownall.

On September 27, 2018, Judge Coleman held a hearing on
the Commonwealth's motion to bypass a preliminary hearing in the
Pownall matter (the "bypass hearing").  During the bypass
hearing, Tripp heard Attorney Fortunato "Fred" Perri, defense
counsel for Pownall, make comments which led her to believe that
there was a leak of grand jury information.  Tripp later
testified in a deposition in this pending action about her
recollection of the bypass hearing:

> . . . [T]he two things I remember
> clearly is that Mr. Perri said to the Judge
> that he had spoken to one of the assigned,
> meaning assigned detectives is what I took
> that to mean.  And that Detective informed

> Mr. Perri that he had never been called
> before the grand jury.
>
> And secondarily, Mr. Perri talked
> about speaking with an actual witness before
> the grand jury, or someone who claimed to be
> a witness before the grand jury.  And
> claimed to be quoted in the presentment.
> And told Mr. Perri, which Mr. Perri then
> relayed in open court, that the quoted words
> in the presentment were not what that person
> had said in the grand jury.

According to Tripp, Perri's statements led her to believe that an OISI detective had leaked grand jury information.

Jacobs maintains in the instant motion that "[o]n September 27, 2018, he [Jacobs] attempted to report . . . acts of corruption and criminality by consulting with an attorney." He maintains attorney-client privilege as to this consultation. Nevertheless, he admitted in his deposition that he was present in the Philadelphia Criminal Justice Center on the date of the bypass hearing.  He further stated in the deposition that "to this day, you [counsel for Tripp], her [Tripp], or no one else knows what I said to Fred Perri.  I do."

Following the bypass hearing, Tripp asked Lieutenant Hendershot, who headed OISI, to determine who from the unit was in the courtroom or on the same floor of the Criminal Justice Center at the time of the hearing.  Lieutenant Hendershot then contacted Jacobs, who admitted that "he [Jacobs] was the person consulting with the attorney about Tripp's and the DAO [sic]

corruption and criminality."  Lieutenant Hendershot relayed his
conversation with Jacobs to Tripp.  In a deposition for this
pending action, Lieutenant Hendershot testified as to his
comments to Tripp:

> I [Hendershot] relayed to ADA
> Tripp that you [Jacobs] were either on the
> floor or in the room – I don't remember
> which one – during the hearing.  And I don't
> recall what hearing it was, but it was in
> reference to Pownall.  And if I'm
> remembering correctly, defense counsel made
> some type of comment to you about why are we
> here or how did we get here.  And you
> replied . . . "I don't know.  I wasn't
> involved in the grand jury," or something to
> that effect.

On October 16, 2018, Jacobs received a court notice to
appear before the Pownall grand jury.  He sought to have Perri
or Attorney Brian McMonagle, also defense counsel for Pownall,
represent him through the Fraternal Order of Police ("FOP").
His request was denied because of conflicts of interest and the
FOP instead engaged Attorney Gregory Pagano as his lawyer.
During his appearance before the grand jury on November 9, 2018,
Tripp asked Jacobs whether he had spoken with Perri or any other
attorneys representing Pownall about the Pownall shooting.
Jacobs responded by invoking his Fifth Amendment privilege
against self-incrimination.

Sometime later, the transcripts from the September 27,
2018 bypass hearing and the November 9, 2018 grand jury

proceeding were lost.  Lacking this evidence, Tripp never

brought any contempt of court charges against Jacobs.  He

concedes that he was never arrested, charged, or indicted and

the Pownall grand jury never issued any presentment as to him.

According to Jacobs, Tripp approached him in the

Criminal Justice Center on August 1, 2019 and "inform[ed] him of

the withdrawal of charges against him."  According to Tripp, she

told Jacobs that "the grand jury investigation that had been

open into the leak was not going to proceed any further and

would be closed."  Consistent with the testimony of Tripp, there

is no evidence in the record that there ever were any filed

charges against Jacobs to withdraw.  Nonetheless, over the next

few weeks Jacobs "kept asking Hendershot for declination [of

prosecution memorandum] of Ms. Tripp."  Receiving no response

from Hendershot or Tripp,[2] Jacobs filed this lawsuit on October

4, 2019.

On January 18, 2020, during the course of this

litigation, Jacobs participated on a podcast titled Search

Warrant: Clear and Present Danger.  In the podcast, he made the

following statements about the OISI unit, its staffing, and its

investigative procedures:

---

2.    Jacobs included in his Response to Defendants' Motions for
Summary Judgment a screenshot of texts between himself and
Pagano on this subject.  These statements are inadmissible
hearsay and cannot be considered on a summary judgment motion.

> The unit that I'm assigned to investigates
> all police discharges that happens in the
> city and county of Philadelphia.
>
> . . . .
>
> There's six detectives and two supervisors.
>
> . . . .
>
> We're on call at issue 24 hours a day, 7
> days a week.  So we have set of working
> hours, but anything outside of those hours,
> would be on call.
>
> . . . .
>
> Certain detectives go to the scene.  We
> divvy up the responsibilities when an
> investigation happens.  Some officers stay
> at headquarters.  Some go out to the scene.
> And some do other investigative tasks that
> is needed at the time.

Jacobs further described in detail the investigation of Ryan

Pownall, including his own interviews of eyewitnesses:

> After the shooting occurred, of course we
> [OISI] were dispatched to handle the
> investigation.
>
> . . . .
>
> I interviewed the majority of the fact
> witnesses of this case.
>
> . . . .
>
> I also interviewed a gentleman that gave a
> statement that was pro police but was not in
> line with the investigation.  And he later
> recanted his observations.
>
> . . . .

> Based on Mr. Freeman's account, which was
> the adult witness in the back of Officer
> Pownall's vehicle . . . everything in the
> investigation lined up, which led me to
> believe that the shooting was justified.
>
> . . . .
>
> I interviewed a gentleman by the name of
> John Ellis.  John Ellis is the gentleman who
> lied in favor of Officer Pownall.
>
> . . . .
>
> So she [Tripp] had Mr. Freeman's interview.
> I'm sure, you know, not that I was in the
> room. . . . [S]he had all this information
> at her disposal before she impaneled this
> grand jury.

Jacobs further recounted his conversations with prosecutors who

handled the matter.  Later, he disparaged the District

Attorney's Office as operating "almost like a criminal

enterprise."  He also disparaged Tripp:

> She's [Tripp] the worst of the worst in our
> profession.
>
> . . . .
>
> If you're corrupt, you're corrupt.
>
> . . . .
>
> And that's why you have prosecutorial
> misconduct by ADA Tripp.  When she goes into
> a grand jury or she starts the grand jury
> proceeding, and she knows that what she's
> going to be providing to the grand jury is
> false, misleading, or perjury, then we have
> problems here.
>
> . . . .

> I've been an investigator for 20 years. I
> worked homicide. . . . I'm sure I could
> present and put together my case to have
> Tripp arrested.  I mean, I have enough
> evidence for probable cause.
>
> . . . .
>
> [W]hat she's doing is a crime.  What she did
> in the grand jury is a crime, what she's
> doing against me is a crime.

The title of the podcast episode referenced one of his comments regarding Tripp, that is that she was "a clear and present danger to the City [of Philadelphia]."

The Philadelphia Police Department had in effect directives restricting public statements by police officers. Relevant to the instant motion are Directive 4.16, which pertains to "Public Affairs and Release of Information to the Public" ("Public Affairs Directive"), and Directive 6.10, which pertains to "Social Media and Networking" ("Social Media Directive").  Both directives prohibit dissemination of confidential information by police officers.  Section 2(A) of the Public Affairs Directive provides that police officers shall not release information that "violate[s] privacy rights or jeopardize[s] ongoing investigations or prosecutions." Section 3(B) of the Public Affairs Directive states that "[i]nformation . . . should be provided to whatever extent possible," but not if it would "[a]dversely affect . . . the investigation or prosecution of a crime" or "disclose

information relative to deployment or staffing."  Section 4(I)
of the Social Media Directive also prohibits police officers
from using "personal insults" and "material that is harassing
[or] defamatory."

The directives allow for narrow exceptions to the
general prohibition on disseminating confidential information
with permission from a higher-ranking official in the
department.  Police officers may speak on behalf of the
Philadelphia Police Department on social media only if they
obtain "express permission from the Police Commissioner or
his/her designee, prior to engaging in such activity."  Social
Media Directive § 3(B)(2)(a).  Section 3F of the Public Affairs
Directive requires that "[a]ll Police Personnel will notify
their Commanding Officer and Public Affairs when contacted by a
media representative for an interview."

But even with permission, police officers must limit
their statements to "circumstances immediately surrounding the
arrest, including the time and place of arrest, resistance,
pursuit, possession and use of weapons" and must not make "any
statements as to the merits of the case."  Public Affairs
Directive §§ 3(G)(1)(d), (H)(2).  Significantly, only "members
of Public Affairs upon conferral with the appropriate Deputy
Commissioner" may disseminate "[a]ny information related to a

-11-

Police involved discharge/shooting." Id. at § 3(I).  It is
undisputed that Jacobs was not a member of Public Affairs.

Jacobs maintains that he told Lieutenant Hendershot a
day before the podcast that he would be "doing a podcast."  He
further states that on November 26, 2019, he received oral
permission from Deputy Commissioner Wilson to "go public with
his public corruption allegations."  This latter statement is at
most a mere scintilla of evidence which no reasonable juror
could find true.  See Anderson, 477 U.S. at 252.  In a
memorandum from Jacobs to Deputy Commissioner Wilson dated
January 27, 2020, Jacobs wrote that during their conversation on
November 26, 2019, Deputy Commissioner Wilson "asked if I
[Jacobs] would first present this case to the Pennsylvania
Attorney General's Office."  Jacobs further wrote, "[y]ou
[Deputy Commissioner Wilson] asked if I [Jacobs] would at least
try first and if I was not successful, I could move forward with
seeking assistance from the U.S. attorney."  Contrary to what he
currently asserts, Jacobs made no reference in this memo to
permission from Deputy Commissioner Wilson to "go public" before
he participated in the podcast.  Deputy Commissioner Wilson
later confirmed at his deposition that on November 26, 2019, he
summoned Jacobs into his office and advised him to contact the
Pennsylvania Attorney General's Office.

It is also uncontested that on January 30, 2020, nearly two weeks after the podcast, Jacobs sent a memorandum to Police Commissioner Christine Coulter seeking "permission to release information to the media upon request regarding corruption reported in my Federal Lawsuit."  The memorandum does not reference any prior permission from Deputy Commissioner Wilson.  The document was stamped "Disapproved" by the Chief Inspector Detective Bureau on February 3, 2020.  A handwritten note included below the stamp reads: "This violated PPD Policy re: release info to media."  The Jacobs memorandum was also stamped twice by Deputy Commissioner Wilson, first as "Received" on February 4, 2020, with a handwritten note "Forward to Law Dept."  Underneath is written "Note 2-6-2020. Law Dept reviewed. Denial is consistent with department policy."  The document was stamped "Disapproved" and initialed by Deputy Commissioner Wilson on February 6, 2020.  Written underneath this stamp is "See note," presumably referencing the note regarding review by the Law Department.

After the podcast, Lieutenant Hendershot referred Jacobs to the Police Board of Inquiry and requested that he be charged with violations of the Philadelphia Police Department's Disciplinary Code.  Deputy Commissioner Wilson received a copy of the podcast and Lieutenant Hendershot's recommendation and referred the matter for investigation.  Defendant Inspector Pace

was assigned to investigate the matter.  Pace determined that Jacobs should be charged with "conduct unbecoming," "neglect of duty," and "disobedience."  Jacobs resigned on March 12, 2021 before a hearing was held on the matter.

Meanwhile, this lawsuit continued.  Jacobs made a number of lengthy amendments to his complaint, adding defendants and claims, including the claim that he suffered Section 1983 retaliation for participating on the podcast.  On two occasions, this court granted the motions of Defendants to dismiss the complaint (Docs. #15-16, #35-36).  Both times, the Court of Appeals affirmed in part and reversed in part.  See Jacobs v. City of Philadelphia, 836 F. App'x 120 (3d Cir. 2020);  Jacobs v. City of Philadelphia, No. 21-2314, 2022 WL 1772989 (3d Cir. June 1, 2022).  The Court remanded for further proceedings two claims of Section 1983 retaliation, one claim of Section 1983 conspiracy, and one claim of violations of the Pennsylvania Whistleblower Law (43 P.S. § 1423; 18 Pa. C.S. § 5301).  See id. After Jacobs filed his Fifth Amended Complaint, this court granted the Motion of Defendants to dismiss his state whistleblower claims (Docs. #66, #67).  The Court of Appeals dismissed his appeal on the ground that it was not an appealable order.  See Jacobs v. City of Philadelphia, No. 22-3181, 2023 WL 3529414 (3d Cir. Feb. 14, 2023).

The case proceeded to discovery.  On December 29, 2023, over four years after the initial complaint was filed, the Defendants and Jacobs filed cross-motions for summary judgment.

III.

Jacobs brings two First Amendment retaliation claims under 42 U.S.C. § 1983, one against Tripp and one against the Philadelphia Police Defendants.  To establish Section 1983 retaliation, a plaintiff must demonstrate that: "(1) [the plaintiff] engaged in constitutionally protected conduct, (2) the defendant engaged in retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link existed between the constitutionally protected conduct and the retaliatory action." Baloga v. Pittston Area Sch. Dist., 927 F.3d 742, 752 (3d Cir. 2019) (internal quotations and citations omitted).  The plaintiff bears the burden of proving each element by a preponderance of the evidence.  See id.  Where the plaintiff is pro se, the court must liberally construe his or her claims. E.g., Higgs v. Atty. Gen. of the U.S., 655 F.3d 333, 339 (3d Cir. 2011), as amended (Sept. 19, 2011).  If the plaintiff is successful, then the burden shifts to the defendant to show "that it would have taken the adverse action even in the absence of the protected conduct."  Balogna, 927 F.3d at 752.

-15-

A.

The court first considers Jacobs's claim against Tripp.  He maintains that after learning that he had consulted counsel about exposing corruption, she retaliated by commencing a fabricated criminal investigation and prosecution against him.  See Jacobs, 2022 WL 1772989 at *6.  Tripp counters that she acted on her good faith belief that an OISI detective violated grand jury secrecy and engaged in speech which is not protected by the First Amendment.  She further argues that Jacobs suffered no retaliatory action.

Jacobs responds that on September 27, 2018, the day of the bypass hearing, he consulted an unnamed attorney about exposing corruption.  He further contends that he could not have leaked information regarding the Pownall grand jury because it is undisputed that he never testified before it as a fact witness.  Tripp, he avers, must have discovered that Jacobs had consulted an attorney and fabricated the alleged leak of grand jury information.

The First Amendment does not protect speech that violates grand jury secrecy.  E.g., Matter of Subpoena 2018R00776, 947 F.3d 148, 156-59 (3d Cir. 2020);  United States v. Smith, 123 F.3d 140, 143-44 (3d Cir. 1997).  The Supreme Court has explained that maintaining grand jury secrecy is critical to the proper functioning of criminal proceedings.

E.g., United States v. Sells Eng'g, Inc., 463 U.S. 418, 423 (1983).  It protects those who are accused and then exonerated by the grand jury from suffering stigma and reputational harm. E.g., Douglas Oil Co. of California v. Petrol Stops Nw., 441 U.S. 211, 219 (1979).  Grand jury secrecy also prevents preindictment information from influencing witness testimony or discouraging prospective witnesses from coming forward.  Id. Finally, it protects witnesses, grand jurors, and the accused from being subjected to intimidation.  Id.  Pennsylvania courts also recognize the importance of grand jury secrecy in state proceedings.  E.g., In re Dauphin County Fourth Investigating Grand Jury, 19 A.3d 491 (Pa. 2011).

As this court explained in its order dated December 18, 2023 (Doc. #167), Pennsylvania law permits the release of grand jury information only with permission from the judge who supervises the grand jury proceedings.  234 Pa. Code R. 556.10. Jacobs never received such permission from Judge Coleman.  On the contrary, it is undisputed that Judge Coleman brought him before the grand jury and administered an oath of secrecy to him.

As an OISI police detective, Jacobs was part of the investigation that was presented to the Pownall grand jury.  He conceded in the podcast that he was deeply involved in the

Pownall matter and certainly knew that it was before the grand

jury:

> I [Jacobs] interviewed the
> majority of the fact witnesses in this
> [Pownall] case.
>
> . . . .
>
> [T]he grand jury that she [Tripp]
> accused me of leaking from, she swore me
> into that grand jury in May of
> 2018. . . .  The next time . . . was August
> 2, when she contacted me to prep me for my
> testimony.  And I guess after our
> conversation not going the way that she
> liked . . . she decided I was no longer
> necessary.  But if you will look at this
> investigation, you would see that I'm on the
> majority of documents . . . .
>
> . . . .
>
> [T]he majority of the fact
> witnesses and some of the things that we
> [OISI] used in investigation . . . I'm also
> attached to those documents and those
> evidentiary items.
>
> . . . .
>
> What she [Tripp] did in the
> [Pownall] grand jury is a crime.

Tripp had reason to believe that Perri, Pownall's

attorney, had confidential grand jury information.  Lieutenant

Hendershot had also informed her that Jacobs had consulted with

Perri.  Thus, Tripp had reason to believe that Jacobs made

statements to Perri that violated grand jury secrecy.  Jacobs,

as noted above, was intimately involved with the Pownall

investigation and knew who the witnesses were from his
interviews.  Tripp's deposition testimony about Perri's
statements at the bypass hearing is corroborated by other
undisputed evidence in the record.  Hendershot testified that
Jacobs admitted to him that Jacobs spoke with Perri on September
27, 2018.  In his own deposition, Jacobs conceded that he spoke
with Perri when he stated that "no one else knows what I
[Jacobs] said to Fred Perri.  I do."  Finally, Jacobs also
suggested that he spoke with Perri on the podcast:

> [O]ne of the attorneys
> that . . . they [FOP] assigned me is in the
> middle of this fiasco, and we have FOP
> attorneys on retainer, but it's a conflict
> at this time because they're representing
> Officer Pownall . . . .

Jacobs testified that he never had an attorney-client
relationship with Perri.  He never identified any other attorney
who represented him or with whom he consulted.  In sum, no
rational juror could find that Tripp acted against Jacobs
because he had consulted an attorney to report corruption.  See
Anderson, 477 U.S. at 252.

Even if a reasonable juror could find that his speech
was somehow protected by the First Amendment, Jacobs has not
come forward with any evidence of retaliation.  First, Jacobs
asserts that when Tripp first spoke with Lieutanant Hendershot
following the bypass hearing, she threatened to arrest all of

-19-

the officers in his unit if he did not identify the source of the alleged leak of grand jury information.  Jacobs never stated that he heard Tripp make this threat or called to the court's attention where he learned about it.  Both Tripp and Hendershot, who were the only witnesses to this conversation, specifically deny that Tripp ever made such a threat.

Second, Jacobs claims that Tripp commanded Hendershot to gather information about the privileged conversations that Jacobs had with his counsel on September 27, 2018.  There is no evidence on the record that Tripp ever made such a request or that Jacobs ever had counsel.  On the contrary, both Tripp and Hendershot separately testified that she merely asked whether a member of his unit had leaked grand jury information to Perri.  Such an inquiry would not "deter a person of ordinary firmness" from seeking legal advice.  See Baloga, 927 F.3d at 752.

Third, it is not disputed that Tripp summoned Jacobs to testify before the grand jury.  But under the circumstances presented here, Tripp's summons was not retaliation.  She had a good faith belief that he violated grand jury secrecy – conduct that is not protected under the First Amendment.

Finally, it is undisputed that Jacobs was never arrested or indicted and thus was not prosecuted.  See Felker v. Christine, 796 F.Supp. 135, 141 (M.D. Pa.), aff'd 983 F.2d 1050 (3d. Cir. 1992).  Nonetheless, he counters that the following

evidence shows he was being criminally prosecuted: (1) he was
summoned before the Pownall grand jury in October 2018; (2)
Tripp made statements to him about "withdrawal of charges" on
August 1, 2019; and (3) Lieutenant Hendershot sent an email
asking Tripp for a formal declination of prosecution memorandum
on January 30, 2020.  None of this evidence comes close to
establishing a genuine dispute of material fact as to an alleged
criminal prosecution.  See Fed. R. Civ. P. 56(a).  A grand jury
summons is not an arrest or indictment.  Tripp's statements are
also not indicative of arrest or indictment.  Finally,
Lieutenant Hendershot's email was clearly sent at the direction
of Jacobs, who testified that several months earlier he "kept
asking Hendershot for a declination of Ms. Tripp."  In any case,
it is not proof of an arrest or indictment.  In sum, Tripp had
every right to investigate what she believed to be a grand jury
leak by calling Jacobs before the grand jury.

Tripp is entitled to summary judgment on Jacobs's
claim of Section 1983 retaliation.

B.

The court next considers the claim that the
Philadelphia Police Defendants retaliated against Jacobs by
bringing disciplinary charges against him after the podcast.
See Jacobs, 2022 WL 1772989 at *7-*10.  The critical issue is
whether Jacobs, who was then a public employee of the City of

-21-

Philadelphia, engaged in constitutionally protected speech when he participated on the podcast.  See Baloga, 927 F.3d at 752 (first factor).  The First Amendment protects speech by a public employee only if three factors are met: (1) the employee spoke as a citizen, not as a public employee; (2) the speech involved a matter of public concern; and (3) the employer burdened the speech without adequate justification under the balancing test established in Pickering v. Board of Education, 391 U.S. 563, 568 (1968).  Baldassare v. State of N.J., 250 F.3d 188, 195 (3d Cir. 2001).  "The inquiry into the protected status of speech is one of law, not fact."  Connick v. Myers, 461 U.S. 138, 148 n.7 (1983).

　　　Pickering is the leading Supreme Court decision on the issue of the First Amendment's protections of a public employee's speech.  391 U.S. at 563.  A public school teacher was terminated for a letter she wrote to a newspaper criticizing the school board for spending more money on athletics than academics.  Id. at 565-66.  The Supreme Court held that the teacher's speech was protected by the First Amendment.  Id. at 573.  It explained that public employees have free speech rights but also that "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."  Id. at 568.  Accordingly,

a court must balance the interests of the employee as a citizen against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.  The teacher's interest in critiquing the use of school funds, which was a matter of public concern, outweighed the interests of the school board in maintaining harmony among employees.  Id. at 569-70, 573.

Pickering suggested two situations in which the balancing test would weigh in favor of the employer:

> "It is possible to conceive of some positions in public employment in which the need for confidentiality is so great that even completely correct public statements might furnish a permissible ground for dismissal.  Likewise, positions in public employment in which the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship between them can also be imagined."

391 U.S. at 570, n. 3.  The Court noted that members of the school board were not persons with whom the teacher "would normally be in contact in the course of his daily work."  Id at 570-71.  Therefore, the case did not present any "question of maintaining either discipline by immediate superiors or harmony among coworkers."  Id.

It is undisputed here that Jacobs made unsupported statements asserting corruption in the Philadelphia District Attorney's Office.  Our Court of Appeals has explained that "[t]he public's interest in exposing potential wrongdoing by public employees is especially powerful." Baldassare, 250 F.3d at 198.  Nonetheless, Defendants rightly argue that any public interest was far outweighed by the City of Philadelphia's interest in "promoting the work of the OISI Unit, maintaining a close working relationship with the District Attorney's Office, and protecting the confidentiality of grand jury material." See Pickering, 391 U.S. at 568.

First, it is uncontested that Jacobs divulged information on the podcast regarding the OISI unit's general staffing practices, duties, and investigatory procedures.  He further revealed confidential information regarding the Pownall investigation while the matter was pending.  And he identified by name two witnesses.  Jacobs did not receive permission from the Philadelphia Police Department to discuss these details with the media.  At most, a rational juror could find that Deputy Commissioner Wilson advised Jacobs to discuss his concerns with the Attorney General's Office.  In any event, the Public Affairs Directive is unequivocal that police officers may never disclose "information relative to deployment or staffing," information that would adversely affect "the police investigation and

-24-

prosecution of a crime," and "[a]ny information related to a
Police involved discharge/shooting."  §§ 3(B), (I).

Jacobs's statements here were in clear violation of
the Philadelphia Police Department's Directives.  Those
Directives were intended to protect the integrity and efficacy
of police investigations and unresolved criminal prosecutions.
Even if Jacobs's statements did involve a matter of public
concern, the circumstances here favor the employer's interests
as contemplated by Pickering.  See 391 U.S. at 570, n. 3.  He
was one of only six detectives in a special position of trust in
the OISI unit charged with investigating police shootings.  As
an investigator in the Pownall matter, he was sworn to secrecy
before the Pownall grand jury.  Thus, Jacobs was in a
"position[] in public employment in which the need for
confidentiality is so great that even completely correct public
statements might furnish a permissible ground for dismissal."
Id.

He also harmed his working relationship with his
superiors when he acted outside of the chain of command.  The
Court of Appeals for the Eighth Circuit was presented with
similar facts in Tyler v. City of Mountain Home, Ark.  72 F.3d
568 (8th Cir. 1995).  There, a sergeant in the Mountain Home
Police Department was demoted for writing a letter to a sergeant
in the Baxter County Sheriff's Department complaining that

-25-

certain Sherriff's Department deputies had violated a policy of
both the Police and Sheriff's Departments regarding alcohol
breath tests.  Id. at 569.  He brought a Section 1983 action
against the chief of police and the city for violating his right
to free speech.  Id.  The Court of Appeals upheld the district
court's grant of summary judgment on the ground that the
plaintiff did not engage in protected conduct.  Id.  The Court
explained that "a police department has a more significant
interest than the typical government employer in regulating the
speech activities of its employees" because "police departments
function as paramilitary organizations charged with maintaining
public safety and order."  Id. at 570.  By acting outside of the
chain of command, the sergeant in the police department "called
into question his working relationship with his superior
officers and at least potentially impaired the police chief's
ability to control the actions of his subordinates."  See id.;
Pickering, 391 U.S. at 570, n. 3.

          Jacobs likewise acted outside of the chain of command
when he discussed confidential police information on the podcast
without permission from his superiors.  His actions not only
violated the Philadelphia Police Department's Directives but
also went against the explicit guidance of his superior officer,
Deputy Commissioner Wilson.  See id. Jacobs endangered the
effectiveness of his working relationship between himself and

-26-

his superiors.  See id.; Pickering, 391 U.S. at 570, n. 3.

Accordingly, his statements are not protected under Pickering

balancing.  See 391 U.S. at 568.

Second, it is undisputed that during the podcast

Jacobs, among other statements, accused Tripp of being a

criminal and the Philadelphia District Attorney's Office of

operating "almost like a criminal enterprise."  There is no

evidence in the record that Jacobs's comments regarding

corruption in the District Attorney's Office had any basis in

fact.[3]  Nor did he have any basis for his claims that the

District Attorney's Office was conspiring with or improperly

influenced by the Black Lives Matter movement.

Defendants are correct that Jacobs's statements

jeopardized the City of Philadelphia's interest in maintaining a

close working relationship between its Police Department and

District Attorney's Office.  That interest is significantly

greater than the school's interest in prohibiting teachers from

questioning the spending priorities of the school board in

---

3.    The underlying Pownall prosecution has a long and complex
history.  While charges against Pownall were ultimately
dismissed, there is nothing in the public record to indicate any
fabrication of evidence or other corrupt practice by the
Philadelphia District Attorney's Office or the Police
Department.  See Commonwealth v. Pownall, CP-51-CR-0007307-2018
(C.P. Phila. Oct. 17, 2022); Pownall v. Krasner, 675 F. Supp.
3d 517 (E.D. Pa. 2023), appeal docketed, No. 23-2049 (3d Cir.
Nov. 6, 2023);  see also Commonwealth v. Pownall, 278 A.3d 885
(Pa. 2022).

Pickering.  See id. at 568-69.  Unlike a teacher's sparse interactions with a school board member, police detectives work closely with prosecutors.  Id. at 570.  As the Tyler court noted, "the amicable working relationship between the two law enforcement agencies was important."  72 F.3d at 570.  When the detective makes unfounded accusations that the prosecutor is a criminal, "the worst of the worst," and a "clear and present danger," he "seriously undermine[s] the effectiveness of the working relationship between them."  See Pickering, 391 U.S. at 570, n. 3.  If police detectives can act as Jacobs did here, the City of Philadelphia faces a breakdown of the functioning of its criminal justice system.  Accordingly, Jacobs's statements are not protected speech.  See id.

        Third, Jacobs during the podcast identified two witnesses, Freeman and Ellis, whose statements to police matched those in the Pownall grand jury's presentment.[4]  Although the presentment was released to the public, names of witnesses were redacted because Pennsylvania law prohibits "pretrial discovery" of "testimony or other evidence that would disclose the identity

_____

4.   Jacobs argues that this information was already made public in a blog post.  See Ralph Cipriano, Detective: D.A. Tampered with Witness in Officer Involved Shooting, BigTrial.net (November 18, 2018).  However, the blog post summarized Jacobs's First Amended Complaint in this suit.  Jacobs cannot claim that because he previously used this suit to reveal confidential information, he was free to disseminate it further.

of any witness or victim." 234 Pa. Code R. 556.10(b)(5)
(emphasis added).  The prohibition exists to protect such
persons from intimidation.  Id.  In this regard, the need for
Jacobs to maintain confidentiality as to the identity of
witnesses in a grand jury proceeding was "so great" that
revealing such information was "permissible grounds for
dismissal." Pickering, 391 U.S. at 570, n. 3.  Accordingly, his
speech was not protected under the First Amendment.

Even if Jacobs's speech was protected, he did not
suffer retaliation.  See Baloga, 927 F.3d at 752 (second
factor).  It is undisputed that Jacobs retired before the Police
Board of Inquiry held a hearing on the disciplinary charges
against him.  A voluntary retirement, even though prompted by
some action of the employer, is not Section 1983 retaliation
unless "a reasonable person under the circumstances would have
felt compelled to resign." Errington v. City of Reading, No.
22-1073, 2022 WL 17336209 at *2 (3d Cir. Nov. 30, 2022) (citing
Colwell v. Rite Aid Corp., 602 F.3d 495, 502 (3d Cir. 2010));
see also Leheny v. City of Pittsburgh, 183 F.3d 220, 227-28 (3d
Cir. 1999).

Jacobs had the option to dispute the charges at his
disciplinary hearing.  See Errington, 2022 WL 17336209 at *2.
The Philadelphia Police Defendants did not prohibit him from
seeking the advice of counsel.  See id.  Nor did they demote

him, dock his pay, or place him on administrative leave while
the matter was pending.  See id.  Jacobs did not face conditions
so unpleasant that a reasonable person would have felt compelled
to resign.  See id.; Colwell, 602 F.3d at 502.  Therefore, his
voluntary retirement did not amount to retaliation.

Defendants Lieutenant Hendershot, Deputy Commissioner
Wilson, and Inspector Pace are entitled to summary judgment in
their favor.

IV.

Additionally, Jacobs brings a civil conspiracy claim
against the Philadelphia Police Defendants and Tripp.  To
prevail on a conspiracy claim under 42 U.S.C. § 1983, a
plaintiff must establish that "state actors took concerted
action based on an agreement to deprive the plaintiff of his
constitutional rights, and that there was an actual underlying
constitutional violation of the plaintiff's rights."  Harvard v.
Cesnalis, 973 F.3d 190, 207 (3d Cir. 2020) (internal quotations
omitted).

For the reasons stated above, Jacobs did not engage in
constitutionally protected speech when he revealed grand jury
information to Perri.  He also did not engage in
constitutionally protected speech when he revealed confidential
information on the podcast.  Furthermore, he did not suffer any

-30-

retaliation.  Therefore, Jacobs did not suffer any underlying constitutional violation.

There is also nothing in the record to show any agreement among Defendants to violate his rights.  Beginning with the alleged criminal prosecution, there is no evidence of any involvement by Deputy Commissioner Wilson and Inspector Pace.  Separately, Tripp's conversations with Lieutenant Hendershot following the bypass hearing are not evidence of any agreement.  Lieutenant Hendershot was simply relaying information to Tripp without any purpose or plan of action to violate Jacobs's rights.

As to the Philadelphia Police Department's disciplinary charges against Jacobs, there is no evidence that Tripp had any involvement.  Deputy Commissioner Wilson merely referred the matter to Inspector Pace after being notified of the podcast.  Lieutenant Hendershot and Inspector Pace separately and independently conducted investigations into the podcast.  They never met on the subject and separately determined that disciplinary charges were appropriate because Jacobs had violated several directives.  There is simply no evidence of conspiracy.

Defendants are entitled to summary judgment on Jacobs's Section 1983 conspiracy claim.

V.

Defendant Tripp separately argues that her actions were protected by qualified immunity.  Evaluating qualified immunity is appropriate for summary judgment because it is primarily a question of law.  Gruenke v. Seip, 225 F.3d 290, 299 (3d Cir. 2000).  Qualified immunity is not "a mere defense to liability," but rather, it is "an immunity from suit."  Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotations omitted).  The court thus considers the issue separately from its discussion of Jacobs's claims against Tripp.

In Saucier v. Katz, the Supreme Court set forth a two-pronged test for a determination of qualified immunity: (a) whether a constitutional or federal right has been violated; and (b) whether that right was "clearly established."  533 U.S. 194, 201 (2001).  If there is no violation or if the right was not clearly established, then the actor is protected by qualified immunity.  Id.  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

This court has found that Jacobs did not suffer any violation of his constitutional rights.  Thus, the court need not consider the second prong of the Saucier analysis.

-32-

Even if Tripp did violate Jacobs's First Amendment rights by calling him before the Pownall grand jury, she at that point had absolute immunity.  The Supreme Court held over four decades ago that prosecutors "are absolutely immune from liability under § 1983 for their conduct before grand juries." Imbler v. Pachtman, 424 U.S. 409, 431 n.33 (1976).  Our Court of Appeals held that "direct solicitations of testimony for use in the grand jury proceedings . . . are encompassed within the preparation necessary to present a case and therefore are immunized as involving the prosecutors' advocacy functions." Rose v. Bartle, 871 F.2d 331, 344 (3d Cir. 1989) (internal quotations omitted).  Even when the grand jury was convened to investigate and recommend charges rather than to indict, a prosecutor has absolute immunity from suit.  See Zimmerman v. Corbett, No. 1:13-CV-02788, 2015 WL 539783, at *7 (M.D. Pa. Feb. 10, 2015); see also Rose, 871 F.2d at 345.  Accordingly, Tripp's conduct before the grand jury was protected by absolute immunity.

VI.

Jacobs has also filed a motion for summary judgment. Viewing the facts in the light most favorable to Defendants, for the reasons stated above, the court will deny his motion.